**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| DEKA INVESTMENT GmbH, DEKA INTERNATIONAL S.A. LUXEMBURG, DEKA FUNDMASTER INVESTMENTGESELLSCHAFT mbH, INTERNATIONAL FUND MANAGEMENT S.A. LUXEMBURG, and METZLER INVESTMENT GmbH, | **FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

DEKA INVESTMENT GmbH, DEKA
INTERNATIONAL S.A. LUXEMBURG,
DEKA FUNDMASTER
INVESTMENTGESELLSCHAFT mbH,
INTERNATIONAL FUND MANAGEMENT
S.A. LUXEMBURG, and METZLER
INVESTMENT GmbH,

                 Plaintiffs,

vs.

WACHOVIA CORPORATION, et al.,

                 Defendants.

No. 09 Civ 7920(RJS)

---

FÖRSTA AP-FONDEN,

                 Plaintiff,

vs.

WACHOVIA CORPORATION, et al.,

                 Defendants.

No. 09 Civ. 8205 (RJS)

---

STICHTING PENSIOENFONDS ABP,

                 Plaintiff,

vs.

WACHOVIA CORPORATION, et al.,

                 Defendants.

Master Docket No. 09 Civ. 4473 (RJS)

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................ 11

III.   THE PARTIES.................................................................................................... 12

       A.   PLAINTIFFS ............................................................................................ 12

            1.    The Deka Plaintiffs .................................................................. 12

            2.    Metzler ...................................................................................... 13

       B.   DEFENDANTS ........................................................................................ 14

            1.    Wachovia ................................................................................... 14

            2.    Individual Defendants............................................................... 15

IV.    CONTROL PERSON ALLEGATIONS/GROUP PLEADING........................ 17

V.     BACKGROUND ................................................................................................ 18

       A.   THE U.S. MORTGAGE CRISIS ............................................................. 18

            1.    Subprime Mortgages Become Attractive to Lenders................ 19

            2.    The Proliferation of Financial Instruments Backed By U.S.
                  Residential Mortgages ............................................................. 21

       B.   INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY
            EARLY 2006............................................................................................ 25

       C.   INDICATORS THAT SECONDARY MARKETS FOR MBSS AND CDOS WERE
            DETERIORATING BY FEBRUARY 2007................................................. 27

VI.    DEFENDANTS' FRAUDULENT SCHEME ................................................... 30

       A.   WACHOVIA PUBLICLY TOUTS THE "PRISTINE CREDIT QUALITY" OF THE
            GOLDEN WEST PORTFOLIO ................................................................. 30

       B.   WACHOVIA CONCEALS THE TRUTH ABOUT THE GOLDEN WEST PORTFOLIO........ 32

            1.    Defendants Mislead Investors by Claiming that Pick-a-Pay
                  Mortgages Were Originated With Strict Underwriting Guidelines .......... 34

            2.    Defendants Mislead Investors By Repeatedly Citing LTV Ratios
                  That Did Not Accurately Reflect The Current Risks Inherent In
                  The Pick-a-Pay Portfolio........................................................... 34

3.   Defendants Mislead Investors Because The 7.5% Annual Payment Cap and 10-Year "Recast" Period Did Not Eliminate The Risk Of "Payment Shock," But Merely Delayed It ................................................. 36

C.   WACHOVIA CASTS ASIDE ITS TRADITIONAL LENDING PRACTICES AND ADOPTS A RISKIER APPROACH ........................................................................... 38

1.   Underwriting Standards Were Weakened to Increase Originations and Boost Profits ................................................................. 40

2.   Wachovia Incentivized Employees to Push Pick-a-Pay Loans on Unsuspecting, Poorly-Qualified Borrowers ............................. 42

3.   Appraisals Related to Wachovia's Loans Were Improperly Inflated ....... 45

D.   WACHOVIA CONCEALS THE TRUTH ABOUT ITS HOLDINGS OF CDOS AND RMBS ................................................................................................... 47

E.   WACHOVIA'S FALSE AND MISLEADING STATEMENTS CONCERNING ITS PICK-A-PAY PORTFOLIO, CDO AND RMBS HOLDING AND EXPOSURE TO SUBPRIME-RELATED LOSSES ARE USED TO PROP UP FINANCIAL RESULTS .......... 47

VII.   THE TRUTH BEGINS TO EMERGE ............................................................................ 49

A.   WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING GROWING LOSSES IN ITS PICK-A-PAY LOAN PORTFOLIO ....................................... 49

B.   WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS EXPOSURE TO SUBPRIME RMBSS AND CDOS ...................................................... 56

C.   IN THE WAKE OF ITS COLLAPSE, THE TRUE EXTENT OF WACHOVIA'S FRAUD IS REVEALED ................................................................................. 60

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 61

A.   MAY 7, 2006 PRESS RELEASE ............................................................................. 62

B.   MAY 8, 2006 CONFERENCE CALL ......................................................................... 63

C.   MAY 12, 2006 CONFERENCE CALL ....................................................................... 64

D.   MAY 16, 2006 CONFERENCE CALL ....................................................................... 65

E.   JULY 20, 2006 CONFERENCE CALL ....................................................................... 65

F.   DECEMBER 28, 2006 AMERICAN BANKER ARTICLE .................................................. 67

G.   JANUARY 23, 2007 CONFERENCE CALL .................................................................. 68

H.   WACHOVIA'S 2006 FORM 10-K ............................................................................ 69

I.   APRIL 16, 2007 CONFERENCE CALL ...................................................................... 72

J.   WACHOVIA'S FIRST QUARTER 2007 FORM 10-Q .................................................... 76

K.   MAY 17, 2007 PRESS RELEASE ............................................................................. 76

| | | |
|---|---|---|
| L. | JULY 20, 2007 CONFERENCE CALL | 77 |
| M. | WACHOVIA'S SECOND QUARTER 2007 FORM 10-Q | 80 |
| N. | OCTOBER 19, 2007 CONFERENCE CALL | 81 |
| O. | WACHOVIA'S THIRD QUARTER 2007 FORM 10-Q | 82 |
| P. | NOVEMBER 9, 2007 CONFERENCE CALL | 82 |
| Q. | NOVEMBER 14, 2007 CONFERENCE CALL | 85 |
| R. | JANUARY 22, 2008 CONFERENCE CALL | 87 |
| S. | JANUARY 30, 2008 CONFERENCE CALL | 92 |
| T. | FEBRUARY 13, 2008 CONFERENCE CALL | 93 |
| U. | WACHOVIA'S 2007 FORM 10-K | 96 |
| V. | MARCH 12, 2008 CONFERENCE CALL | 96 |
| W. | APRIL 14, 2008 CONFERENCE CALL | 98 |
| X. | JULY 22, 2008 AND SEPTEMBER 9, 2008 CONFERENCE CALLS | 104 |
| IX. | WACHOVIA'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER | 105 |
| A. | DEFENDANTS KNEW THAT WACHOVIA DID NOT EMPLOY STRICT UNDERWRITING STANDARDS IN ITS ORIGINATION OF PICK-A-PAY LOANS | 105 |
| B. | DEFENDANTS KNEW THAT EMPLOYEES WERE INCENTIVIZED TO PROMOTE PICK-A-PAY LOANS WITHOUT REGARD TO RISK MANAGEMENT STRATEGIES | 106 |
| C. | HIGHLY UNUSUAL AND SUSPICIOUS INSIDER STOCK SALES BY THOMPSON AND OTHER INDIVIDUAL DEFENDANTS CREATE A STRONG INFERENCE OF SCIENTER | 109 |
| D. | GOVERNMENT INVESTIGATIONS CREATE A STRONG INFERENCE OF SCIENTER | 112 |
| | 1. The SEC's Investigation Into Defendant Steel | 112 |
| | 2. The SEC Launches an Investigation into Golden West's Lending Practices | 113 |
| | 3. The SEC Recovers More Than $7 Billion From Defendant Wachovia Securities | 113 |
| E. | WACHOVIA'S NUMEROUS AND EGREGIOUS VIOLATIONS OF GAAP AND SEC REGULATIONS IN ITS FINANCIAL REPORTING CREATE A STRONG INFERENCE OF SCIENTER | 114 |
| X. | WACHOVIA'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS | 116 |

A.   OVERVIEW OF WACHOVIA'S GAAP AND SEC REGULATION VIOLATIONS ......... 116

B.   APPLICABLE ACCOUNTING PRINCIPLES AND SEC REGULATIONS ...................... 119

C.   WACHOVIA'S SPECIFIC VIOLATIONS OF GAAP ...................................................... 124

    1.   Mounting Loan Losses Went Unrecorded ................................................ 125

    2.   Goodwill was Carried at Amounts Far in Excess of Realizable Value ............................................................................................................ 128

    3.   Wachovia Consistently Overstated the Value of Certain Investments ................................................................................................. 131

    4.   Wachovia Misrepresented and Failed to Follow Its Disclosed Accounting Policies ................................................................................... 139

    5.   Wachovia Failed To Consolidate Certain Off-Balance Sheet Arrangements ........................................................................................... 141

    6.   Wachovia's Financial Statements Should Have Been Restated ............. 143

    7.   Overstated Underwriting Revenue on CDO Securitizations .................. 146

    8.   Wachovia Manipulates ARS Auctions to Hide Losses ........................... 148

    9.   Wachovia Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting .................. 155

XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 158

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE ........................................................................................ 158

XIII.   LOSS CAUSATION .................................................................................................... 159

COUNTS .................................................................................................................................. 168

COUNT I FOR VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER FOR ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS ............................................................................ 168

COUNT II FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS) ..................................................... 170

COUNT III COMMON LAW FRAUD FOR INDUCING PLAINTIFFS TO PURCHASE WACHOVIA STOCK ......................................................................... 171

COUNT IV COMMON LAW FRAUD FOR INDUCING PLAINTIFFS TO HOLD THEIR WACHOVIA STOCK ............................................................................... 172

COUNT V NEGLIGENT MISREPRESENTATION FOR INDUCING PLAINTIFFS TO
    PURCHASE WACHOVIA STOCK ............................................................ 174

COUNT VI NEGLIGENT MISREPRESENTATION  FOR INDUCING PLAINTIFFS
    TO HOLD WACHOVIA STOCK................................................................... 176

COUNT VII CIVIL CONSPIRACY ...................................................................... 179

XIV.   PRAYER FOR RELIEF ........................................................................... 180

JURY DEMAND ..................................................................................................... 181

Plaintiffs Deka Investment GmbH, Deka International S.A. Luxemburg, Deka Fundmaster Investmentgesellschaft mbH, and International Fund Management S.A. Luxemburg (the "Deka Plaintiffs"), Metzler Investment GmbH ("Metzler"), Första AP-Fonden ("Forsta"), and Stichting Pensioenfonds ABP ("ABP") (collectively, the "Plaintiffs"), by their undersigned counsel, make this first amended consolidated complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents; press releases; new articles; analysts' statements; conference call transcripts and presentations; and transcripts from speeches and remarks given by the defendants. Plaintiffs make the following allegations against Wachovia Corporation ("Wachovia" or the "Company"), Wells Fargo & Company ("Wells Fargo") as successor-in-interest to Wachovia, G. Kennedy Thompson ("Thompson"); Thomas J. Wurtz ("Wurtz"), Donald K. Truslow ("Truslow"), Lanty L. Smith ("Smith"), and Robert K. Steel ("Steel") (collectively, "Defendants"). Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.    This action involves two related, but distinct frauds. First, from 2006 through sometime in 2007, Wachovia engaged in extremely risky lending practices, but told the market that its lending was prudent and conservative. Second, as the housing market began to deteriorate, and those risky lending practices began to manifest themselves in a high rate of loan defaults and impaired assets, Wachovia misled the market by claiming it was not being impacted by the negative changes in the housing market and subprime loans. In addition, it took

insufficient reserves for its impaired assets in an attempt to support its claim that it was not being affected. Either of these frauds could have been disclosed, but neither was.

2.       This two-pronged fraud arises from Wachovia's ill-conceived plan to expand its business at all costs, including by deceiving investors when that disastrous business plan failed. Anxious to capitalize on what it perceived to be a rare opportunity in the U.S. real estate market, Wachovia hastily acquired a mortgage lender with a risky portfolio of subprime loans and then launched its signature product, a payment-option, adjustable rate mortgage known as Pick-a-Pay, throughout the organization. When analysts and investors raised concerns, Wachovia repeatedly assured them that Wachovia's conservative underwriting and origination practices, high-quality credit standards, risk management strategy and strong liquidity made it immune from the effects of a deteriorating mortgage market and that, unlike its competitors, it would emerge from the mortgage industry meltdown unscathed.

3.       In actuality, Defendants knew that Wachovia's growth strategy was anything but conservative. Basic underwriting standards, such as minimum credit scores and income verification, had been scrapped, and employees and outside brokers were trained to use high-pressure tactics to generate new originations, often without proper disclosure to potential borrowers. Thus, contrary to Defendants' public statements, Wachovia had taken an inherently risky product and marketed it to a risky class of borrowers, a very dangerous combination even when economic conditions are favorable. Defendants then compounded the degree of risk by failing to monitor the portfolio for signs of distress.

4.       Moreover, Wachovia's poorly-timed expansion into the mortgage industry and its high-risk portfolio of subprime assets meant that, as the mortgage market weakened, it stood to lose billions of dollars. In an attempt to conceal the Company's precarious financial situation

and maintain its stock price at an artificially high level, Defendants adopted a strategy of deliberate and willful deception, by, among other things, failing to properly value Wachovia's assets, maintaining inadequate reserves to cover losses, and outright denying that Wachovia was sitting on one of the largest and most toxic portfolios of subprime assets in the banking industry. Defendants also employed numerous accounting and other financial manipulations to distort key measures of Wachovia's stability and liquidity so that investors would not learn the truth about its financial condition.

5.     Wachovia's demise began in May 2006, when it announced that it would acquire Golden West Financial Corp. ("Golden West"), a California-based residential mortgage portfolio lender, for more than $24 billion.  By this time, many analysts were already predicting that the U.S. housing market had reached its peak and that the housing bubble was about to burst. Nevertheless, Wachovia, led by then-CEO G. Kennedy Thompson, went on a campaign to convince investors that it had bagged "a crown jewel" of the mortgage business.

6.     Golden West's signature product was the Pick-a-Payment ("Pick-a-Pay") mortgage, a payment-option, adjustable rate mortgage so named because borrowers could choose from four different payment options every month.  The first two options amortized the mortgage in the same manner as more conventional products, with borrowers making a payment that covered principal and interest sufficient to pay off the loan in either a 30 or 15 year term.  The third option provided for an interest-only payment.  The last, and, as detailed herein, the most nefarious option, allowed the borrower to elect to pay a minimum amount that did not even cover monthly accrued interest.  The remaining interest was then added to the outstanding principal. This creates what is known as "negative amortization," because with each minimum monthly payment, the borrower's total debt rises, which ultimately locks in the borrower to a much higher

monthly payment when the mortgage automatically "recasts" in five or ten years to the fully-amortizing amount.

7.      In mid-2006, Wachovia hastily put together a deal to acquire Golden West and its $124 billion Pick-a-Pay and other adjustable-rate mortgage loan portfolio. Prior to and after that acquisition, the U.S. housing market continued to deteriorate. New home sales stalled, and median home sale prices reached a plateau. Interest rates were on the rise. Most significantly, mortgage default rates began to spike as low introductory rates on mortgages originated twelve to twenty-four months earlier began to reset to fully-indexed levels. Certain markets, such as California and Florida, which had experienced the biggest upswings during the preceding housing boom, were poised for the biggest declines. These events also began to affect secondary markets on which collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBSs") were traded as investors became leery of the increasing risk and sought to unwind their positions.

8.      Investors and analysts expressed concern that Golden West's portfolio, which was heavily concentrated with adjustable rate mortgages, especially in California, would be impacted by these changing economic conditions. However, in the face of a shifting tide, Wachovia pressed onward, determined to continue its expansion into new markets. During numerous conference calls and presentations, Thompson reassured investors and critics of the Golden West merger by describing it as a "low risk" transaction and emphasizing the "strong credit culture" and "pristine credit quality" of the Golden West loan portfolio.

9.      The Golden West merger closed on October 1, 2006. Thompson proudly proclaimed, "The combination of Wachovia and Golden West greatly enhances our market presence, product set and mix of businesses, enabling us to deliver a stronger value proposition

4

for our customers and shareholders." The combined company had an estimated $700 billion in assets and a $107 billion market capitalization.

10.    Although Wachovia outwardly projected a celebratory mood, the storm clouds continued to gather. On October 4, 2006, just days after the Golden West merger was consummated, five federal agencies published final guidance in the *Federal Register* on non-traditional mortgage product risks, which included "payment option" adjustable-rate mortgages, such as the then-newly-minted Wachovia Pick-a-Pay mortgage. The guidance explicitly counseled lenders to, *inter alia*, "maintain sound loan terms and underwriting standards despite competitive pressures," "verify the borrower's income," "adopt more robust risk management practices," and "maintain capital at levels that reflect portfolio characteristics." Further, lenders were advised to pay attention "to appropriate legal review and to using compensation programs that . . . improperly encourage lending personnel to direct consumers to particular products."

11.    From October 2006 to September 2008, unbeknownst to investors and contrary to its public statements, Wachovia arrogantly proceeded with its plan to integrate Golden West in defiance of the guidance of five federal agencies.

12.    First, Wachovia, which historically had focused on traditional, fixed-rate mortgages, became captivated by the Pick-a-Pay product and its potential to boost earnings in the short term. Thus, at a time when all indications suggested that the mortgage market was cooling and other mortgage lenders began failing, Wachovia threw all its resources behind expanding the Pick-a-Pay loan program, without disclosing that the risks were materially higher and the value of these mortgages was materially lower than represented at the time.

13.    Second, throughout 2007 and 2008, as competitive pressure mounted, Wachovia dove deeper and deeper into the abyss by employing methods to continue to feed its Pick-a-Pay

addiction and disguise the fact that its portfolio was becoming increasingly risky. As detailed herein, these methods included, *inter alia*, relaxing underwriting standards, incentivizing employees to sell Pick-a-Pay mortgages over conventional mortgages, increasingly relying on outside brokers to generate new sales, lowering required monthly minimum payments, and using out-dated information to track borrower delinquency and assess credit risk. As a result, Wachovia repeatedly overstated the value of its loan portfolio and failed to take adequate loan reserves to preserve its capital position.

14.     Third, when the effects of the housing market decline began to ripple through secondary markets, Wachovia concealed the extent of its holdings of collateralized debt obligations ("CDOs") and mortgage-backed securities. With Wachovia's "burgeoning asset-backed and mortgage-backed securities businesses," which securitized billions of dollars in CDOs and other mortgage-backed securities, Defendants were in a position to know that the value of those holdings had significantly declined and that certain hedges against risk were in jeopardy. Nevertheless, Defendants prevented Wachovia from taking adequate write-downs in a timely manner, further distorting the Company's balance sheet and allowing it to keep its stock at levels that did not accurately reflect its financial position.

15.     From 2006 through 2008, Wachovia adamantly denied that it was experiencing any problems. To allay investors' doubts, Wachovia repeatedly issued reassuring but inaccurate statements indicating that Pick-a-Pay mortgages were distinguishable from and superior to other subprime mortgages because: (1) Wachovia employed strict underwriting guidelines, which required "FICO driven credit scoring" and "diligent and methodical documentation standards" to ensure that "borrowers always qualified at the fully indexed rate"; (2) annual payment increases were capped at 7.5% to limit immediate "payment shock" from adjustable rate resets; (3) there

was a ten-year delay before Pick-a-Pay mortgages recast to the fully-amortizing rate; (4) low loan-to-value ratios at origination created an equity cushion in the event of default; and (5) employees were trained on Pick-a-Pay and "responsible cash-flow management."

16.     Moreover, Defendants told investors on numerous occasions that Wachovia was immune from the effects of the mortgage industry meltdown.  In one conference call on January 23, 2007, Defendant Thompson stated, "we just don't think we are going to be impacted by it like some in that business will be. We are very comfortable with that."  This statement was false when made because, while not disclosed at the time, delinquencies in Pick-a-Pay mortgages and losses on CDOs and RMBSs were mounting materially, and Wachovia had failed to set aside adequate reserves to cover the decline in those assets.

17.     In April 2007, Wachovia even went so far as to assure investors that "if anything, we think that any changes [in the mortgage industry] might in fact *benefit* us relative to our competition … [I]t would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion other than we are very responsible underwriters and servicers of these clients."

18.     By November 2007, Wachovia began to sink under the weight of its deception as it was forced to announce charge-offs for losses in its loan and trading portfolios, including growing delinquencies in Pick-a-Pay mortgages, as well as losses on previously-concealed holdings of subprime CDOs and RMBSs.  Wachovia also announced for the first time that it would "bring the Golden West portfolio on to a consistent methodology with the rest of the company in how we treat these loans."  Up to that point, investors were unaware that Wachovia's earnings did not reflect that loans that had gone delinquent for more than six months remained on the books.  These partial, but misleading, disclosures continued into 2008, as Wachovia leaked

7

out information concerning increasing losses and further write-downs, which were attributed to "market disruptions," but which, in reality, were indications that Wachovia had hidden from investors the true value of its assets and the inherent risks in its loan and trading portfolios.

19.     In April 2008, Wachovia, which only weeks earlier had assured investors that its capital and liquidity positions remained stable, announced (i) plans to raise $7 billion in capital in two concurrent, dilutive stock offerings, (ii) a reduction in quarterly dividend, and (iii) increases in loan loss reserves, particularly to cover escalating losses in Pick-a-Pay mortgages. Wachovia also implicitly acknowledged that its allegedly "strict underwriting standards," which were supposed to ensure a low-risk loan portfolio, were a complete farce when it announced implementation of a new model to better estimate credit costs in the Pick-a-Pay portfolio and tightening of home mortgage lending standards so as to require minimum credit scores and verification of borrowers' assets and employment before making loans.[1]  However, as investors would soon learn, these remedial measures were all too little, too late.

20.     By the end of the summer of 2008, Thompson had been ousted as Chairman and CEO and the Pick-a-Pay product had undergone a major overhaul, which many considered an admission by Wachovia that "a lot of borrowers were put into loans they either didn't understand or couldn't afford and that a further surge in defaults is inevitable."[2]  Interim CEO Lanty Smith admitted, "there's been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it."

21.     In a last ditch effort to hold off the rushing waters, new-CEO Robert K. Steel appeared on the CNBC program "Mad Money" in mid-September 2008, and told host Jim

---

[1] *See* "Wachovia tightens home mortgage standards," April 11, 2008, TRIANGLE BUSINESS JOURNAL, available at http://www.triangle.bizjournals.com/triangle/stories/2008/04/07/daily43.html.

[2] *See* Dean Foust, "Pick-A-Pay Goes Away...," BUSINESS WEEK, June 30, 2008, available at http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

Cramer that out of $500 billion in loans, only $10 billion were bad.   To prevent further immediate declines in Wachovia's stock, which had been steadily declining for months, Steel also reassured investors that "We thought about bringing partners in to work with us on the portfolio. But, for now, we feel like we can work through this, and that's the strategy. ... [Wachovia] ha[s] a great future as an independent company..."  Steel's remarks were so clearly false when made that they led to an SEC investigation.

22.     Only two weeks later, as speculation mounted that Wachovia was on the verge of being placed in receivership by the FDIC, Wachovia's deception was finally and completely revealed when, on September 29, 2008, it was announced that Wachovia would be acquired by Citigroup in a deal worth approximately $1 per share – a market capitalization loss of approximately $109.8 billion from 2007.

23.     Wachovia was subsequently acquired by Wells Fargo in a stock-for-stock transaction worth approximately $12.7 billion, or roughly $6.50 per share – substantially less than Wachovia had paid just a few years earlier to acquire Golden West.   In the wake of Wachovia's collapse, investors finally learned what Wachovia had concealed since its ill-fated acquisition of Golden West, as Wachovia announced in October 2008 a net loss of $23.9 billion, which included $6 billion to increase loan loss reserves, as well as $1.9 billion in net charge-offs. Moreover, expectations for total losses in the Pick-a-Pay portfolio increased to 22% from just 12% in the prior quarter.   Wachovia's quarterly loss was the largest quarterly net loss by a bank ever and the largest loss incurred by a U.S. financial institution since the subprime mortgage meltdown began.   The October 2008 loss, when combined with the $10 billion in losses taken earlier in the year, wiped out nearly all the profit Wachovia has earned since 2001.

24.    To make matters worse, the October 2008 disclosure was just the tip of the iceberg. According to an article published by *Bloomberg*, Wells Fargo Chief Executive Officer John Stumpf said as recently as December 10, 2008 that "Wachovia's $482.4 billion loan portfolio will produce $60 billion in losses over the next three years, with about 60 percent coming from option adjustable-rate mortgages."[3]  This stands in stark contrast to Defendant Steel's remarks just months earlier that losses in the loan portfolio were expected to be approximately $10 billion.

25.    On February 27, 2009, Wells Fargo admitted in its 2008 Form 10-K that:

> Certain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments. . . . ***Of the $446.1 billion of loans acquired in the Wachovia merger, $93.9 billion were determined to be credit-impaired.***

26.    The Deka Plaintiffs purchased over $43 million in Wachovia common shares between May 2006 and September 2008 in reliance on financial information and disclosures which, unbeknownst to the Deka Plaintiffs, were materially false and misleading. The Deka Plaintiffs lost over $26 million as a result of their purchases of these securities and their decline in value as it was revealed that, contrary to Wachovia's assurances, the inherent risks in Wachovia's loan portfolio and its exposure to subprime assets meant that Wachovia stood to lose billions as market conditions worsened.

27.    Plaintiff Metzler Investment GmbH purchased over $17 million in Wachovia common shares between May 2006 and September 2008 in reliance on financial information and disclosures which, unbeknownst to Plaintiff, were materially false and misleading. Metzler lost

---

[3] *See* Ari Levy, "Wells Fargo's Purchase of Wachovia Tested by Economic Crisis," January 1, 2009, available at http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aJx1Gt0NKWgo.

over $11 million as a results of its purchases of these securities and their decline in value as it was revealed that, contrary to Wachovia's assurances, the inherent risks in Wachovia's loan portfolio and its exposure to subprime assets meant that Wachovia stood to lose billions as market conditions worsened.

28.    Plaintiff Första AP-Fonden purchased over $22 million in Wachovia common shares between May 2006 and September 2008 in reliance on financial information and disclosures which, unbeknownst to Plaintiff, were materially false and misleading.  Plaintiff lost over $19.6 million as a result of its purchases of these securities and their decline in value as it was revealed that, contrary to Wachovia's assurances, the inherent risks in Wachovia's loan portfolio and its exposure to subprime assets meant that Wachovia stood to lose billions as market conditions worsened.

29.    Plaintiff ABP purchased over $314 million in Wachovia common shares between May 2006 and September 2008 in reliance on financial information and disclosures which, unbeknownst to Plaintiff, were materially false and misleading.  Plaintiff lost over $217 million as a result of its purchases of these securities and their decline in value as it was revealed that, contrary to Wachovia's assurances, the inherent risks in Wachovia's loan portfolio and its exposure to subprime assets meant that Wachovia stood to lose billions as market conditions worsened.

## II.    JURISDICTION AND VENUE

30.    The claims herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t-1; and common law.

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1332.

32.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the false and misleading statements and omissions were made in or issued from this District.  Wachovia has a substantial presence in New York.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

33.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.     PLAINTIFFS

#### 1.     The Deka Plaintiffs

34.     Plaintiff Deka Investment GmbH ("DI"), formerly Deka Deutsche Kapitalanlagegesellschaft GmbH, was formed through a merger between Deka Investment Management GmbH and Deka Deutsche Kapitalanlagegesellschaft GmbH on April 1, 2002. DI's predecessor was originally founded on August 16, 1956 and remains the foundation of all the investment activities undertaken by entities under the DekaBank Deutsche Girozentrale ("DekaBank") umbrella, including DI.  DI manages assets of more than € 100 billion approximately in equity, bonds and money market funds.  DI controls the underlying mutual funds and acts as attorney-in-fact for them.

35.     Plaintiff Deka International S.A. Luxemburg ("DIL"), a mutual fund company established under the laws of Luxembourg, is a subsidiary of DekaBank.  DIL manages assets of

more than € 2 billion. DIL acquired ordinary shares of Wachovia through open-market purchases.

36.     Plaintiff Deka FundMaster Investmentgesellschaft mbH ("DFM") is an investment management company established under the laws of Germany. DFM is a subsidiary of DekaBank. DFM manages assets of more than € 1.8 billion in equity, bonds, and money market funds. DFM acquired Wachovia shares through open-market purchases on the New York Stock Exchange ("NYSE").

37.     Plaintiff International Fund Management S.A. Luxemburg ("IFM") is an investment fund manager established under Luxembourg law and a subsidiary of DekaBank. IFM suffered losses in connection with its purchases of shares of Wachovia.

38.     Plaintiffs DI, DIL, DFM, and IFM (collectively, the "Deka Plaintiffs") acquired 1,492,110 shares of Wachovia through open-market purchases suffering losses.

### 2.    Metzler

39.     Plaintiff Metzler Investment GmbH ("Metzler") is an investment company under German law and a subsidiary of one of Germany's oldest private banks in uninterrupted family ownership. Its main offices are at Grosse Gallusstrasse 18, in Frankfurt am Main, Germany. Metzler manages over € 20 billion in assets of retail and institutional investors in mutual fund products under the Metzler legal umbrella.

40.     Metzler acquired 518,026 shares of Wachovia through open-market purchases suffering losses.

### 3.    Forsta

41.     Första AP-Fonden ("Forsta") is a global retirement pension fund for every person who is, or ever has been, employed in Sweden. Forsta is one of Sweden's largest pension managers, with net assets of approximately SEK 195 billion as of September 2009 that are

13

allocated among a wide spread of investments around the world. Since its inception in 2001,
Forsta has generated investment earnings of SEK 28 billion as of June 30, 2009. Forsta invests
in equities, fixed income securities, foreign exchange and alternative investments worldwide.

42.     Forsta acquired over 564,300 shares of Wachovia through open-market purchases
suffering losses.

### 4.     ABP

43.     Plaintiff Stichting Pensioenfonds ABP ("ABP"), an entity established under the
laws of the Kingdom of the Netherlands, is the pension fund for public employees in the
governmental and education sectors in the Netherlands. With assets amounting to nearly €150
billion, ABP is one of the three largest pension funds in the world. Its assets represent around
35% of total Dutch pension fund assets, and its client base totals some 2.2 million participants
and retirees (e.g., civil servants, educators, university employees, policemen and firemen). ABP
maintains its office and principal place of business at Oude Lindestraat 70, Postbus 2889, 6401
DL Heerlen, The Netherlands.

### B.     DEFENDANTS

### 1.     Wachovia

44.     At all relevant times herein, defendant Wachovia Corporation ("Wachovia" or the
"Company") was a diversified financial services company, which operated as a financial and
bank holding company, headquartered in Charlotte, North Carolina. It was one of the nation's
largest financial services providers offering a broad range of commercial and retail banking and
brokerage services, along with corporate and investment banking products and services.
Wachovia had operations in twenty-one states, and maintained nationwide retail brokerage,
mortgage lending and auto finance businesses. As of December 31, 2007, Wachovia ranked as
the fourth largest bank in the United States with total assets exceeding $780 billion. According

to the Mortgage Bankers' Association, Wachovia was the seventh leading provider of consumer mortgage loans in the nation.

45.    On December 31, 2008, Wachovia merged with Wells Fargo & Co. ("Wells Fargo"). As part of the merger, Wells Fargo acquired all outstanding shares of Wachovia's preferred securities, which were converted into shares of a corresponding series of Wells Fargo preferred stock having substantially the same rights and preferences. As a result of the merger, Wells Fargo also acquired all of Wachovia's businesses and obligations, including all of its outstanding debt.

46.    Wells Fargo is named herein as a Defendant as the successor-in-interest to Wachovia.

### 2.    Individual Defendants

47.    Defendant G. Kennedy Thompson served as Wachovia's Chief Executive Officer ("CEO") and President from April 18, 2000 until he retired at the request of Wachovia's Board of Directors on June 1, 2008. During that time, Defendant Thompson signed Wachovia's Forms 10-K and 10-Q pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, was quoted in Wachovia's press releases and participated in conference calls with securities and market analysts. Defendant Thompson also signed the Registration Statements for the merger with Golden West and for the merger with A.G. Edwards. Thompson also signed the Registration Statement for Wachovia's April 14, 2008 common stock offering. Defendant Thompson is responsible for the materially false and misleading statements complained of herein. As an executive officer, Defendant Thompson was responsible for the day-to-day operations of the Company.

48.    Defendant Thomas J. Wurtz served as Chief Financial Officer ("CFO") and Senior Executive Vice President from January 31, 2006 until on or about July 24, 2008. During

that time period, Defendant Wurtz signed Wachovia's SEC filings, including, but not limited to, Wachovia's Forms 10-K, 10-Q and 8-K, and participated in conference calls with securities and market analysts. Defendant Wurtz also certified Wachovia's Forms 10-K and 10-Q pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002. Defendant Wurtz also signed the Registration Statements for the mergers with Golden West and A.G. Edwards, and the Registration Statement for Wachovia's April 2008 Offering. Defendant Wurtz is responsible for the materially false and misleading statements complained of herein. As a senior executive officer of Wachovia, Wurtz was responsible for day-to-day operations of Wachovia and his behavior is central to Wachovia's misconduct.

49.    Defendant Donald K. Truslow served as Chief Risk Officer ("CRO") from 2000 until October 2008. As CRO, Truslow reported to CEO Thompson and was responsible for the oversight of Wachovia's operational, credit, interest rate, balance sheet and market risk. Defendant Truslow is responsible for many of the materially false and misleading statements complained of herein.

50.    Defendant Lanty L. Smith was, at all times relevant herein, a member of Wachovia's Board of Directors. Smith also served as Chairman of Wachovia's Board since May 2008 and as interim CEO of Wachovia from June 1, 2008 to July 9, 2008, following the departure of Thompson. Prior to his appointment as interim CEO, Smith was also a member of the Board's Audit Committee and Corporate Governance & Nominating Committee.

51.    Defendant Robert K. Steel was named Chief Executive Officer of Wachovia on July 9, 2008.

52.    The defendants identified in ¶¶ 40-44 are collectively referred to herein as the "Individual Defendants."

16

## IV.   CONTROL PERSON ALLEGATIONS/GROUP PLEADING

53.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Wachovia, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through Wachovia's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Wachovia officers and/or directors.

54.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential, proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

55.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein.  The Individual Defendants knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of securities laws.

56.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions violated these specific requirements and obligations.

57.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or the opportunity to prevent the issuance or cause them to be corrected.   Accordingly, they are responsible for the accuracy of the public reports and statements detailed herein.

## V.     BACKGROUND

### A.     THE U.S. MORTGAGE CRISIS

58.     The current crisis in the U.S. residential mortgage market is a byproduct of the market of approximately seven years ago.  At that time, the Federal Reserve began cutting interest rates dramatically, and the rate on a 30-year fixed rate mortgage was at the lowest levels seen in nearly 40 years.  This presented a unique opportunity for many individuals to achieve the American dream of homeownership.  The combination of increased demand for homes and lower

interest rates fueled a building boom in new homes, a dramatic rise in home prices and increases in origination and lending to new homeowners.   At the same time, lower interest rates and increased liquidity in capital markets broadly depressed risk premiums, and lenders and investors sought riskier opportunities to bolster their investment returns.   This lead to the creation of new financial instruments that bundled newly-originated, riskier mortgages into securities, which re-packaged and spread this risk to investors in secondary markets.

59.   Wachovia was an active participant in both the origination and securitization channels during this period.  Thus, to understand Wachovia's fraud, it is necessary to briefly understand the market forces that converged to create what *The Economist* has called the "biggest financial bubble in history."

### 1.    Subprime Mortgages Become Attractive to Lenders

60.   For lenders, the historically-underserved "subprime borrower" became a very attractive source of potential profit.  In broad terms, a subprime borrower is generally one who has a high debt-to-income ratio (usually 50% or greater), an impaired or minimal credit history, or some other characteristic that is associated with a higher risk of default.  As explained in examination guidance issued by federal regulators:

> The term "subprime" refers to the credit characteristics of individual borrowers.  Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories. Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase. Such loans have a higher risk of default than loans to prime borrowers.[4]

---

[4] *See* Office of the Comptroller of the Currency, *et al.*, "Expanded Guidance for Subprime Lending Programs," available at http://www.fdic.gov/news/news/press/2001/pr0901a.html.

61.     Lenders typically rely on the Fair Isaac Credit Organization ("FICO") credit score to classify a borrower as "prime", "nonprime", or "subprime." FICO defines the FICO score, which ranges from 300 to 850, as "the standard measure of U.S. consumer risk" and "the recognized industry standard in consumer credit risk assessment." A borrower with a FICO score below 660 is generally labeled "subprime."

62.     Additionally, "subprime," when used to describe mortgages, may refer to loans sharing certain underwriting characteristics that increase the likelihood of default, often because the borrower cannot satisfy the underwriting criteria employed for conforming, prime loans. The underwriting features associated with subprime mortgages include: (1) high loan-to-value ("LTV") ratios, often in excess of 80%; (2) minimal or no down payment; (3) low introductory, or "teaser" rates; (4) the option to pay less than the monthly principal and interest payment; and (5) minimal or no documentation or verification of borrower income or assets (otherwise known as "stated income," "no income/no asset verification," "NINA" or "no-doc" loans). In some cases, depending on the collateral and the lender's underwriting criteria, loans bearing some of these hallmarks may have been classified as "Alt-A" or "nonprime," a category falling somewhere between prime and subprime.

63.     The LTV ratio was particularly important in assessing the risk associated with a subprime loan. The LTV ratio compares the amount loaned to the total appraised value of the property. For example, if a borrower obtains a mortgage for $70,000 to purchase a house worth $100,000, the LTV ratio is 70%. Lower LTV ratios are indicative of less risk for two reasons. First, a borrower with low loan balance relative to the value of the property is less likely to default, because he has too much equity at stake to risk losing. Second, in the event of default, the built-in equity cushion protects the lender from loss, because even after the costs of

foreclosure are factored in, the lender is still at a greater likelihood of recouping the original loan amount.

64.     Once lenders whet their appetite, they became increasingly willing to undertake additional risk (*e.g.*, loans with higher LTV ratios and less borrower documentation) in exchange for the boost in profits.  Subprime mortgage originations grew from $173 billion in 2001 to a record level of $665 billion in 2005, which represented an increase of nearly 300%.[5]  As competition for this lucrative new pool of borrowers increased, lenders offered consumers a new array of loan products, oftentimes without consideration as to whether borrowers really understood the terms or ultimately had the ability to repay.

### 2.     The Proliferation of Financial Instruments Backed By U.S. Residential Mortgages

65.     Lenders were also motivated to engage in riskier lending practices because of the expansion in the market for securities backed by pools of mortgages.  These mortgage-backed securities ("MBSs") and collateralized debt obligations ("CDOs") enabled lenders to sell mortgages to third parties, thereby transferring the risk of delinquencies and defaults on the mortgages they originated.  Thus, lenders could generate profits by ramping up originations, regardless of loan quality.

66.     MBSs and CDOs are both types of asset-backed securities ("ABSs").  ABSs are not a new concept.  The Government National Mortgage Association ("Ginnie Mae") had been bundling and selling securitized mortgages as ABSs for years.  However, the collateral underlying Ginnie Mae's ABSs was subject to strict criteria that earned these securities AAA ratings from the credit rating agencies.  As the real estate market exploded, the ABS was used as

---

[5] *See* Eric Petroff, "Who Is To Blame For The Subprime Crisis?", available at http://investopedia.com/printable.asp?a=/articles/07/subprime-blame.asp.

the platform to propagate new, more creative financial instruments that often bundled and re-bundled subprime mortgages or loans to borrowers with less-than-stellar credit.

67.     For instance, the residential mortgage-backed security ("RMBS") bundled subprime residential mortgages. To create an RMBS, an originator or underwriter purchased a large number of individual residential mortgages (often numbering in the thousands) from banks and/or non-bank mortgage lenders (i.e., Wachovia). Generally, the purchased mortgages underlying an RMBS possessed similar characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that they could be pooled together and rated accordingly.

68.     Once the originator or underwriter purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold them to a "special purpose vehicle" ("SPV"). An SPV is a separate, bankruptcy-remote legal entity created by the originator in order to transfer the risk of the underlying mortgages off the originator's balance sheet. The SPV takes title of the individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool. RMBSs are issued in several unequal classes called tranches, ranging from "High Grade" (AAA and AA-rated bonds), "Mezzanine" (BBB- to B-rated bonds), or an unrated equity tranche sometimes called the "residual."

69.     The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages through the prioritization of payments and the apportionment of losses among the different classes of bonds. Typically, the AAA-rated tranche of the RMBS received first priority on cash flows from the borrowers on the underlying mortgages (otherwise known as "remittance payments") but received a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders received the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that

the underlying pool of mortgages experienced defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

70.     In most instances, an RMBS originator or underwriter worked closely with one of the three rating agencies, Moody's Corp. ("Moody's"), Standard & Poor's ("S&P") or Fitch, to determine the right combination of mortgages to include as collateral for a given RMBS. The goal for an originator or underwriter was to fill each mortgage pool with high interest paying but riskier collateral that would still allow for an AAA-rated class of RMBS. As set forth above, riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans. By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV. This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

71.     Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors. The SPV transferred proceeds from the sale of the bonds to the originator in consideration for the underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

72.     The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), illustrates the creation and structure of a typical RMBS issuance:



73.     While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective.  Wachovia, among others, was also involved in developing more complex structured finance products designed to profit from Mezzanine subprime RMBS, most notably Collateralized Debt Obligations, or CDOs.

74.     Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  It is created in very much the same way as RMBSs, the key difference being that while RMBSs are backed by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches.

75.     Just as with RMBSs, CDO originators amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO.  Instead of warehousing residential mortgages, a CDO originator collected tranches of RMBS.  In the course

of this process, the CDO originator had to evaluate the quality of the RMBS tranches that would be used to collateralize the CDO. In other words, the originator had to decide if it was creating a "Mezzanine CDO," which typically would be collateralized by lower BBB/BB-rated RMBS tranches, or a "High Grade CDO," which typically would be collateralized by AAA/AA-rated RMBS tranches.

76.     CDO originators, like Wachovia, earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors.

### B.    INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY EARLY 2006

77.     By late 2005, three key indicators used by industry experts to assess the state of the mortgage market pointed in the direction of a slowdown in mortgage markets.   First, as illustrated by the chart below, the Housing Price Index, which measures changes in home prices, peaked in mid-2005 and then began to decline precipitously in 2006:



OFHEO HOUSE PRICE INDEX HISTORY FOR USA
Seasonally-Adjusted Price Change Measured in Purchase-Only Index

78.     Second, as housing prices declined, interest rates began to rise from their historically-low levels:



79.     This combination was devastating for U.S. borrowers who over-extended themselves by purchasing homes based on their ability to pay initial lower monthly payments marketed by lenders as part of "payment-option" loan products (such as Wachovia's Pick-a-Pay) or other adjustable rate mortgages ("ARMs").  The original theory behind these mortgages was that as long as home values continued to rise, the borrower could use the increased equity to "catch-up" on their payments and refinance the mortgage when the low introductory or adjustable rate was about to expire.

80.     Unfortunately, with rising interest rates, declining home prices and expiring introductory rates, many borrowers began to experience "payment shock" as monthly payments skyrocketed to account for recasting of interest rates and resetting of payments to fully-amortizing levels.  As a result, beginning in 2005, mortgage default rates, the third indicator of the state of the mortgage market, rose drastically, particularly for subprime loans, as illustrated in the chart below:



Mortgage delinquency rates, 2001–07

NOTE: The data are monthly. Prime-mortgage data extend through April 2007, and subprime-mortgage data extend through May 2007. Delinquency rate is the percent of loans ninety days or more past due or in foreclosure. Prime mortgages include near-prime mortgages.
SOURCE: First American LoanPerformance.

81.     The sharp increases in mortgage delinquency rates, coupled with stagnant housing prices, should have alerted banks, like Wachovia, to the possibility that subprime and other ARM borrowers would not be able to repay loans.  Wachovia, which repeatedly touted its conservative approach, its sophisticated risk modeling tools, and its active and diligent risk management, must have been aware of the spike in loan delinquencies beginning in mid-2005 and must have witnessed a similar spike in delinquencies in its own mortgage loan portfolio.

### C.     INDICATORS THAT SECONDARY MARKETS FOR MBSS AND CDOS WERE DETERIORATING BY FEBRUARY 2007

82.     The spike in mortgage delinquencies also impacted the value of RMBSs and CDOs, which Wachovia had amassed in its loan portfolio and which were tied to the revenue streams that the underlying subprime mortgages were supposed to generate.  This rise in delinquencies, in conjunction with declining home values and rising interest rates, lead to tightening lending standards, making it that much more difficult for subprime borrowers to

refinance their way out of resetting mortgages they could not afford, and which, in turn, exacerbated already-deteriorating market conditions.

83.     By February 2007, it was widely recognized that this convergence of factors would materially impair even the highest rated MBSs and most senior tranches of CDOs. This decline in value was reflected in a specialized index, the ABX.HE ("ABX Index"), which was designed in January 2006 by a consortium of banks, including Wachovia, to track the value of subprime RMBS tranches.   Specifically, the ABX Index measures the cost of purchasing protection for a subprime RMBS.   Thus, if the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value. Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgages.

84.     As set forth in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted, evidencing that the cost of insuring subprime RMBSs had increased dramatically.   This corresponds to the rise in payment delinquencies reported at the same time.   Investors thus anticipated that the risks associated with subprime RMBS would almost certainly cause large losses.

Figure 5: ABX.BBB 06-2



Source: Markit

85.     Since CDOs were backed by subprime RMBS tranches, even highly-rated CDOs were in danger of suffering severe devaluation.  On February 18, 2007, the front page of the *New York Times* Business Section referred to a report by Mason and Rosner titled, "How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?", which concluded that credit ratings of RMBSs and CDOs bore little relation to reality and that, "[g]iven the high proportion of CDO investments in mezzanine RMBS," "even investment grade rated CDOs will experience significant losses."[6]

86.     By February and March 2007, the ABX Index for BBB and BBB- RMBS tranches had suffered substantial declines, with some BBB- tranches having dropped approximately 60%

---

[6] *See* Mason and Rosner, "How Resilient are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?," Feb. 15, 2007, p. 30 and p. 2 (www.hudson.org/files/publications/Mason_RosnerFeb15Event.pdf).

of par.  Market analysts predicted that values were "going to zero."[7]  Likewise, CDO prices plummeted at every Mezzanine CDO level, including the "super senior" levels that had been retained by Wachovia during its securitization process.

87.     Thus, the escalating risks associated with RMBS and CDO were well documented and understood early in 2007.  What was unknown was that Wachovia had built up billions of dollars of these securities in its portfolios because it had retained a sizeable share of the Mezzanine CDO tranches that it created.  Wachovia managed to keep this information hidden until January 2008.  As these investments became completely illiquid to the point of being virtually worthless, Wachovia propped up their value for years by reassuring investors that it had undertaken appropriate risk-management strategies, including hedging against losses.  However, Wachovia, a "vertically-integrated" mortgage originator and wholesaler with "burgeoning asset-backed and mortgage-backed securities businesses," which securitized $24.2 billion of commercial mortgages in 2007, accounting for 10.8% of the total securitizations in the U.S. that year, knew that these stop-gap measures were wholly inadequate to deal with the oncoming capital and liquidity crisis it would face once the truth about the value of these assets was revealed.

## VI.   DEFENDANTS' FRAUDULENT SCHEME

### A.   WACHOVIA PUBLICLY TOUTS THE "PRISTINE CREDIT QUALITY" OF THE GOLDEN WEST PORTFOLIO

88.     Wachovia announced on May 7, 2006 that it planned to expand its nationwide footprint as a mortgage originator by acquiring California-based mortgage lender, Golden West.

89.     Up to this point, Wachovia was a diversified financial services company, engaged primarily in traditional lending activities.  It was not known for subprime mortgage origination.

---

[7] *See* Jody Shenn and Shannon D. Harrington, "Subprime Mortgage Derivatives Extend Drop on Moody's Reviews," Bloomberg, Feb. 22, 2007.

In fact, Wachovia had been widely credited for its conservative lending practices. Defendant Thompson promoted this image of the Company at a meeting of bankers in January 2006, where he commented on the "toxic" loans being marketed by other mortgage lenders: "I have literally been amazed at the terms offered by some mortgage lenders, though thankfully not at Wachovia…" Analysts were increasingly amazed too, and many doubted Wachovia's strategy and timing in acquiring a California-based mortgage lender with a very different business model.

90.    This prompted a campaign by Defendants to convince investors of the soundness of the decision to acquire Golden West. From the outset, this meant materially misstating the risks associated with Golden West's signature product, the Pick-a-Pay loan. For instance, the May 7, 2006 press release announcing the merger, which was filed with the SEC on May 8, 2006 on Form 8-K, and which was incorporated by reference into certain offering materials, proudly declared that Golden West was "a risk-averse residential mortgage portfolio lender," known for its "pristine credit quality," which would "generate superior long-term growth in earnings per share." In a conference call with analysts on May 8, 2006, Thompson described Pick-a-Pay as "an elegantly simple option ARM product that is low risk because of, number one, the product features … and two, because of [Golden West's] rigorous underwriting process." Thompson also flatly denied that the Golden West acquisition marked Wachovia's entrance into the subprime market when he said, "They have no subprime origination at Golden West, so a very conservative portfolio."

91.    While housing prices tumbled and interest rates rose, Defendants continued their campaign into the summer of 2006. In an August 2006 presentation, Thompson characterized Golden West as a "top 10 mortgage originator" with a "low risk $121 billion consumer loan portfolio."

31

92.     On October 1, 2006, Wachovia completed the acquisition of Golden West. Golden West shareholders received 1.051 shares of Wachovia plus $18.6461 in cash for each share of Golden West stock.  The total cost of the acquisition was $24.3 billion.  Wachovia raised the cash for the Golden West acquisition primarily through debt and other offerings. Subsequent to the Golden West acquisition, Wachovia's 2006 Annual Report evinced a strong combined entity with a market capitalization of $108 billion and stated assets of $707 billion.

93.     Despite Defendants' promotion of the acquisition, analysts still suspected that Wachovia paid a substantial premium for Golden West after the real estate market had already peaked.  According to a December 24, 2008 article in the NEW YORK TIMES, several current and former Wachovia officials have also said that the deal was agreed to in a matter of days without adequate time to conduct due diligence.  Nevertheless, as detailed herein, Defendants repeatedly made false and misleading statements concerning the risks inherent in the Pick-a-Pay product and the degree to which Wachovia's $120 billion Pick-a-Pay loan portfolio would be impacted by changing market conditions.  Indeed, Wachovia made numerous statements indicating that it had no subprime exposure at all.  As set forth herein, Wachovia's efforts to conceal the truth about its exposure to deteriorating market conditions were compounded by its failures to take adequate loss reserves, write down assets in a timely manner, and employ appropriate internal controls and risk management strategies.

**B.     WACHOVIA CONCEALS THE TRUTH ABOUT THE GOLDEN WEST PORTFOLIO**

94.     Golden West's signature product, the Pick-a-Pay loan, lies at the center of Wachovia's fraud.  From May 2006 until October 2008, Defendants repeatedly reassured investors that the Pick-a-Pay loan was distinguishable from and superior to other option ARM and subprime products offered by competitors.  Defendants made these assurances because, by the time the Golden West acquisition was consummated in October 2006, it was already apparent

that the mortgage market was headed for a crash. By denying the impact of changing market conditions, Wachovia was able to keep its share price artificially inflated and report increasing profits while competitors with similar exposures were beginning to crumble and fail.

95.     Like other payment option ARMs, the Pick-a-Pay mortgage gave borrowers four different payment options every month. The first two options provided for a full payment of interest and principal due, in an amount sufficient to satisfy the loan in either 15 or 30 years. The third option provided for payment of accrued interest, while maintaining the previous loan balance. The fourth option allowed the borrower to make a minimum payment that was less than the accrued interest for that period, with the remaining unpaid portion of interest added to the outstanding principal balance of the loan.

96.     A borrower who makes only the minimum payment experiences "negative amortization," because with each payment, the outstanding principal balance of the loan actually increases. In a real estate market that is stable or rising, the borrower's election of a payment that leaves him further away from payoff is rationalized by the notion that the borrower can "catch-up" by refinancing at a later date and using equity gained as the result of increasing housing prices. However, by October 2006, when the Golden West deal closed, these market conditions no longer existed.

97.     Nevertheless, Defendants repeatedly touted four product features that immunized the Pick-a-Pay loan portfolio from the vagaries of the market:  (1) Golden West's (and subsequently, Wachovia's) strict underwriting guidelines; (2) low LTV ratios of approximately 70%; (3) an annual payment cap of 7.5%, which limited immediate "payment shock" from adjustable-rate resets; and (4) a 10-year delay before Pick-a-Pay mortgages "recast" to fully-amortizing rates.

33

## 1. Defendants Mislead Investors by Claiming that Pick-a-Pay Mortgages Were Originated With Strict Underwriting Guidelines

98.     From the moment the Golden West acquisition was announced, Defendants latched onto Golden West's "conservative underwriting standards," as the key factor that ensured that their $120 billion Pick-a-Pay loan portfolio, unlike portfolios of subprime lenders, was "low risk." During a May 8, 2006 investor conference call, Defendant Thompson was effusive: "They are obsessed, and we have been so impressed as we have visited with Golden West and studied their process, they are obsessed with conservative underwriting, and as a result, their credit quality in every environment over that 43-year-period has been outstanding ... We love the conservative model."

99.     Defendants also loved the short term profits generating by increasing volume of Pick-a-Pay loans.  As discussed in more detail, *infra*, at Section VI.C, Golden West did not employ strict underwriting criteria at all.  In fact, many Pick-a-Pay loans were originated without regard to a borrower's FICO score and without verification of employment or assets. Unbeknownst to investors, Wachovia quickly adapted similar lax underwriting criteria once the Pick-a-Pay loan was embraced and launched throughout the organization.

## 2. Defendants Mislead Investors By Repeatedly Citing LTV Ratios That Did Not Accurately Reflect The Current Risks Inherent In The Pick-a-Pay Portfolio

100.    The focus on low LTV ratios at origination was also deliberately deceiving.  As explained, *supra*, Section V, mortgages with a low LTV are both less likely to default and less costly to lenders if they do.  With respect to the risk of default, a borrower with substantial equity has a stake in the property and is thus less inclined to risk losing that investment.  In contrast, borrowers with little or no equity, *e.g.*, Pick-a-Pay borrowers making minimum payments insufficient to cover monthly accrued interest, have little incentive to continue making payments.

From the lender's perspective, if the borrower defaults, a lower loan balance relative to the value of the property (*i.e.*, a low LTV ratio) increases the likelihood that the lender can recoup the amount still outstanding, less foreclosure costs.

101.    By repeatedly emphasizing the low LTV ratios of Pick-a-Pay loans *at origination*, Defendants deliberately concealed the impact of changing market conditions on the Pick-a-Pay loan portfolio, and specifically, the ever-increasing risks of default.  In fact, Defendants knew that LTV ratios had risen dramatically from the time the loans were originated.  This was due to the fact that as the majority of borrowers elected to make only minimum payments, their loan values increased.    In addition, in 2007, Defendants fueled the acceleration of negative amortization by lowering the required monthly minimum payment so that unpaid interest accumulated at a faster pace.  This increase in negative amortization increased loan values and directly led to much higher LTV ratios.  Moreover, at the same time that loan values were increasing, property values were on the decline (partly as the result of failures in Wachovia's supposedly "robust" appraisal procedures), particularly in the geographic areas where the loan portfolio was most concentrated.  This further accelerated the increase in LTV.

102.    Defendants ignored and indeed, denied, this reality, consistently maintaining throughout 2006, and as late as December 2007, after they implemented programs that reduced monthly minimum payments, that the average LTV ratio was approximately 71%.    On November 9, 2007, at a conference at the BancAnalysts Association of Boston, Defendant Truslow explained,

> The average loan to value at origination was about 71%. We do
> some refresher work from time to time, where at the property level
> we go out and order AVMs or automated -- actually values that are
> generated by automated valuation models I think is what it stands
> for and actually if you take a look at the most recent run across our
> book the loan to value and aggregate *is actually a little better than*
> the 71%. (emphasis added).

103.    Although Defendant Truslow conceded that a portion of loans categorized as non-performing had LTV ratios greater than 90%, he dismissed this statistic as not being very significant: "Very little about 90% we've been very careful of where we have gone about 90% loan to value and the performance there has been very good."

104.    It wasn't until April 2008, that Defendants finally admitted that the repeated reference to LTV ratios at origination was virtually meaningless. At that time, Defendants made a fundamental change to their loss reserve model to take this shifting LTV dynamic into account. This necessitated a massive increase in loan loss reserves, as it was revealed that 14% of Wachovia's $120 billion loan portfolio had LTV ratios exceeding 100%.

105.    Only in late 2008 did Defendants finally acknowledge that the average LTV ratio for the entire Pick-a-Pay portfolio had risen from the often-cited 71% to a shocking 95%. The risks of default and loss severity at 95% are entirely different and hardly fall within the description of "low risk" that Defendants had promoted.

### 3.    Defendants Mislead Investors Because The 7.5% Annual Payment Cap and 10-Year "Recast" Period Did Not Eliminate The Risk Of "Payment Shock," But Merely Delayed It

106.    Finally, Defendants' attempts to distinguish Pick-a-Pay from other payment option ARMs based on the 7.5% annual payment cap and 10-year recast period were false and misleading, because these features did not alter the underlying problem associated with payment option ARMs, namely that the subprime borrower, with an already high debt-to-income ratio

and/or unverified income or assets, would eventually be faced with a payment he could not afford, especially in a market where interest rates were rising and home values were declining.

107.    The 10-year recast period repeatedly emphasized by Defendants was also misleading because Pick-a-Pay loans actually would recast much sooner if borrowers elected to make only the minimum payment each month. This is due to the fact that in order to curtail negative amortization, the borrower's minimum monthly payment increased to fully-amortizing levels once the LTV ratio reached 125%. Where the borrower's LTV ratio was greater than 85% at origination, the cap was even lower, with loans recasting to fully-amortizing levels when the LTV ratio reached 110%. As economic conditions worsened, Wachovia failed to acknowledge that more borrowers were electing to make only minimum monthly payments. With housing values declining at the same time, this meant that LTV ratios were rise faster, thereby accelerating the time table for recasting.

108.    The effects of accelerated recasting of Pick-a-Pay loans were readily apparent to Wachovia. In 2006, as low "teaser" rates on mortgages originated one, three or five years earlier began to reset to current rates, many borrowers experienced "payment shock" as minimum monthly payments doubled or tripled to fully-amortizing levels, and as a result, mortgage delinquencies skyrocketed.

109.    Contrary to Defendants' assurances, Pick-a-Pay mortgages operated the same way as other payment option arms, except in slow motion. Thus, the 7.5% cap on payment increases and seemingly-longer period before the mortgage "recast" just meant that it might take longer for Pick-a-Pay borrowers to reach the unaffordable payment threshold and delinquency, but eventually, they would get there, just as with other payment option ARMs.

110.    The delinquencies and bankruptcies experienced by many competitors should
have been a call to action for Defendants. Instead, Defendants utilized their competitors' failures
as an opportunity to ramp up originations, trumpet Pick-a-Pay's purported superiority and justify
Wachovia's low loan loss reserves as compared to other subprime lenders.    However, in
actuality, Defendants knew but failed to inform investors that the Pick-a-Pay portfolio was living
on borrowed time, because Pick-a-Pay would eventually succumb to the same market forces that
were afflicting other loan portfolios with similar subprime exposure.

### C.    WACHOVIA CASTS ASIDE ITS TRADITIONAL LENDING PRACTICES AND ADOPTS A RISKIER APPROACH

111.    As previously explained, prior to the Golden West acquisition, Wachovia had a
reputation as a conservative lender of traditional fixed rate mortgages. However, Wachovia had
a strong desire to "expand its footprint" into new markets, particularly in Western states where
Golden West's portfolio was concentrated.    This quest for growth became an obsession, and
Defendants literally banked on Pick-a-Pay as the means to that end.

112.    After the Golden West merger was completed, Defendants, blinded by their
expansion ambitions, allowed the Pick-a-Pay product to infiltrate the entire company.    As
Russell Kentell, a former chief financial officer of Golden West's mortgage subsidiary, World
Savings, explained to THE NEW YORK TIMES, the merger created "pressure" for "a pretty good-
sized increase in loan volume … [Wachovia] wanted volume and wanted growth." *See* Michael
Moss and Geraldine Fabrikant, *Once Trusted Mortgage Pioneers, Now Scrutinized*, THE NEW
YORK TIMES, December 24, 2008. Within the first few months of integration, Golden West

executives "took control of all mortgage lending. And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature 'Pick-a-Payment' loans."[8]

113. Thus, at a time when all indications suggested that the tide had turned on the housing and mortgage markets, Wachovia ramped up its efforts to expand the Pick-a-Pay product throughout the organization. In April 2007, Defendants announced that 800 employees were being trained to offer Pick-a-Pay loans and would be deployed to key locations. Wachovia also hired and trained outside brokers to market and originate Pick-a-Pay loans. Wachovia promoted the Pick-a-Pay loan via TV commercials, brochures, and on its website. This aggressive marketing continued even after many banks stopped offering similar loans.[9] In fact, as late as April 2008, with the number of loan delinquencies increasing, LTV ratios rising, and mortgage lenders failing, Wachovia was still running television ads promoting Pick-a-Pay loans.

114. To a large extent, Wachovia achieved its goal. By 2007, it had become the second largest provider of payment option ARMs, a category that includes Pick-a-Pay loans. In 2007 alone, Wachovia extended an additional $33.4 billion in Pick-a-Pay loans, a 34% increase over 2004 and 2005. By 2008, Pick-a-Pay loans accounted for approximately 70% of Wachovia's mortgage portfolio.

115. But the price of this success was concealed. Defendants repeatedly assured investors that Wachovia would "not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices" or "struggle for higher originations at the expense of damaging the business model." In actuality, Wachovia was willing to abandon

---

[8] Dean Foust, "Wachovia: Golden West Wasn't Golden," BUSINESS WEEK, June 4, 2008, available at: http://www.businessweek.com/magazine/content/08_24/b4088026392160.htm.

[9] Rick Rothacker, "Wachovia mortgage program stirs concerns," CHARLOTTE OBSERVER, March 31, 2008 ("Wachovia has expanded into these mortgages at a time when others are pulling back. Charlotte-based Bank of America, for example, stopped making the loans last year.").

conservative underwriting standards and implement incentives that weakened internal controls and risk management practices in order to satisfy its appetite for the short term profits generated by Pick-a-Pay loans and its hunger to grow at all costs.

### 1. Underwriting Standards Were Weakened to Increase Originations and Boost Profits

116.    Wachovia had repeatedly touted Golden West's "conservative underwriting standards." However, in actuality, Wachovia failed to employ even the most basic underwriting standards in connection with its Pick-a-Pay loans. Several former employees have confirmed that Golden West and/or Wachovia (1) did not require minimum credit scores; (2) did not verify borrower income or assets; and (3) routinely manipulated, or "packaged" loan applications to sell loans to unqualified borrowers.

117.    First, contrary to Defendants' claims that Wachovia was not a subprime lender, Wachovia originated billions of dollars in Pick-a-Pay loans to borrowers with either no credit history or with credit scores well below 660, which is typically considered subprime. Credit scores are routinely required for many loans, but for its largest and riskiest loan – the Pick-a-Pay – Wachovia failed to set any kind of minimum standard. Such lax standards gave Wachovia the flexibility to approve loans and continue to record profits even as the real estate market showed signs of distress and the pool of potential borrowers began to shrink. Indeed, it wasn't until April 14, 2008 that investors learned that Wachovia had originated $16.5 billion of Pick-a-Pay loans to subprime borrowers with FICO scores below 660 during 2007 and early 2008.

118.    Second, Wachovia did not verify borrower income or assets. The IRS allowed lenders to easily verify borrower incomes by using IRS Form 4506T in connection with a loan application. By verifying borrowers' incomes with the IRS, Wachovia could easily have prevented borrowers from overstating their income, which would have allowed Wachovia to

make a more accurate determination regarding their ability to repay loans. Instead, Wachovia trained its employees and outside brokers to offer loans to borrowers on a "No Income, No Asset" verification basis, and "No Income, No Asset, No Employment" verification basis. As *60 Minutes* reported, potential borrowers were shown fliers assuring them that the application would sail through the underwriting process without verification. Thus, Wachovia virtually guaranteed that the loans it originated would be fraudulent by letting potential borrowers know in advance that any information they provided – whether truthful or not – simply would not be verified. This failure by Wachovia to verify borrower incomes or assets substantially increased the risk associated with its mortgage portfolio.

119.    Finally, in an atmosphere that emphasized quantity over quality, Wachovia's willingness to play fast and loose with underwriting standards lead to outright manipulation of loan documents to get borrowers approved. In a February 15, 2009 interview with *60 Minutes*, Paul Bishop, a former Golden West loan consultant who worked in San Francisco from November 2002 until May 2006, referred to this process as "packaging." According to Mr. Bishop, "[i]t was one grand wink-wink, nod-nod," where information was added, deleted and moved around to get approval. Mr. Bishop also explained how potential borrowers were encouraged to inflate their income: "So I don't really need to know what you make. I don't need proof. You tell me you make $200,000 a year? You make $200,000 a year."

120.    Mr. Bishop further described the contest-like circumstances in which loans were sometimes approved. "We would have these instant underwriting events in an office where we would assemble five underwriters right there. . . . 80, 90, 100 [applications] would be reviewed." Eventually, as Mr. Bishop told *60 Minutes*, "Everybody that could qualify, anybody that could