fog a mirror, anybody that could just breathe, you know, and qualify at any level had basically been refinanced once, twice, three, sometimes four times."

121.    The truth about Wachovia's underwriting criteria (and the lack thereof) did not come to light until April 11, 2008, when it was reported in the press that Wachovia would begin to require minimum credit scores and verify borrowers' assets and employment.[10]

122.    Defendants had emphasized Wachovia's "conservative underwriting" as the feature that set it apart from its competitors.  Instead, its lack of even the most basic standards had fueled the Pick-a-Pay loan frenzy, substantially increasing the risks associated with the Pick-a-Pay loan portfolio.

### 2.    Wachovia Incentivized Employees to Push Pick-a-Pay Loans on Unsuspecting, Poorly-Qualified Borrowers

123.    To make matters worse, as the economy deteriorated throughout 2007, the pool of borrowers became smaller and smaller.  Thus, Wachovia found other ways to drive demand, namely by resorting to lending practices that took advantage of borrowers who could least afford it – those with substandard credit and insufficient income.

124.    A training script published in the CHARLOTTE OBSERVER provides a sample sales pitch Wachovia encouraged employees to use when selling Pick-a-Pay loans.  The script illustrates how Wachovia trained employees to target less-qualified borrowers:

> "If you're like us, there's more coming out than in some months, and we start putting more and more charges on our credit card. . . . What can we do?  Uncle Sam isn't going to take less.  Or the car company.  Or the credit card company.  The children need to be cared for.  You can't get along without insurance.  Plus, you need to eat, and keep the lights on.  That leaves your mortgage payment. . . . What if you could pay a lot less on your mortgage some months when you need flexibility?"

---

[10] See "Wachovia tightens home mortgage standards," TRIANGLE BUSINESS JOURNAL, April 11, 2008, available at: http://triangle.bizjournals.com/triangle/stories/2008/04/07/daily43.html.

125.    What Wachovia did not tell potential borrowers was that the cost of "flexibility" was mounting – and often insurmountable – debt.  Wachovia employees were urged to downplay the consequences of negative amortization and emphasize to customers the increased cash flow Pick-a-Pay loans provided.  BUSINESS WEEK reported that a Wachovia training video "instructed [loan officers] to avoid using terms like 'negative amortization' in favor of euphemisms like 'deferred interest.'"[11]

126.    In addition to being less than transparent in communicating the risks, Wachovia then took it one step further, and marketed the selection of a Pick-a-Pay loan as a wise financial decision.  In an MSNBC.com article, former Wachovia mortgage consultant Sharren McGarry ("McGarry") described how Wachovia told her to promote Pick-a-Pay loans:

> The pitch included sales literature comparing two brothers.  One took the Pick-a-Pay loan, made the minimum payment and put money in the bank.  The second brother got a conforming loan. Five years later, both brothers needed to pay their children's college tuition.  "(The brother with the conforming loan) didn't have money in the bank," said McGarry. . . . "That's how they sold it."

127.    In 2007, when the pace of originations slowed, Wachovia deliberately tried to lure new, and even less creditworthy, borrowers into Pick-a-Pay loans by lowering the required minimum annual payment to 1% of the loan balance.  However, the increased acceleration of negative amortization was neither explained to borrowers nor disclosed to investors, who continued to receive assurances that the Pick-a-Pay portfolio remained stable.

128.    In addition to training, Wachovia ensured that employees were properly motivated by offering lucrative incentives to sell Pick-a-Pay loans as compared to other loan products.  For instance, a Wachovia call center document obtained by the CHARLOTTE OBSERVER

---

[11] *See* Foust, *supra* at fn. 8.

showed Wachovia awarded sales representatives 120% of their incentive pay for selling at least four Pick-a-Pay loans per month. Wachovia also set minimum monthly quotas for sales of Pick-a-Pay loans. If loan officers failed to meet these quotas, they were disciplined, and sometimes fired.

129.    A former Wachovia mortgage consultant in Texas told the CHARLOTTE OBSERVER that he was supposed to sell two Pick-a-Pay loans per month. "That's all we heard about was Pick-a-Pay . . . If you sold a 30-year fixed (rate mortgage), they'd say, 'Why didn't you sell a Pick-a-Pay?'" Another former Wachovia loan officer quoted in the same article said she left Wachovia because of the intense pressure to sell Pick-a-Pay loans. Similarly, outside brokers employed by Wachovia were paid commissions based on the number of loans they closed.

130.    McGarry says she was required to ensure that Pick-a-Pay loans accounted for roughly half of her total sales. When McGarry did not meet her quota, she said her manager "frequently reminded [her] that her job requirement was that [she] do 45 percent of [her] volume in the Pick-a-Pay loan." In June 2008, her manager wrote a "Corrective Action and Counseling" warning for McGarry failing to meet the bank's production expectations.

131.    Other sources corroborate McGarry's story. For instance, an internal Wachovia memorandum cited by the CHARLOTTE OBSERVER said if sales quotas were not met, "it may lead to further corrective action up to and including termination[.]"

132.    Wachovia's decision to implement these aggressive sales tactics and employee incentives directly contravened guidance published by bank regulators in October 2006, which expressed concern that the expansion of nontraditional mortgage loans, such as Pick-a-Pay, "exposes financial institutions to increased risk relative to traditional mortgage products."[12]

---

[12] *See* Interagency Guidance on Nontraditional Mortgage Product Risks, Wednesday, October 4, 2006, 71 Fed. Reg. 58609-07, p. 58613.

Bank regulators explicitly counseled that "communications with customers, including advertisements, oral statements, promotional materials, and monthly statements, should provide clear and balanced information about the relative benefits and risks of these products, including the risk of payment shock and the risk of negative amortization."[13]  Moreover, lenders were warned that "[l]ending personnel should be monitored" and "attention should be paid ... to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products."[14]

133.    Wachovia consistently maintained that procedures were in place to prevent exactly the kind of escalating risks that bank regulators predicted. However, unbeknownst to investors, the only procedures that ultimately mattered to Wachovia were those that produced consistent profits and growth. Thus, "conservative underwriting" fell by the wayside while aggressive and opaque sales tactics were encouraged and rewarded. As a result, Defendants knowingly increased the concentration of risky loans in Wachovia's portfolio.

134.    Several lawsuits have been filed against Wachovia, Golden West and World Savings by borrowers alleging violations of the Truth in Lending Act, because the risks of negative amortization and other features associated with Pick-a-Pay loans were not disclosed or explained.  Wachovia's and Golden West's lending practices have also been the subject of several ongoing investigations by the SEC and the Justice Department.

### 3.    Appraisals Related to Wachovia's Loans Were Improperly Inflated

135.    The appraisal process employed by Golden West, and after the merger, by Wachovia, was supposed to provide additional protection from Pick-a-Pay losses, because proper

---

[13] *Id.* at 58616-7.

[14] *Id.* at 58618.

valuation of the underlying collateral ensured that Wachovia could recoup the original loan amount in the event of default and foreclosure.

136.    On April 16, 2007, Defendant Wurtz spoke reassuringly about the Golden West appraisal process:

> [T]he Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to the quality of the appraisals.   Most appraisals are completed by in-house appraisers and the appraisal process, I can tell you, it's very robust. Over the last several months since our teams have worked more closely with one another through integration, our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger.

137.    However, after Wachovia's acquisition of Golden West, Wachovia discontinued the policy of exclusively employing in-house appraisers in connection with Pick-a-Pay loans. Instead, Wachovia utilized outside, third-party appraisers to value the property, and relegated in-house appraisers to reviewing these third-party appraisal reports.

138.    In contrast to Wachovia's in-house appraisers, who were rewarded based on the long term accuracy of the appraisal, the outside, third-party appraisers received a one-time payment at the time the loan closed.   Thus, they did not have the same "cradle-to-grave" mentality that motivated in-house appraisers, and as a result, these third-party appraisals were more likely to overvalue the property.   This contributed to a further distortion in LTV ratios in the Pick-a-Pay loan portfolio.

139.    Plaintiffs believe that additional discovery will uncover further evidence that Wachovia misrepresented the value of the underlying loan portfolio, which meant that even at origination, LTV ratios were false and misleading and investors were exposed to a substantial undisclosed risk of loss inherent in the Pick-a-Pay loan portfolio.

### D. WACHOVIA CONCEALS THE TRUTH ABOUT ITS HOLDINGS OF CDOS AND RMBS

140. During 2006 and 2007, Wachovia created, structured and underwrote approximately $10.11 billion of CDOs backed by pools of subprime mortgages. At all times until November 9, 2007, Wachovia concealed that it had retained in excess of $2.1 billion of those same CDO securities.

141. After the extent of Wachovia's holding of subprime-related securities was revealed, Defendants repeatedly issued quarterly and annual reports that materially overstated the value of those holdings. Indices tracking the market prices of CDOs indicated that with respect to certain of Wachovia's holdings, the value had completely evaporated. Yet, Wachovia, itself a large participant in the securitization market, turned a blind eye to this reality and instead implemented a strategy in which Wachovia took incremental, but insufficient and untimely, write-downs in an effort to conceal the truth about its exposures and the financial impact of carrying billions of dollars of worthless assets on its balance sheet.

142. The risks associated with such subprime CDOs were well understood no later than February 2007. By October 2007, the market had completely dried up. Thus, Wachovia knew that taking incremental write-downs on certain of its assets was an exercise in futility, but it persisted in doing so in order to maintain its façade of financial well-being.

### E. WACHOVIA'S FALSE AND MISLEADING STATEMENTS CONCERNING ITS PICK-A-PAY PORTFOLIO, CDO AND RMBS HOLDINGS AND EXPOSURE TO SUBPRIME-RELATED LOSSES ARE USED TO PROP UP FINANCIAL RESULTS

143. Each quarterly and annual report that Wachovia filed with the SEC between July 2006 and October 2008 contained a discussion of Wachovia's "tier 1 capital ratio" and stated that Wachovia's balance sheet was "strong and well capitalized under regulatory guidelines." Tier 1 capital is the core measure of a bank's financial strength and its ability to withstand future

losses. The Tier 1 capital ratio is the ratio of a bank's "core capital," *i.e.*, equity capital and retained earning (along with disclosed reserves), to its total risk-adjusted assets.

144.    Contrary to its statements in its SEC filings, Wachovia's balance sheet was neither strong nor well capitalized. As an initial matter, throughout 2007 and 2008, Wachovia failed to disclose the extent of its holdings of RMBSs and CDOs, all of which were rapidly declining in value. Moreover, although in November 2007, Wachovia claimed that its portfolio was hedged, because the risks associated with its CDO and RMBS exposures were transferred to "AAA rated financial guarantors,"[15] Wachovia knew by mid-2007 that certain of these guarantors were over-exposed and did not have adequate resources to make good on these guarantees. For instance, Wachovia's wholly-owned subsidiary, BluePoint Re Ltd., a financial guaranty reinsurance company, began to buckle under the weight of its exposures to asset-backed securities throughout 2007.    Consequently, Wachovia's 2007 financial results included a complete write-down of its $300 million investment in BluePoint Re. Just like certain of the counterparties to Wachovia's hedging transactions on its own trading portfolio, BluePoint Re experienced a credit downgrade and was eventually forced into bankruptcy. Thus, Wachovia knew first-hand that its trading portfolio was not as insulated from risk as it led investors to believe.

145.    Furthermore, the Pick-a-Pay loan portfolio concealed the degree of losses Wachovia stood to incur as market conditions deteriorated. Defendants had assured investors that conservative underwriting and built-in product features separated Pick-a-Pay from other payment option ARMs. Defendants relied on these purported aspects of Pick-a-Pay loans to justify maintaining low loan loss reserves as compared to competitors.    In fact, after the

---

[15] *See* Form 8-K, dated November 8, 2007, p. 3.

acquisition of Golden West, Wachovia reserved *less than 1%* of its outstanding loan amounts to cover potential losses. However, because Wachovia did not employ strict underwriting standards and because Pick-a-Pay's features postponed, but did not prevent, the inevitable "payment shock" leading to increased defaults, there really was no backstop on the losses Wachovia stood to sustain. Thus, Wachovia's earnings were overstated in each and every quarter beginning as early as October 2006, because Wachovia failed to take loan loss reserves that accurately reflected the degree of risk inherent in the Pick-a-Pay portfolio.

146.    The combination of inadequate loan loss reserves and insufficient write-downs of assets, which enabled Wachovia to meet earnings guidance every quarter, created the impression that Wachovia was liquid and adequately capitalized. In actuality, Wachovia's Tier 1 capital ratio was severely impaired, and accelerating negative amortization and improper accounting of delinquencies meant that Wachovia likely would face a capital shortfall. Nevertheless, as late as July 2008, Wachovia reported a Tier 1 capital ratio of approximately 8%, meeting regulatory guidelines and signaling to investors that the Company was well capitalized. This resulted in an artificially inflated stock price throughout 2006 and 2008, when it appeared that Wachovia was outperforming its competitors. In reality, unbeknownst to investors, the worst was yet to come.

## VII.   THE TRUTH BEGINS TO EMERGE

### A.   WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING GROWING LOSSES IN ITS PICK-A-PAY LOAN PORTFOLIO

147.    On October 19, 2007, Wachovia gave an indication that there were problems in its Pick-a-Pay loan portfolio when it announced that both charge-offs and nonperforming assets increased in the third quarter of 2007 as compared to the prior quarter. Specifically, nonperforming assets rose $881 million, which resulted in nonperforming assets as a percentage of loans rising from .47% in the second quarter of 2007 to .63% for the third quarter of 2007. Of

this amount, $587 million was attributable to an increase in consumer real estate loans and $127 million was attributable to consumer foreclosed real estate. Although Defendants were forced to acknowledge that "most of the increases in nonperforms does come out of the legacy Golden West portfolio," they carefully placed the blame for these increases elsewhere, noting that "problems in these markets really for all lenders seem to be across the board without regard to originating FICO, the type of loan or the condition of the property." External forces, namely "continued weakness in the housing market and the possibility for slowing consumer sector," were also responsible for the fact that Wachovia "anticipate[d] that nonperforming loans on [the] consumer mortgage book [would] continue to increase over the next few quarters and that losses will be up, albeit at fairly modest charge-off rates."

148.    At the same time, Defendants attempted to mitigate the impact of this disclosure by distancing themselves from other lenders. Defendant Truslow explained, "I think the fact that the way those [Golden West] loans were underwritten and how collateral was appraised et cetera, I think we are probably faring in much better shape than other lenders in those markets." This was intentionally misleading, because as discussed herein, underwriting standards had already been sacrificed to increase originations, and the appraisal process had been revamped. Thus, these stopgap measures that would protect Wachovia from the same fate as its competitors did not exist.

149.    Further evidence that the Pick-a-Pay portfolio was heading for trouble came to light on November 9, 2007, when Defendant Truslow announced at the BankAnalysts of Boston conference that:

> In the fourth quarter what we're going to do is implement a
> consistent, bring the Golden West portfolio on to a consistent
> methodology with the rest of the company in how we treat these
> loans and we will take write offs at a 180 days past due. And so
> what that means is in the fourth quarter there'll be a little bit of an
> acceleration of charge offs into the fourth quarter that by historical
> standards would've taken place in subsequent quarters and we
> have baked basically that acceleration into the guidance that we
> gave in our third quarter earnings call for the fourth quarter which
> were charge offs of between 25 and 30 basis points. I just want to
> point that out.

150.    Wachovia cleverly tried to disguise the true nature of the problem by referring to the portfolio as "Golden West" rather than "Pick-a-Pay," a completely inaccurate characterization given the billions of dollars in Pick-a-Pay loans originated by Wachovia after the 2006 Golden West acquisition, but it could not hide that prior to this disclosure, it had employed a different accounting methodology to Pick-a-Pay loans that apparently allowed Wachovia to avoid recognizing losses on nonperforming loans for more than 6 months after they were past due. Thus, Wachovia had no choice but to brace investors for a spike in charge-offs in the fourth quarter of 2007, as well as loan loss provisions in an amount between $500 and $600 million. However, these charge-offs and provisions for loan losses should have occurred months earlier, but were deliberately delayed in order to keep Wachovia's share price artificially inflated.

151.    On January 22, 2008, Wachovia issued another partial disclosure, which hinted at the danger lurking in the Pick-a-Pay loan portfolio. As an initial matter, the impact of the change in accounting methodology announced in November 2007, *i.e.*, recording estimated losses when a loan reaches 180 days past due, as opposed to waiting an indeterminate time to charge-off nonperforming loans, was severe. Wachovia reported that of the $80 million in losses in the Pick-a-Pay loan portfolio for the fourth quarter of 2007, $63 million – or nearly 80% – was

attributable to this accounting methodology change. Furthermore, nonperforming assets just in the Pick-a-Pay loan portfolio increased $1 billion in the fourth quarter of 2007.

152.   During the January 22, 2008 investor conference call, Wachovia also reiterated that "the average current loan-to-value across the portfolio [was] basically unchanged from origination, coming in around 72%." However, Wachovia implicitly admitted the misleading nature of this often-emphasized statistic when it explained that "there's a wider distribution of values around that average" and that "[nonperforming Pick-a-Pay] loans [had] an average current estimated loan-to-value of about 81%."

153.   On that same conference call, Defendants were asked about the percentage of Pick-a-Pay borrowers making minimum payments. This statistic was significant because in a deteriorating market, it was increasingly important to consider the effects of negative amortization on LTV ratios. However, Defendants were unable to provide a clear answer. Defendant Truslow claimed, "I don't believe [the percentage of borrowers making minimum payments] has gone up. The tricky part is, and what I don't know is, that it's different borrowers every month so it's hard to look at a static percentage and assume it's the same borrowers. But I don't believe it's gone up. But we're going to have to check that." Thus, Wachovia continued its practice of revealing incongruent pieces of information in each disclosure, which allowed Wachovia to appear forthcoming, but which, in reality, served to mask Wachovia's precarious financial position.

154.   On April 14, 2008, just weeks after reassuring the market of its liquidity, the strength of its underwriting practices and the adequacy of its loss reserves, Wachovia stunned investors and analysts when it announced plans to raise $7 billion in capital in two concurrent, dilutive stock offerings and a reduction in the quarterly common stock dividend. Wachovia's

first quarter earnings release explained that these actions were necessary "to enhance its capital base and operational flexibility."

155. In addition, Wachovia reported a loss of $350 million, or $.20 per share, for the first quarter of 2008. The loss was attributed to a $2.8 billion increase in credit loss reserves, including $1.1 billion specifically for Pick-a-Pay loans. For the first time, Wachovia revealed that LTV ratios for 14% of the $120 billion Pick-a-Pay portfolio – or nearly $17 billion – were above 100%. Furthermore, late payments had nearly doubled to 3.1% and the effects of negative amortization would be greater than previously reported, as roughly 68% of Pick-a-Pay borrowers elected to make only the minimum payment in March 2008, and 52% of Pick-a-Pay borrowers had elected to make only minimum payments in the last 6 months.

156. At this same time, Wachovia shockingly reported that it would begin tightening lending standards. This was the first indication investors received that Wachovia failed to adhere to the strict underwriting standards that were supposed to produce a low risk loan portfolio. In fact, Wachovia disclosed that $51 billion in Pick-a-Pay loans (or approximately 62% of the total portfolio) had been made to subprime borrowers with credit scores below 660. Of that amount, nearly half, or roughly $25 billion, consisted of loans to borrowers with credit scores below 620.

157. Wachovia also revealed that it would begin to use a new model to take into account deteriorating market conditions, and specifically, the impact of rising LTV ratios and negative amortization on borrower behavior. Once again, this was the first time that investors were given a sense that Wachovia had not been tracking these risk factors in its portfolio but instead had used an inappropriate model to assess risk. This, in turn, justified maintaining lower, and what proved to be inadequate, loan loss reserves, which in turn, produced higher earnings reports. Higher earnings reports and improperly valued assets lead to distortions in the Tier 1

53

capital ratio, enabling Defendants to prolong the belief that Wachovia was still positioned to withstand future losses.

158.    During the investor conference call on April 14, 2008, analysts attempted to pinpoint the reasons why Wachovia's assessment of its capital position and level of risk, particularly in its Pick-a-Pay portfolio, suddenly shifted. As one analyst commented:

> [I]t strikes me that there's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook. You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut, and then five or six weeks later coming to a different conclusion or some other metrics as well. But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically.

159.    Defendants continued to claim that the downturn in the economy was responsible, but as the analyst's comments implied, those same conditions existed months before, when Defendants projected a much stronger outlook. Thus, the only thing that had really changed was that as the risks inherent in the Pick-a-Pay portfolio materialized, Defendants could no longer utilize incomplete disclosures and clever accounting to obscure Wachovia's true financial predicament.

160.    On June 2, 2008, Wachovia announced that Defendant Thompson would retire at the request of the Company's board. Although the board claimed that "No single precipitating event caused the Board to reach this decision," analysts believed that Defendant Thompson's relentless campaign to defend the Golden West acquisition, even as losses mounted and credit quality deteriorated in the Pick-a-Pay loan portfolio, led to his ouster.[16]

---

[16] See Dean Foust, "Wachovia: One Thompson Deal Too Many," BUSINESS WEEK, June 2, 2008, available at http://www.businessweek.com/bwdaily/dnflash/content/jun2008/db2008062_952319.htm;

161.   On June 18, 2008, further evidence of Wachovia's lax underwriting came to light when *Bloomberg* reported that Wachovia would begin calling people who applied for Pick-a-Pay loans through mortgage brokers to confirm that the risks inherent in the product – namely, negative amortization and loan recasting – had been adequately explained.   Although mortgage brokers accounted for approximately 30% of Wachovia's origination of Pick-a-Pay loans, it now became apparent that they had been operating with very little oversight, and Wachovia had lost confidence in the loans being generated through these channels.

162.   Then, on June 30, 2008, Wachovia's Pick-a-Pay loan program came to an abrupt end, when Wachovia announced that the Pick-a-Pay minimum payment option would be eliminated and pre-payment penalties on Pick-a-Pay mortgages were being suspended.   The June 30, 2008 announcement was a striking admission that the Pick-a-Pay loan program had failed, because it exposed the fact that Pick-a-Pay was no different from any other payment option ARM.   Thus, although Defendants previously distinguished Pick-a-Pay loans based on "conservative underwriting," "low LTVs at origination," and purportedly unique product features, such as payment caps and longer recasting periods, the truth was that there were no stopgaps in place to stave off losses.   Not only had Defendants known for over a year that the Pick-a-Pay loan portfolio was plagued by accumulating negative amortization and skyrocketing rates of default, but they deliberately set in motion the chain of events leading to this implosion by, among other things, lowering required minimum payments, failing to monitor third-party brokers, extending loans to subprime borrowers and failing to adhere to the underwriting guidelines they touted in public disclosures.   As the Pick-a-Pay loan portfolio spun out of

control, Defendants tried to contain losses by eliminating pre-payment fees and giving borrowers a chance to refinance out of mortgages "they either didn't understand or couldn't afford."[17]

163.     In July 2008, Wachovia announced further increases in its loan loss reserves, which reflected "higher expected loss factors for consumer real estate," including a substantially-increased allowance for Pick-a-Pay losses. Moreover, Wachovia reported a goodwill impairment of $6 billion, largely attributable to the overvaluation of the Golden West franchise. This forced Defendants to finally admit that "Golden West was a mistake and that [Defendants] [had] to deal with the consequences of it."

### B.     WACHOVIA'S PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS EXPOSURE TO SUBPRIME RMBSs AND CDOs

164.     On October 19, 2007, Wachovia gave the first partial indication of its exposure to losses on subprime RMBSs and CDOs when it reported that it had taken a $1.3 billion write-down in the Corporate and Investment Bank's trading portfolio for the third quarter of 2007. However, Wachovia assured investors that "the majority of the lower market valuations in the third quarter largely arose from a repricing of risk in the marketplace and do not reflect deterioration in the underlying credit quality of the assets in our leveraged finance and commercial real estate securitization businesses."

165.     To further mitigate the impact of this disclosure, Defendant Thompson reminded investors during a conference call on the same day that Wachovia had an "institutional bias" against subprime and had avoided subprime in its origination efforts. Thompson also downplayed the significance of Wachovia's subprime exposure by explaining that this $1.3

---

[17] *See* Dean Foust, "Pick-a-Pay Goes Away…," BUSINESS WEEK, June 30, 2008, available at: http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

billion write-down stemmed from "AAA subprime paper" held in Wachovia's trading portfolio, which had unexpectedly and rapidly declined in value.

166.    This disclosure was deliberately misleading in at least two ways. First, because it failed to provide any information concerning the types and amounts of RMBSs and CDOs that Wachovia actually held, it gave the false impression that to the extent that Wachovia held subprime securities, those securities were the more-highly rated "AAA", as compared to mezzanine and other lower-rated RMBSs and CDOs that were more risky and prone to devaluation as market conditions deteriorated. As would later be revealed, this was not true.

167.    Second, it failed to disclose that Wachovia's exposure to subprime was not limited to its trading portfolio. To the contrary, the Pick-a-Pay loan portfolio was full of subprime-related assets that were equally exposed, if not more so, to substantially increased risk of loss as the housing and mortgage markets continued their downward spiral.

168.    Thus, while investors were given the hint of a problem, they were still unaware and had no way of determining that Wachovia's $1.3 billion write-down was materially insufficient, because it did not reveal the true value of these mortgage-related assets. Moreover, because the nature and amounts of Wachovia's holding of subprime assets remained undisclosed, investors could not discern the true degree of risk, nor the full extent of losses that were likely to be incurred as lower-rated subprime assets and Pick-a-Pay subprime loans embedded in Wachovia's trading and loan portfolios sustained further losses. Indeed, these assets had been materially impaired months earlier, and according to market indices, by October 2007, certain tranches of Wachovia's CDOs had lost nearly 70% of their value.

169.    On November 8, 2007, only weeks after the filing of Wachovia's Form 10-Q and announcement of the $1.3 billion write-down, Wachovia filed a Form 8-K, which reported that

further deterioration in the markets for subprime RMBSs and CDOs had adversely impacted the Company's outlook for the remainder of 2007. Accordingly, Wachovia announced that the value of the CDOs held in its trading portfolio had declined by an additional $1.1 billion. The Form 8-K revealed, for the first time, that this was largely attributable to $1.23 billion of mezzanine-grade CDO exposures, which Wachovia held in its trading portfolio as of September 30, 2007.

170.   Wachovia also disclosed for the first time that its total net exposure to subprime RMBSs and CDOs was estimated at $2.73 billion as of October 31, 2007. Of this amount, $2.1 billion were AAA-rated subprime RMBSs, leaving only $680 million in riskier subprime CDOs after the $1.1 billion write-down. Wachovia reassuringly told investors that "the remaining exposures are, we think, fairly modest."

171.   As with the October disclosure, the November 8, 2007 announcement only partially revealed the truth concerning Wachovia's subprime exposure. First, Wachovia's statements that it held mostly AAA-rated securities were clearly false, as nearly two-thirds of the $1.1 billion write-down was taken against mezzanine-grade CDOs. Second, Wachovia's emphasis on "total net exposure" subtly concealed a more insidious truth, which Wachovia would soon be forced to reveal.

172.   That truth came to light on January 22, 2008, when Wachovia announced its earnings for the fourth quarter of 2007, which were included in a Form 8-K filed on the same day. At that time, Wachovia disclosed that its subprime holdings were not $2.73 billion, as it stated in November 2007, but actually closer to $6.9 billion. This $4.2 billion discrepancy between the subprime holdings reported on the November 2007 Form 8-K as compared with the January 2008 Form 8-K was due to the fact that in November 2007, Wachovia had reported its subprime holdings on a *net basis*, whereas the January 2008 Form 8-K reflected *total gross*

*exposures*. As it turned out, Wachovia had retained $4.2 billion of subprime securities in the course of attempting to securitize those assets. Wachovia had hedged that exposure through agreements that purportedly transferred the risks of those exposures to Wachovia's counterparties, and so it had netted that amount out in calculating its subprime holdings. This was deliberately deceiving, because it gave no indication that Wachovia *gross* exposure was significantly greater than investors were lead to believe.

173. As an initial matter, the amounts that Wachovia claims to have hedged do not square with disclosures by certain counterparties concerning those agreements. Specifically, ABMAC and MBIA, two of the largest Monoline insurers, have released data showing that Wachovia transferred in excess of $7 billion of super senior CDO risks just to those two parties alone.

174. Furthermore, by January 2008, Wachovia knew that its hedges with the Monoline insurers were insecure, as the credit ratings of these entities had been downgraded, and there was a strong likelihood that they would not be able to make good on any of their financial guarantees. Only later was Wachovia forced to acknowledge this reality as, throughout 2008, it ultimately recognized $411 million of losses – a write-down of 26% – attributable to its Monoline exposure.

175. The January 2008 earnings release also included a further round of write-downs on Wachovia's CDO holdings, totaling $970 million. However, this write-down still did not bring Wachovia's portfolio in line with reality. Wachovia knew as the result of its attempts to "de-risk" its CDO portfolio that the market for certain mezzanine and junior tranches of these CDOs was completely dried up. Thus, taking these incremental write-downs was an attempt to perpetuate the myth that Wachovia was financially sound and well-capitalized.

176.    On April 14, 2008, Wachovia announced another $1.6 billion in market valuation losses, "reflecting lower valuations in virtually all asset classes." Furthermore, Wachovia conceded that certain of its holdings remained overvalued as it announced that, rather than continue to take write-downs on certain assets, it had moved those assets out of the trading portfolio and into other investment portfolios, which, as an accounting matter, did not require "mark-to-market" valuations.

177.    By July 2008, Wachovia had written down the value of the $2.1 billion of retained CDOs by $1.69 billion, or 79.7%. However, Wachovia knew by February 2007 that the value of these assets was substantially impaired. Moreover, in October 2007, when it first began to write down those assets, Wachovia knew that the write-downs were insufficient and did not accurately reflect the true value of these assets, which by that point, were illiquid and nearly worthless.

### C.    IN THE WAKE OF ITS COLLAPSE, THE TRUE EXTENT OF WACHOVIA'S FRAUD IS REVEALED

178.    On September 26, 2008, Wachovia and Citigroup initiated negotiations regarding a possible acquisition of Wachovia by Citigroup. Three days later, under pressure from the FDIC that seizure of Wachovia's assets was imminent, it was that Citigroup had agreed to acquire Wachovia for $2.16 billion in stock and assumption of Wachovia's senior and subordinated debt totaling approximately $53 billion. Under the terms of the agreement, Citigroup agreed to absorb up to $42 billion in losses on Wachovia's $312 billion loan portfolio, with the FDIC absorbing losses beyond that. In exchange for the FDIC's bearing the risk of loss, it would receive $12 billion of preferred stock in Citigroup.

179.    News of the proposed Citigroup-Wachovia deal sent Wachovia's stock price reeling, as the price per share plummeted from $10 per share to $1.84 at the close of trading on September 29, 2008. Wachovia's market capitalization literally appeared to evaporate overnight.

180.    On October 3, 2008, following a change in the tax regulations that allowed the acquirer of a banking corporation to accelerate the deduction of the acquired bank's pre-existing losses and use them as a setoff against the acquirer's own tax liability, Wachovia agreed to be acquired by Wells Fargo in an all-stock transaction worth approximately $15.4 billion.

181.    On October 22, 2008, Wachovia announced a quarterly loss of $23.9 billion, one of the largest quarterly losses ever reported by a U.S. company.

182.    After the closing of the Wachovia acquisition, Wells Fargo recorded substantial write-downs that further confirmed that Wachovia's mortgage-related assets were far more impaired than Wachovia had acknowledged.  By February 27, 2009, Wells Fargo admitted in its 2008 Form 10-K that:

> Certain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments. . . . *Of the $446.1 billion of loans acquired in the Wachovia merger, $93.9 billion were determined to be credit-impaired.*

(Emphasis added).

## VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

183.    Based on the foregoing, Defendants made numerous false and misleading statements during the relevant time period concerning the risk concealed in its loan portfolio and in its holdings of subprime-related securities.  Defendants further mislead investors by referring to Wachovia's conservative underwriting practices and institutional bias against subprime as justification for maintaining lower loan loss reserves as compared to competitors.  Because Defendants concealed their actual exposure to subprime-related assets, they also failed to take write-downs in a timely manner that reflected the deteriorating value of those assets.  Thus, throughout the relevant time period, Wachovia's earnings and capital position were continually

overstated and false and misleading because they did not take into account the degree of loss Wachovia stood to incur as market conditions spiraled downward.

A.    **MAY 7, 2006 PRESS RELEASE**

184.    On May 7, 2006, Wachovia announced its plans to acquire Golden West in a press release. Defendants made materially false and misleading statements in the Company's May 7, 2006 press release.

185.    Defendant Thompson stated:

> We believe this combination of our two companies, both known for exceptional customer service and *pristine credit quality*, will generate superior long-term growth in earnings per share . . . For four decades, Golden West has taken industry-wide challenges in stride and *maintained a singular focus as a risk-averse residential mortgage portfolio lender*. The result is an astonishing 25-year track record of 17 percent compound annual growth in earnings per share and virtually no credit losses realized even in the toughest year in its history.

186.    Defendant Thompson's statement was materially false and misleading when made because Golden West was not risk-averse, and the credit quality of its borrowers was not pristine.    In fact, Defendants knew that Golden West originated subprime, adjustable rate mortgages without so much as verifying borrower income and assets, and without even requiring borrowers to have a minimum credit score.    Moreover, Golden West's signature product, the Pick-a-Pay loan, was inherently risky, particularly in a deteriorating real estate market as already existed in May 2006, because as home values declined and LTV ratios increased, borrower defaults would also rise.    Thus, Defendants mislead investors as to the true nature of the risks in connection with the acquisition of Golden West and as a result, Defendants exposed the Company to the worst mortgage-related losses in its history.

### B.  MAY 8, 2006 CONFERENCE CALL

187.   Defendants made materially false and misleading statements during a May 8, 2006 conference call.  Defendants' statements regarding the Golden West acquisition were critical to investors as real estate prices were declining nationwide.  In fact, just 3 days earlier, a *CNNMoney* article declared, "The housing bubble has finally started to deflate."  Even Herbert Sandler, Golden West's CEO mentioned – and dismissed – the growing "real estate crisis" during the May 8, 2006 call.  Sandler said:

> The question is, is there anything in the environment or anything going on? So, I was listening to the brilliant Bloomberg today and MSNBC today, and I heard all the brilliant comments that were called in.  Well, they are worried about the option ARM.  We are going to have a real estate crisis.  They are selling at the high.  I mean that's a bunch of garbage.  I've never heard anything so irrelevant in my life.

188.   Defendants falsely and misleadingly claimed that Golden West's "low risk" portfolio and "conservative underwriting" would insulate them from the declining real estate market.  Specifically, Defendant Thompson stated Golden West was "obsessed with conservative underwriting . . ." and that Pick-a-Pay was "low risk because of, number one, the product features of [Pick-a-Pay] and two, because of their underwriting process."  Thompson falsely added, "They have no subprime origination at Golden West, so *a very conservative portfolio*."

189.   Thompson's assertions that Golden West's portfolio was "conservative" and "low risk" were materially false and misleading.  The Pick-a-Pay loan was inherently risky.  The potential for negative amortization created by the Pick-a-Pay loan increased the risk of default for the borrower and decreased the bank's ability to mitigate losses in the event of such a default.  The riskiness of the Pick-a-Pay product was amplified by Wachovia's failure to require a minimum credit score or verify borrower income.  Far from being "conservative" and "low risk,"

63

Golden West's underwriting practices, as adopted and perpetuated by Wachovia, were recklessly insufficient.

### C.    MAY 12, 2006 CONFERENCE CALL

190.    Wachovia held another investor conference call on May 12, 2006. During the call, Defendant Wurtz made materially false and misleading statements regarding the recasting of interest rates on Pick-a-Pay loans and the resulting increase in required minimum payments. Specifically, analysts and investors expressed concerned that recasting could increase the likelihood of default. However, Defendant Wurtz misled investors regarding the risks associated with recasting:

> **Gerard Cassidy, RBC-Analyst**
>
> Can you share with us on the deferred interest how long does it take a typical person who takes out one of these mortgages . . . if they were to choose the minimum payment from day one? How long does it take them to get to those caps of 110% and 125%?
>
> **Tom Wurtz, Wachovia – CFO**
>
> It takes a long time. Probably about at least four or five years, probably in the average environment six or seven years, something like that.

191.    Wurtz added:

> [I] would attribute Golden West's success to . . . making certain that the borrower can pay at the contractual interest rate for the loan . . . [T]hey don't anticipate when they make the loan that the borrower will be unable to repay the loan should they choose to make the full amortizing payment.

192.    Wurtz' May 12, 2006 statement was materially false and misleading when made because Defendants knew that Golden West did not "make certain" that borrowers would be able to repay their loans. Indeed, neither Golden West, nor later, Wachovia, even instituted the most basic underwriting procedures, such as verifying income, requiring a minimum credit score, or

training personnel to only offer Pick-a-Pay loans to qualified borrowers. Moreover, Defendants knew but failed to acknowledge the acceleration of negative amortization that was likely to occur as real estate values declined, particularly in Florida and California, where most Pick-a-Pay loans originated, which would cause Pick-a-Pay loans to recast sooner. Thus, contrary to Defendants' statements, Pick-a-Pay loans were indistinguishable from ARMs offered by competitors, and investors were mislead about the degree to which Wachovia was insulated from risk as a result of Pick-a-Pay features such as longer recasting periods and caps on payment increases.

### D.   MAY 16, 2006 CONFERENCE CALL

193.   Defendants made materially false and misleading statements during a May 16, 2006 UBS Global Financial Services Conference.

194.   When asked whether he was concerned about increasing negative amortization in the Golden West portfolio, Defendant Thompson responded: ***"I'm really not concerned. And I'm not concerned because of the conservative underwriting standards that the company has."***

195.   Defendant's May 16, 2006 statements were materially false and misleading when made because Defendants knew that Golden West's underwriting standards were not conservative at all. Consequently, the increase in negative amortization was a warning sign that deteriorating conditions in the real estate market were already impacting Golden West's Pick-a-Pay loan portfolio. However, Defendants' dismissive comments concealed this risk and mislead investors into believing that Golden West's purported "conservative underwriting" made the Pick-a-Pay loan a better product than other ARMs offered by competitors, which would insulate Wachovia from the effects of a declining real estate market.

### E.   MAY 19, 2006 8-K

196.   On May 19, 2006, Wachovia filed a Form 8-K with the SEC reporting certain financial information and further describing Wachovia's pending merger with Golden West. The

May 19, 2006 Form 8-K incorporated by reference an exhibit showing "Pro Forma Financial Information." According to the exhibit, the pro forma value of the merged company's loans net of unearned income as of March 31, 2006 was $402 billion, with an allowance for loan losses of only $3.3 billion.

197.    The statements contained in the May 19, 2006 Form 8-K were materially false and misleading, because, as described herein, the value of Golden West's assets was massively overstated, because its loan portfolio was ridden with subprime mortgages that were at a high risk of default.  As a result, the allowance for loan losses of only $3.3 billion was wholly inadequate and resulted in distortions in Wachovia's Tier 1 capital ratio.

### F.    JULY 20, 2006 CONFERENCE CALL

198.    Defendants made materially false and misleading statements during a July 20, 2006 conference call.

199.    Defendant Thompson, in particular, repeated his false and misleading claim about Golden West's supposedly "conservative" underwriting:

> We had an assumption going in that credit underwriting at Golden West was really good, and boy, do we feel strongly about that after a couple months of working with them.  They are professionals. Their reputation is wonderful, as you know, and everything we've seen says, if anything, *they're even better than the market seems to think they are.*

200.    Defendant Thompson's foregoing statement was materially false and misleading because as detailed herein, Golden West's underwriting was recklessly deficient.  Golden West originated subprime ARMs without verifying income or requiring a minimum credit score. These reckless underwriting practices, adopted and expanded by Wachovia, led to extraordinary losses, and ultimately, caused Wachovia's collapse.

**G.      OCTOBER 2, 2006 8-K**

201.   Defendants made materially false and misleading statements in the Form 8-K filed by Wachovia on October 2, 2006.   The October 2, 2006 Form 8-K announced the completion of the Golden West acquisition and incorporated by reference an exhibit showing "Pro Forma Financial Information."  Similar to the May 19, 2006 Form 8-K, the October 2, 2006 Form 8-K reported that the value of Wachovia's loans following the merger was $405 billion, with an allowance for loan losses of $3 billion.  The October 2, 2006 Form 8-K also incorporated by reference the July 24, 2006 Proxy Statement for Wachovia's acquisition of Golden West, which contained several additional false and misleading statements concerning the Pick-a-Pay loan portfolio.   In particular, the Proxy Statement stated that the merger would "diversify Wachovia's balance sheet into higher yielding low-risk assets," "the two companies have … strong credit culture and credit quality, and "Golden West's financial condition and assets are very sound.

202.   These statements were materially false and misleading, because Golden West did not have a strong credit culture or credit quality, but in fact, had employed lax underwriting standards to originate loans to subprime borrowers who were at a higher risk of default.  Thus, the Pick-a-Pay loan portfolio was not high-yield, low-risk.   Consequently, the Pro Forma Financial Information overstated the value of Wachovia's loans and failed to set aside adequate loan loss reserves based on the degree of risk embedded in the Pick-a-Pay portfolio.

**H.      DECEMBER 28, 2006 *AMERICAN BANKER* ARTICLE**

203.   In a December 28, 2006 article, *American Banker* reported additional materially false and misleading statements made by Defendants.  In the article, Wachovia COO Robert McGee stated, with regards to investor concerns over negative amortization, that:

> [Investors] are really overreacting . . . The credit and the risk isn't
> any different than when people draw from a home equity line . . .
> [T]here is still a huge amount of equity in these properties.

204.     McGee's statement was materially false and misleading because by late 2006, the

depressed housing market was causing homeowner equity to decline – particularly in California

where the bulk of Golden West's loans was concentrated.  Thus, declining homeowner equity

and increased negative amortization were very serious issues.  McGee's statements falsely led

investors to believe that Pick-a-Pay loans were different and were not experiencing the same

problems as other ARMs offered by competitors.  Moreover, McGee's statement that there was

"a huge amount of equity in these properties" was materially false and misleading when made,

because it was based on outdated information relating to LTV ratios *at origination*, which failed

to account for the impact of declining home values and increased negative amortization.

**I.      JANUARY 23, 2007 CONFERENCE CALL**

205.     Defendants made many false misleading statements during a January 23, 2007

conference call.  First, Defendant Truslow stated:

> The allowance for credit losses, as has been mentioned, wound out
> up year at 3.5 billion dollars when you take in the reserve for
> unfunded commitments or 84 basis points. *We recognize that on
> the surface when you stack this up against peers it looks low*, but
> as we've been saying for a couple of quarters, the addition of
> Golden West will have a dilutive impact on that reserve to loan
> ratio and that we have brought over a very large portfolio of loans
> that have had no losses for many years and *the outlook for 2007 is
> for a track record that will continue with very de minimus losses*
> and so the impact when you bring such a low loss content portfolio
> into the overall mix will just naturally dilute that ratio. As a matter
> of fact, after you bring over Golden West and look at our 420
> billion dollar resulting portfolio, something like 45% of the total
> portfolio is now in the form of first lien residential consumer
> mortgage loans which by their very nature have a very, very low
> loss content. So I just encourage you as you look at that ratio and
> compare across peers you have really got to take our loan mix into
> consideration and the loan mix at Wachovia is probably pretty
> unique relative to a lot of peers.

206.   Defendant Thompson stated:

> But I am very, very comfortable with the disclosures at Golden
> West and with the disclosure that we will follow through with at
> Wachovia. In fact, we ...welcomed the new disclosure that came
> out of the changes in how Option ARMs would be disclosed. We
> think anything that tightens up those kinds of things will help our
> product line because *it is very conservative and we will – we just
> don't think we are going to be impacted by it like some in that
> business will be*. We are very comfortable with that. . . .
>
> I think that the point that Tom was making about introducing the
> Option ARM into Wachovia's channels is absolutely key and
> while other Option ARM originators are seeing – and other
> mortgage originators are seeing volume drop fairly significantly,
> we think this introduction into our branch system and into our
> mortgage system is going to produce growth in Pick-a-Pay
> outstandings which *will make our numbers pretty good in the
> mortgage business going forward.*

207.   Defendants' January 23, 2007 statements were materially false and misleading
when made because Defendants knew that Pick-a-Pay loans were not "unique" and were, in fact,
indistinguishable from other payment option ARMs offered by competitors.   Additionally,
Defendants mislead investors by claiming that Wachovia was not "going to be impacted ... like
some in [the Option ARM] business will be."   In actuality, Defendants knew but failed to
disclose that they had substantially overpaid to acquire Golden West's portfolio of subprime
payment option ARMs, that Pick-a-Pay was as susceptible to the affects of a deteriorating real
estate market as competitors' payment option ARMs, and that there were no conservative
underwriting standards to insulate the Company from losses.  Furthermore, Defendants mislead
investors by touting certain product features of Pick-a-Pay loans to justify their failure to take
adequate loan loss reserves losses in a declining housing market.

## J.   WACHOVIA'S 2006 FORM 10-K

208.   On February 28, 2007, Wachovia filed its annual report on Form 10-K for 2006
("2006 10-K"). In its 2006 10-K, Defendants stated:

The accrual of interest is generally discontinued on commercial loans and lease that become 90 days past due as to principal or interest, or where reasonable doubt exists as to collection, unless well secured and in the process of collection. Certain consumer loans that become 120 days past due are placed on nonaccrual status. Consumer real estate secured loans that become 180 days past due are placed on nonaccrual status, with the exception of certain non-traditional loans which are placed on nonaccrual status at 90 days past due. Generally, consumer loans that become 180 days past due are charged off. When borrowers demonstrate over an extended period the ability to repay a loan in accordance with the contractual terms of a loan classified as nonaccrual, the loan is returned to accrual status.

209.    The foregoing statement was materially false and misleading when made because it misstated Wachovia's accounting practices related to charge-offs. Nearly a year later, Defendants admitted in a January 22, 2008 disclosure that prior to the fourth quarter of 2007, Wachovia "recognize[ed] the losses at the time of an actual property sale." Thus, Wachovia's 2006 10-K statement was false and violated numerous provisions of GAAP and SEC Regulations, because Wachovia delayed recognition of losses in contravention of its own stated accounting policies, which artificially inflated earnings.

210.    In its 2006 10-K, Wachovia also made misleading statements about its credit quality: "*We are optimistic about our outlook for credit quality as we enter 2007 given the highly collateralized nature of our loan portfolio.* While we expect modest increases in credit costs, we believe overall credit quality will remain strong."

211.    This statement was materially false and misleading when made because Wachovia knew or recklessly disregarded that its relaxed underwriting practices, combined with declining home values and increased negative amortization, left a greater percentage of its loans under-collateralized.

212.    Defendants Thompson and Wurtz certified that the information contained in the 2006 10-K was accurate by signing a statement, which said:

70

Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statement, and other financial information included in this report, fairly present in all material aspects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;

The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financing reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financing reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in according with generally accepted accounting principles;

213.    The 2006 10-K was also materially false and misleading because Defendants

omitted the following material facts:

- Defendants failed to employ even basic underwriting and loan origination practices. Since Defendants originated the vast majority of its home loans without verifying income or assets, and without requiring a minimum credit score, Defendants were incapable of accurately determining their borrowers' abilities to repay loans;

- A significant portion of Defendant's mortgage portfolio was inadequately collateralized; and

- Defendant's loan loss provisions did not properly reflect the risk facing the Company. Defendant's inadequate loss provisions also falsely inflated

Wachovia's reported income and retained earnings, which distorted Wachovia's Tier 1 capital ratio.

**K.     APRIL 16, 2007 CONFERENCE CALL**

214.    Wachovia held a conference call on April 16, 2007 to discuss its 2007 first quarter earnings.  During this call, Defendants made many materially false and misleading statements.

215.    Defendant Thompson:

> [L]ooking forward, with the integration of Golden West on track, we feel confident about the superior credit quality of our mortgage portfolio, the prospects for cross-selling our product set in Golden West markets, and originating pick-a-pay mortgages through traditional Wachovia channels.

216.    In response to an analyst's question about whether Wachovia might "get caught up in" the declining housing market, Thompson replied:

> I don't think so … We don't fear it, and we don't fear it because the guidance that we've seen would impact most people in the option ARM and fixed pick-a-pay kind of business. ***But it does not affect us.*** And I think that goes to the very conservative underwriting standards and servicing standards that the Sandlers implemented at Golden West and we are changing none of that. So, ***if anything, we think that any changes might in fact benefit us relative to our competition.***
>
> I also think that many competitors were underwriting to the introductory or teaser rate.  And Golden West has never done that. We've always underwritten to a fully indexed rate, which we will continue. I think if you look at the credit history and right up to the current moment, it would be hard for me to imagine how anybody could look at our underwriting of these loans and draw any conclusion other than we are very responsible underwriters and servicers of these clients.

217.    Defendant Truslow:

> We did see a jump in non-performing assets during the quarter as they increased $383 million, and we ended the quarter at 40 basis points of loans, which is still very low by historical standards. … ***[W]e believe that the loans which make up the increase have little or no loss content*** and therefore our outlook for charge-offs and provision for the remainder of the year is unchanged.

First, the largest portion of the increase, 194 million, is in the Golden West portfolio. ... 90 days is important because you'll remember that we moved loans at 90 days to non-perform in the Golden West portfolio.

*[T]he Golden West loans are very conservatively underwritten at low loan-to-values with particular attention paid to the quality of the appraisals.* Most appraisals are completed by in-house appraisers and the appraisal process, I can tell you, it's very robust. Over the last several months since our teams have worked more closely with one another through integration, our view regarding the quality of the Golden West underwriting practices has just continued to grow stronger. Additionally, when loans have been classified as non-performing, the historical pattern as you can see is that few of those loans are actually foreclosed. Borrowers have equity that they certainly want to protect, and the level of that equity typically gives them options to sell the property, refinance it or otherwise cure the past due.

In addition, the customer outreach process at Golden West emphasizes early intervention at the first signs of delinquency. And the company has been very successful at counseling borrowers through difficult times. And the fact that the loans are on the balance sheet rather than packaged into securities provides us with additional flexibility in working with customers as well.

So standing back and looking at loans categorized as non-performing in the Golden West portfolio as at the end of the quarter, *the average loan-to-value is around 74%* and the actual level of foreclosed properties at the end of the quarter remained very low at just $23 million representing only 141 accounts and only 23 of those were in California. Furthermore, the loan-to-value of the foreclosed properties is 77%. So good cushion there, and *those are our current appraisals* as we've taken those properties back onto the balance sheet, and again suggests that meaningful cushion is available to cover the loan balance upon sale. So standing back and understanding the unique practices at Golden West, it's fairly easy to comprehend why this portfolio has done so well even in distressed mortgage markets in the past.

218.    Defendant Truslow then addressed concerns related to Wachovia's involvement in subprime mortgage markets:

I want to add just two quick notes that seem to be of interest in the market today. First to comment about subprime residential mortgages, clearly there have been emerging challenges in the

subprime mortgage market, particularly surrounding firms who are active in originating lower quality loans and then selling them in securities form. I'll tell you that defining subprime mortgage loans can be tricky and typically see them talked about in the press as loans with low FICO scores, say 620 or below, and weak collateral margins. But in reality, we as many lenders use a lot of different factors in underwriting consumer loans to include the level of the borrower's net worth, our relationship history with them, debt to income, etcetera. But for sake of discussion, if we use a definition of a consumer mortgage loan that has a FICO score of 620 or below and has a loan-to-value of over 80%, so a pretty conservative measure particularly on the loan-to-value side, the loans in our portfolio that fit that definition total only about a billion three or just over 0.5% of our consumer mortgage portfolio.

And then of the billion three there's a little over $800 million that consists of loans to customers where we've got a good relationship and a good track record, most of these originated through our branches, and these loans tend to perform very well and very differently than just sterile loans bought at low FICO scores in the market, and an additional 140 million of the billion three consists of Community Reinvestment Act-related loans. And so backing out those two pools of loans leaves just a little over $300 million against that billion three. So a very, very low amount on our balance sheet.

Second quick note is around Alt-A. We do originate Alt-A mortgages primarily for distribution in our Wachovia Mortgage company channel and our mortgage operation in the Corporate and Investment Bank under the trade name Verities. I will tell you that our experience with these loans has been very good and continues to be good. Over time, we have chosen to hold some of these loans for investment purposes in our portfolio and our accumulated loan portfolio in the loan account totals around $3.4 billion of these loans, and most of them have been with us for a while and are now well seasoned and the portfolio has performed very well.

So just in quick summary, as we discussed in our guidance during the January call, I think we are seeing a modest inflection in credit costs, certainly from the very low levels that we experienced last year, but we're pleased with the quality of the portfolio and think that the credit quality remains very strong on the loan account.

219.    Defendant Wurtz continued:

Obviously, the mortgage market is turning out to be more of a challenge than we had anticipated. This obviously affects the performance of Golden West. Originations for the industry are projected to be down from 2006 levels and fixed rate loans are more in favor than ARMs. While these factors will impact our revenue for the mortgage business, *we're extremely confident that the credit performance of the Golden West portfolio will remain very strong* and that the integration of our businesses will be seamless. We've made great progress in broadening our origination channels for the Golden West product set and we're also very encouraged by the sales of checking products in the World Savings branches.

*One thing I can tell you is we will not stretch for earnings by altering the Golden West origination system or weakening their proven credit practices.* So while it looks like the composition of our income statement may look a little different for the year than what I envisioned back in January, I still think we're on track to meet the bottom line guidance we previously provided.

NPAs (non-performing assets) were up 28%, driven primarily by Golden West mortgage portfolio. This is entirely consistent with our expectations. Don Truslow will provide further details later in our call, but *the loss content on these incremental mortgage NPAs is expected to be negligible*. First, only a small portion of Golden West loans that reach 90 days past due ever reach foreclosure; and finally when they do, *losses are very minimal*.

220.   Defendant's April 16, 2007 statements were materially false and misleading when made because Defendants knew that Wachovia did not employ "conservative" lending practices; the loss content in its mortgage portfolio was greatly understated; and its then-current average LTV ratios were higher than disclosed, particularly in distressed markets where Pick-a-Pay loans were concentrated. Moreover, Defendant's statements that Wachovia would not be affected and would benefit from the subprime mortgage crisis were materially false, misleading and reckless when made because they perpetuated the belief among investors that Wachovia was not exposed to the same risk of loss relative to its competitors.

## L.   WACHOVIA'S FIRST QUARTER 2007 FORM 10-Q

221.   In its First Quarter 2007 10-Q, which Defendants filed with the SEC on May 4, 2007, Defendants included materially false and misleading statements regarding its management of credit risk:

> The low level of net charge-offs reflects a continuing solid credit environment, *the highly collateralized nature of our loan portfolio and our careful management of the inherent credit risk in our loan portfolio*. The Golden West portfolio has a long record of extremely low net charge-offs, including, virtually none for the past eight years, reflecting strong underwriting and credit risk management.

222.   The foregoing statement was materially false and misleading when made because Defendants knew that Wachovia's loan portfolio was no longer "highly collateralized"; nor was credit risk being carefully managed. In fact, by May 2007, Defendants knew but failed to disclose that neither Golden West nor Wachovia employed conservative underwriting standards; Wachovia had relaxed underwriting standards in order to continue its pace of origination in a slowing real estate market; and loans that were "highly collateralized" at origination were impacted by declining home values and accumulating negative amortization, which caused LTV ratios to rise.

## M.   MAY 17, 2007 PRESS RELEASE

223.   Defendants made materially false and misleading statements in a May 17, 2008 press release. Specifically, Defendant Wurtz made materially false and misleading statements concerning the expected performance of the Pick-a-Pay loan portfolio:

> The Fixed-Rate Pick-a-Payment loan continues to be an attractive product in this environment. Increases in nonperforming assets are not unexpected; however, *World Savings' conservative underwriting practices and low loan-to-collateral values give us confidence the portfolio will continue to perform favorably in this environment.*

224.    Defendant Wurtz' foregoing statements were materially false and misleading when made because neither Golden West nor its successor, Wachovia, employed conservative underwriting practices.   Furthermore, Defendants knew that declining home values and accumulating negative amortization were driving LTV ratios upward, which made the Pick-a-Pay loan portfolio much riskier and more likely to incur losses than Defendants lead investors to believe.

### N.    JULY 20, 2007 CONFERENCE CALL

225.    Defendants made materially false and misleading statements during Wachovia's July 20, 2007 conference call with investors.

226.    While acknowledging "the turbulence in the capital market," Defendant Truslow reassured investors that Wachovia was "in very good shape."  Defendant Truslow further stated:

> [T]he turbulence is causing some disruption in the market. But in the end it's probably a very healthy correction to a market that had become very aggressive in its willingness to accept ever-increasing leverage levels, weaker structures, and thinner pricing.  *But we view the risk to Wachovia what's currently happening is very modest.*

227.    Defendant Truslow also made materially false and misleading statements concerning Wachovia's exposure to subprime markets.  Defendant Truslow stated:

> And *given we don't have a subprime focus in our business* and that our home equity loan exposure is both modest and mostly all in the form of very high-quality prime equity lines combined with the low loss content of our nonperforming loans, we are very comfortable with our allowance coverages at the end of the quarter. . . . As for subprime and our capital markets businesses and in our origination businesses, we shied away from diving into this business over the last few years, as that market took off. Really for two reasons. One is given the firm's prior experience in the subprime market in the late '90s and also, importantly, the view of our Capital Markets Group that the risk in this arena has been underpriced for quite some time. So we just haven't felt that it's been a business that's made good sense for us and therefore *we have actively managed our business to minimize our exposure to*

> *the subprime market.* So as a result *there's been little impact to our businesses with the turbulence in the subprime markets, and we don't anticipate any meaningful potential impact to earnings from subprime going forward.*

228.   Discussing Wachovia's potential losses within its mortgage portfolio, Truslow

stated:

> Given the environment, again, we are not surprised to see the residential nonperforms trend up; as we noted last quarter, it is what we've been expecting, and I would anticipate that we will continue to see some trend up over the next few quarters as well. *But because of the way these loans are underwritten, we are not seeing any meaningful increases in losses in the portfolio. And we don't expect to see any rises in losses as we look forward over the next few quarters.* And so the underwriting process and how these things are booked and what we are ultimately relying upon, holding up very, very well, as expected.

229.   Discussing potential "payment shock" from recasting loans, Truslow stated:

> I do want to remind everybody that our Pick-a-Pay product, which is our option payment ARM, is structured with caps that limit the amount a customer's payment may increase in any given year to no more than 7.5% of the payment. So on a $1,000 mortgage payment, that would be a $75 increase from one year to the next. *And therefore, just want to point out that payment shock in our option ARMs is just not an issue here at all. So it's really not an issue with the product.*

230.   Discussing Wachovia's LTV ratios, Truslow stated:

> The average loan-to-value of the residential non-performing loan book using updated appraisal information where we have gone out and we have refreshed the appraisal information on the book, is at a low 72% as of quarter-end, giving us good cushion against those loans.

231.   Discussing the Golden West acquisition, Defendant Thompson stated:

I think we are going to be happy that we did this deal long-term, and we are going to be happy that we did it because of the experience that we are having in the West as we use the branches that we acquired. And I think on the mortgage side, this product, this Pick-a-Pay product is going to be very attractive when yield curves go back to normal and as the housing market comes out of – the recovery. So, yes, we are going through a little pain with it now. But I think a year out, 18 months out, two years out, we are going to be very happy that we did this deal.

232.    Discussing Wachovia's nonperforming assets ("NPAs"), Thompson stated:

But if you compare our mortgage company to almost any other in the industry, *our NPAs are outstanding.* And our NPAs at a company level would have to be considered outstanding in comparison to our peer group.

233.    Defendants' July 20, 2007 statements were materially false and misleading when made because:

- Defendants vastly understated Wachovia's credit risks. Wachovia's acquisition of Golden West exposed Wachovia to billions of dollars worth of risky mortgages at a time, and in places, where housing markets were declining. Moreover, as a result of Wachovia's reckless underwriting practices, these mortgages were extended to borrowers who routinely elected to make minimum payments and who were incapable of repaying their loans once they recast to fully-amortizing levels.

- Defendants had significant exposure to subprime markets both as a result of its lending practices and its securitization activities. In fact, Defendant's claim that it "actively managed [its] business to minimize [its] exposure to subprime markets" is contradicted by the fact that Defendants continued to expand Pick-a-Pay loan origination using lax underwriting criteria at the same time that the loan portfolio was already showing signs of strain. Moreover, Defendants concealed the extent of subprime assets held in Wachovia's trading portfolios.

- Defendants' repeated claims that its underwriting standards would protect Wachovia from significant losses were materially false and misleading. Defendants' underwriting standards were reckless and inadequate. It was not until much later, when Defendants disclosed that they would begin to "verify income and employment history before making loans,"[18] that investors discovered that even minimal underwriting standards had not been in place.

---

[18] *Wachovia adjusts mortgage underwriting guidelines*, SACRAMENTO BUSINESS JOURNAL, Apr. 11, 2008.

- Defendants misled investors concerning the risk of payment shock and potential for default associated with Pick-a-Pay loans, because Pick-a-Pay's features, such as the payment cap and 10-year recast period, merely delayed, but did not eliminate, the time it took before borrowers were faced with payments they could not afford.

- Defendants misled investors by claiming to possess a "good equity cushion" on Pick-a-Pay loans based on LTV ratios. First, Defendants knew that declining home values and rising negative amortization meant that the LTV ratios were rising rapidly. Second, Defendants knew that the average LTV ratio for the loan portfolio overall was misleading, because the spread around the average had increased, which meant that the in many cases, the equity cushion had been depleted.

## O.   WACHOVIA'S SECOND QUARTER 2007 FORM 10-Q

234.   Wachovia filed its Second Quarter 2007 10-Q with the SEC on July 30, 2007. The 10-Q contained additional materially false and misleading statements regarding the Company's credit risk:

> Consumer net charge-offs were $249 million, up from $112 million in the first six months of 2006. . . . The low level of net charge-offs reflects the highly collateralized nature of our portfolio and our careful management of inherent credit risk. Our consumer real estate portfolio has a long record of relatively low net charge-offs, *reflecting strong underwriting and credit risk management*.

235.   The foregoing statement was materially  false and misleading when made, because as set forth herein, Defendants' underwriting standards were reckless and inadequate. In addition, as discussed, *infra* at Section X, contrary to Defendants' statements, the "low level of net charge-offs" resulted from Defendants' failure to follow Wachovia's disclosed accounting policies, and did not reflect "the highly collateralized nature" of the portfolio or "careful management of inherent credit risk." In particular, Pick-a-Payment loans were not charged off until the underlying collateral was sold, which, in many instances, occurred months after the loan went into default. Thus, Defendants presented a distorted view of Wachovia's financial position

relative to its competitors and misled investors about the degree of credit risk contained in the Pick-a-Pay loan portfolio.

**P.    OCTOBER 19, 2007 CONFERENCE CALL**

236.    Defendants made additional materially false and misleading statements during an October 19, 2007 conference call.

237.    Discussing the Company's purportedly "low" LTV ratios, Defendant Truslow stated:

> "[N]onperforming loans continue to have a loan – low loan-to-value on average and, therefore, we believe it represent relatively low loss content. Loan-to-values at the origination of these nonperforming loans averaged 75%. Periodically, we go through and we update those values using AVM estimated value analysis, and we did that in August. And that's all done at the loan level and so when we ran this analysis in August, we saw a little bit of deterioration in the loan-to-value numbers, but they were still at a very conservative 77%.

238.    Discussing, and partially disclosing Wachovia's exposure to subprime, Defendant Thompson stated:

> *[W]e have an institutional bias here against subprime.* We avoided it in our origination efforts and we avoided it in – for the most part in our securitization efforts. And so, frankly, I think we had a little bit of a breakdown in having AAA subprime in some of our portfolios that we took losses on. I do think that it is really quite amazing that we could take $300 million of losses on AAA paper. I mean we didn't – we didn't expect it, that that paper could degenerate that fast with that kind of swiftness.

239.    Defendants' October 19, 2007 statements were false and misleading because Defendants knew the Company's LTV ratios were artificially inflated and that the Company's subprime exposure was significant.    Wachovia was not, and its directors could not have reasonably believed it was, against subprime lending.    Wachovia purchased Golden West knowing that it did not even require minimum credit scores from borrowers.    Moreover,

Wachovia fully embraced Golden West's approach after acquiring it by also not requiring minimum credit scores. Wachovia's "institutional bias" was towards selling as many high-interest loans as it could regardless of the credit-worthiness of its borrowers.

### Q.    WACHOVIA'S THIRD QUARTER 2007 FORM 10-Q

240.    Wachovia filed its Third Quarter 2007 Form 10-Q with the SEC on November 9, 2007. In its 10-Q, the Company repeated materially false and misleading statements about its management of credit risk, "strong" underwriting, and level of collateralization:

> While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, our careful management of inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit environment.

241.    The foregoing statement was materially false and misleading when made, because, as explained herein, it overstated the Company's level of collateralization, management of credit risk, and utilization of underwriting standards.

### R.    NOVEMBER 9, 2007 CONFERENCE CALL

242.    Defendants made materially false and misleading statements during a November 9, 2007 conference call. By then, investors were concerned with the risks associated with Option ARMs, like Pick-a-Pay. Although Wachovia's Pick-a-Pay mortgages were "often compared with other option ARMS available in the marketplace," Defendant Truslow falsely asserted that "there really are very significant differences in the product" that insulated it from the risks inherent in other Option ARM products.

243.    Discussing the "safety" of Wachovia's Pick-a-Pay loans, Defendant Truslow stated:

> First of all, this is a portfolio product for us. We are a portfolio lender and that is important because everybody in the chain of these loans basically treats this with – these loans with a cradle to grave mentality.   So the appraisers, the underwriters, the relationship managers to their management team, this is not an originate and dump into the capital market and be done with it sort of product. ***This is a product where people are measured and their performance rewarded or penalized, based upon the long-term quality and value of these loans that are being created.***

244.    Defendant Truslow's statement was materially false and misleading because Wachovia's compensation structure and origination practices incentivized employees to promote Pick-a-Pay loans, irrespective of the borrowers' needs and qualifications, and without regard to "long-term quality and value."   Moreover, Wachovia's Pick-a-Pay loans were issued without income verification or a minimum credit score requirement.   Thus, Pick-a-Pay was not distinguishable from other payment option ARMS, but instead involved the same risks of loss.

245.    Discussing the risk of "payment shock" in recasting Pick-a-Pay loans, Defendant Truslow stated:

> It is also a consumer friendly product from a resets standpoint. Obviously resets from the 2/28 and the 3/27[18] that are on the market are of significant concern, particularly in the subprime sector.   Our product basically has a 7.5% payment cap on the minimum payment which protects consumers. ***So payment resets here just really aren't an issue….***

246.    Defendant Truslow's statement was materially false and misleading when made because Wachovia's 7.5% payment cap on Pick-a-Pay loans merely deferred, rather than eliminated, the risk of payment shock.   Moreover, to prevent the accumulation of negative amortization, minimum payments on Pick-a-Pay loans automatically adjusted to a fully-amortizing levels when LTV ratios increased to pre-set limits.   Defendants knew but failed to disclose that more Pick-a-Pay borrowers were electing to make only minimum monthly payments at the same time that housing prices were falling, which meant that Pick-a-Pay loans

would recast to fully-amortizing rates on an accelerated time table. Thus, Defendants' statements were false and misleading because Wachovia's Pick-a-Pay loan portfolio would eventually experience the same increased rates of default as other payment option ARM portfolios, but only at a slower rate as compared to Wachovia's competitors.

247. Defendant Truslow made additional materially false and misleading statements regarding the LTV ratios of Wachovia's Pick-a-Pay loans:

> So very different than some other products and then, of course, conservative loan to value is on top of the more conservative appraisal process that we have. Very few loans made above 80% and here we have lent above 80% we have required mortgage insurance. So on most properties at the outset we've acquired 20 to 30% real cash equity on the front end.

248. Defendant Truslow's foregoing statement was materially false and misleading when made, because although LTV ratios may have been low *at origination*, the then-current LTV ratios were significantly higher. Defendants knew but failed to disclose that since the majority of Pick-a-Pay borrowers paid the minimum monthly payment, which did not even cover the entire interest owed for a given month, their loan balances, and consequently their LTV ratios, were increasing. Simultaneously, property values, particularly in areas like California and Florida, where most Pick-a-Pay loans originated, were declining rapidly. Declining property values caused LTV ratios to increase even more. Thus, Defendants mislead investors because initial LTV ratios did not provide the safety net Defendant Truslow described.

249. Discussing Wachovia's exposure to subprime markets, Defendant Truslow made additional materially false and misleading statements:

> Clearly we could have done a better job around subprime on – *for the company that has had such a negative bias towards subprime.* We didn't leap into the origination side. We stayed away from a lot of the businesses that evolved and grew beginning just a couple of years ago yet we found ourselves in this downdraft with pockets of subprime exposure that essentially, there were investments or positions taken in various places across the platform. Mostly in the form of what we believe to the very high-quality assets, AA, Super Senior, AAA, and adjunct to that is that where those decisions were made, they probably didn't involve the expertise and talent of the part of the platform that really had the most experience around residential mortgages and subprime, probably too reliant on the ratings and taking too much comfort in historical performance around securities with those ratings.

250.   Defendant Truslow's foregoing statement was materially false and misleading when made because Wachovia did not have a "negative bias" towards subprime. On the contrary, Wachovia acquired Golden West knowing that it was heavily involved in subprime lending. Moreover, Defendants knew that after Wachovia acquired Golden West, Wachovia adopted Golden West's lax underwriting practices and expanded the Pick-a-Pay loan product throughout the organization, thereby substantially increasing Wachovia's subprime-related assets in its General Bank business segment. Defendants also knew but failed to disclose that Wachovia was accumulating subprime-related assets in its trading portfolio, because it was forced to retain the residuals of securitizations it had originated but could not sell into secondary markets. Thus, Defendants' statements were false and misleading, because Wachovia's holdings of subprime-related assets exposed the Company to greater levels of risk than Defendants indicated.

S.   **NOVEMBER 14, 2007 CONFERENCE CALL**

251.   On November 14, 2007, Defendants made additional materially false and misleading statements during a presentation at the Merrill Lynch Banking & Financial Services Investor Conference.

85

252.    Specifically, Ben Jenkins, Vice Chairman and President of Wachovia's General Bank, made materially false and misleading statements regarding the supposedly distinguishing features of Wachovia's Pick-a-Pay mortgages:

> From a credit perspective, we believe our work to build a low-risk, highly collateralized consumer portfolio and a wholesale portfolio that is very granular in size and very well balanced between geography and industry, that's the right strategy for us and it will pay off for us in 2008 ...

*****

> The appraisal process is, again, done by somebody on staff, a Wachovia appraisal, who knows the market, knows the submarket, and the only pressure that appraiser feels is the pressure to get it exactly right from a value standpoint....And we have protections built in for the borrower in terms of how much movement that can be in the payment rate.  The payment rate can only move up 7.5% year to year.  So if rates move up dramatically, the borrower's payment rate only goes up 7.5%....

*****

> Now, the fourth fundamental for good performance is superb risk management, and that has, I think, long been the hallmark of our company....And with the addition of Golden West, our real estate portfolio has a loan to value at origination of 71%....

253.    The foregoing statements were materially false and misleading when made because: (i) lax underwriting standards created an inherently risky loan portfolio; (ii) Wachovia no longer employed the same appraisal process; (iii) payment caps did not prevent "payment shock" because loans would automatically recast to fully-amortizing levels as LTV ratios rose; and (iv) LTV ratios *at origination* were outdated and no longer representative of then-current market conditions.

T.   **JANUARY 22, 2008 CONFERENCE CALL**

254.   Wachovia released its fourth quarter 2007 earnings statements in a Form 8-K filed on January 22, 2008.  Following the release of its fourth quarter 2007 earnings, Defendants made materially false and misleading statements during a January 22, 2008 conference call.

255.   In particular, Defendant Thompson made several materially false and misleading statements during the call:

> Nevertheless, based on recent action in our stock price, I'm certain that investors are anxious about several questions on Wachovia which I want to address now.  The first question is, what is the level of losses in your Pick-a-Pay mortgage portfolio? … *[O]ur Pick-a-Pay portfolio will generate very meaningful bottom-line profits in 2008, and I do not believe that investors grasp that fact today.*
>
> The second question: does Wachovia have enough capital?  After our December preferred offering, Wachovia's capital levels were higher at year-end than at the end of the third quarter in spite of the marks and in spite of the reserve build that we did in the fourth quarter.  And we're confident that those capital levels will increase as we go through 2008.
>
> And the third question: will Wachovia cut its dividend?  And the answer to that question is *we have no plans to cut the dividend because we don't need to cut the dividend.*  We're confident in our ability to meet our 2008 business plan.  And that plan, as we have said before, will generate cash earnings that will cover our dividend payments, continue to build necessary credit reserves, improve our capital ratios and support growth in our business lines. (emphasis added).
>
> \*\*\*\*\*
>
> And of course we have contended that all along we've been lumped in with option ARM products of other companies, and *ours is vastly different. . . . So we think we're in good shape there*, and we think that product is going to be attractive going forward. (emphasis added).

256.   Defendant Thompson's foregoing statements were materially false and misleading when made, because Defendants knew or recklessly disregarded the risks associated with the

Pick-a-Pay portfolio while simultaneously claiming that the Pick-a-Pay portfolio would generate profits. Defendant Thompson repeatedly attempted to distinguish Pick-a-Pay loans from other Option ARMS when, in fact, Pick-a-Pay was subject to the same risks as other Option ARMS. Although Defendant Thompson claimed the Company was "good shape," Defendants knew that Wachovia was on the brink of total collapse.

257.    Defendant Wurtz made additional materially false and misleading statements during the same call:

> *[T]here's clear evidence that our Pick-a-Pay portfolio is to date performing very similar to that of the average prime portfolio* in the industry in terms of 60 day delinquency as an example....
>
> \*\*\*\*\*
>
> We feel very good about our execution from both an operating standpoint and on the integration front, and *believe we're poised for strong results* barring complete meltdown in the equity markets. (emphasis added).

258.    Defendant Wurtz's foregoing statement was materially false and misleading for the reasons described above.

259.    Defendant Truslow made additional materially false and misleading statements during the same call:

> Given the stressed mortgage market, and the fact that *the underwriting for Wachovia's Pick-a-Pay product is different from what is a typical option payment ARM* and therefore admittedly a little difficult to categorize against other more common products, we've included the next two slides to provide some help in better understanding how this portfolio is performing in this market against traditional prime, Alt-A, and subprime loans.