> So if you'll slip over to slide 18, this chart's the Wachovia Pick-a-Pay 90-day past due ratios. And the green diamond line, and the Wachovia overall mortgage portfolio inclusive of Pick-a-Pay is in the darker blue, small square line, against prime, Alt-A, and subprime industry results. And *you can see that the Wachovia results are performing well measured against Alt-A, and just modestly worse than prime.* And of course subprime performance has been rather dismal....

> [W]e provided this to the extent that it would be helpful.... But we think that slide 18 in aggregate tells a story that is maybe not well understood in the market. (emphasis added).

260. Defendant Truslow's foregoing statement was materially false and misleading because Defendant Truslow knew or recklessly disregarded the fact that Pick-a-Pay loans would not continue to "perform[] well measured against Alt-A," because Pick-a-Pay loans eventually reset to the same "payment shock" levels that were triggering defaults in other payment option ARMs. Thus, Defendant Truslow's statement was materially false and misleading.

261. Defendant Truslow made additional false and misleading statements regarding the Company's underwriting practices and the LTV ratios for its Pick-a-Pay portfolio:

> For the Pick-a-Pay product, the portfolio has an original loan-to-value of about 71% and an original FICO score of about 673. And as a reminder, *the Golden West underwriting practices focused on a rigorous appraisal process* and the borrower's ability to fund 20% to 30% of the purchase price up front. Using estimated current valuation updates that we ran in November, *the average current loan-to-value across the portfolio is basically unchanged from origination, coming in around 72%.* (emphasis added).

262. Defendant Truslow's foregoing statement was materially false and misleading because the LTV ratios across the Pick-a-Pay portfolio had already increased significantly since origination. Thus, the risk of loss to the Company was far greater than Defendant Truslow claimed.

We've begun experiencing higher loss rates where we have loans in markets that experienced rapid price appreciation since 1999, and are now seeing rapidly declining trends in housing values. Most of the build in the allowance for the Pick-a-Pay product was for the loans in those markets where the estimated current loan-to-values have risen or are expected to rise above 95%, were originated over the last three years, and are exhibiting a higher likelihood of default. So when you carve out this pool of loans, it constitutes about $8 billion of the $120 billion Pick-a-Pay portfolio.

In December, severities I believe, got to just under 25%. And so again you have to take that in light of where most of these sales have been, so the most severely impacted properties. *And we have been helped by the fact that we had 20, 30% real equity on the front end...* (emphasis added).

\*\*\*\*\*

That would be the loss against the value of the loan. So if you think about some markets in California that have given up 25, 30% from their peak, that could entirely take away the equity that the borrower put in on the front end, and maybe a little more. And then you take into account the foreclosure costs, cost of fixing up the property, going through foreclosure, the commissions that we're willing to pay to get the house moved. We've been willing to take some possibly higher severities in some markets to get the properties moved ...

263.  Defendant Truslow's foregoing statements were materially false and misleading when made because vastly more loans were at risk of default, and the at-risk properties were not sufficiently collateralized. Specifically, nearly 70% of Wachovia's Pick-a-Pay portfolio consisted of loans originated in California and Florida, places hit hardest by the declining housing market. Moreover, because most Pick-a-Pay borrowers were paying only the minimum monthly payment, negative amortization was accumulating and loan balances were increasing, not decreasing.

264.  Towards the end of the conference call, Defendant Thompson made additional materially false and misleading statements:

> And I think, in addition to that if you look at the provision expense in the fourth quarter and if you look at what we're planning going forward, I think *we're being very conservative from a credit standpoint moving forward.*
>
> So I think we are being very conservative. And I think we are optimistic about the future given the conservatism that we've already taken. And that's why we feel comfortable giving the kind of guidance that we've given you as far as covering the dividend, growing capital ratios, growing our business. And we're optimistic about Wachovia. Frankly, *it's just hard for me to understand the impact that our stock price has taken over the last three months because I look at how we compare to others and I feel very good about where Wachovia is.*

265.     Defendant Thompson's foregoing statement was materially false and misleading when made because Wachovia had one of the largest portfolio of payment option ARMs, and it was precisely this type of mortgage that had the highest risk of default. The risk of default in the Pick-a-Pay loan portfolio was the same, if not greater, than would be experienced in other payment option ARM portfolios, because Defendants knew that Pick-a-Pay's features delayed, but not eliminated, many of the defaults. Defendants also knew that Wachovia had insufficient credit reserves to account for these impending losses. Defendant Thompson's statement that Wachovia was "being very conservative from a credit standpoint moving forward" was therefore false and misleading.

266.     Wachovia's insufficient credit reserves were questioned by Kevin Fitzsimmons, an analyst participating in the conference call. Fitzsimmons asked:

> I know you've given a lot of detail today, but if you can help us reconcile how and why we shouldn't come away thinking the allowance is very low and specifically the ratio I'm looking at primarily is the allowance to NPA [non-performing asset] ratio being at only 88%, and which I'm sure is well below peer level....

267.    In response, Defendants merely repeated their false and misleading statements concerning the credit quality of Wachovia's loan portfolio and the level of collateralization associated with its Pick-a-Pay loans.

### U.    JANUARY 30, 2008 CONFERENCE CALL

268.    Defendants made materially false and misleading statements during a January 30, 2008 conference call.

269.    Discussing the Pick-a-Pay portfolio, Defendant Thompson stated:

> So I know that potential credit losses are of concern for investors and I want to talk directly with you about that. ***Wachovia, as we see on this slide, has historically been a conservative underwriter and I can assure you that that's not changed….***[H]ere we underwrote, as did Golden West before us, with a substantial cash upfront, we were at 70, 71% loan-to-value on our mortgage portfolio. And we are confident, in fact, ***we are very confident that the loss content on these NPAs will not approach levels of loss content in other asset classes that you look at.***
>
> [T]his slide further illustrates that. It shows why we've got confidence in the statement I just made.
>
> Our mortgage portfolio loss rate will be manageable because as this slide shows [] the dark green line shows 90-day past-due performance for Wachovia's Pick-a-Pay mortgage portfolio … [Y]ou can see on this slide that it tracks most closely to the blue line, which is the entire mortgage industry prime performance. It's way below the red line which is subprime and it's tracking well below Alt-A which is the gray line. So that gives us confidence that our loss rate in the Pick-a-Pay portfolio is going to be good.
>
> I think you should take further comfort by focusing on this slide. This slide shows delinquency rates for Wachovia portfolios versus industry averages for the same portfolios. ***[I]n every category, mortgage, whether it be Pick-a-Pay or traditional mortgages, home equity, and in auto finance, Wachovia is demonstrably superior to the industry.*** (emphasis added).

270.    Defendant Thompson's foregoing statement was materially false and misleading for the reasons already explained above.

271.   When questioned about the high default rates in other Option ARM portfolios and whether Wachovia was concerned about defaults within its Pick-a-Pay portfolio, Defendant Thompson stated:

> *[O]ur option ARMs were totally different than other option ARMs in the market.* We've gone over this time and time again. We've got a cap on payment rates going up by more than 7.5%; we underwrote to the fully indexed rate, not to the teaser rates, our average go-in-on LTV was somewhere in the 70 to 72% range. So we've got [ ] a cushion, and we're being hurt in California, where we've seen great price depreciation and in some other places. But overall, I stand by what I've said about the NPA's are rising, but *our loss content in our NPA portfolio will not be anything close to other asset classes.* (emphasis added).

272.   Defendant Thompson's foregoing statement was materially false and misleading when made because Defendants knew but failed to disclose that Wachovia's Pick-a-Pay loans were not fundamentally different than other payment option ARMs offered by competitors. Moreover, Defendants knew that Wachovia had relaxed underwriting standard to the point where Wachovia could not have known whether its borrowers could repay loans at the fully-indexed rate. Finally, Defendant Thompson's reference to LTV ratios in the "70 to 72%" range was false and misleading because Defendants knew that current LTV ratios were much higher than LTV ratios at origination, because declining real estate values and increasing negative amortization were causing LTV ratios to increase at rapidly accelerating rates.

### V.   FEBRUARY 13, 2008 CONFERENCE CALL

273.   Defendants made materially false and misleading statements during a February 13, 2008 conference call.

274.   During this call, Defendants repeated their false and misleading assurances that (1) only a small portion of their mortgage portfolio was at risk of default; (2) the current LTV ratios of Wachovia's mortgages were essentially unchanged since origination; (3) Wachovia's

loss reserves were sufficient; and that (4) Wachovia's Pick-a-Pay loans were immune from the same risks inherent with other Option ARM loans.

275.    A participant questioned Defendants about the risk of default once its loans fully recast, specifically whether *"[Wachovia's] just delaying the inevitable by delaying the recast event to a later time period…"* (emphasis added).

276.    Defendant Truslow gave a materially false and misleading response:

> So it really hasn't – it's a – it gets a lot of attention and we get a lot of questions about it but *it just hasn't been a factor from an asset quality standpoint or a delinquency standpoint* and again, we believe that it's actually very favorable from the consumer's vantage point in that it avoids some of the traps that are now popping up in some other products. (emphasis added).

277.    Defendant Truslow's assertions were materially false and misleading because Wachovia's rate caps allowed it to defer, but not to avoid, the same default risks inherent in other payment option ARM products.

278.    Defendant Truslow made additional materially false and misleading statements regarding the LTV ratios within the Pick-a-Pay portfolio.  Defendant Truslow stated:

> The interesting thing is, I think the last run we did was in November and across the whole book, the actual loan to value for the portfolio went down by a couple of percent.  And even in the pick-a-pay portfolio, it was down by a little bit.

> We did give I believe in – I think it's in here, I know we did in the earnings report that of the non-performs in the pick-a-pay portfolio, the current average loan to values in the non-performs was, I believe, about 81% if I'm remembering that number correctly.  So we did try to give a little color as to what's happening on average in the non-perform category.

279.    Defendant Truslow's foregoing statement was materially false and misleading because average LTV ratios were higher than 81% for Wachovia's NPAs.  In fact, the Company's California loans LTV ratios averaged over 90%.

280.    Defendant Thompson made materially false and misleading statements during the

call. Thompson stated:

> But, we feel good, actually about how [Pick-a-Pay] is performing
> relative to the rest of the industry.  Some of the characteristics just
> to keep in mind about the pick-a-pay product, and we like to
> continue reminding people about this. . . .
>
> [T]he minimum payment can only move by 7.5% per year . . . *So
> the pick-a-pay product is actually pretty consumer friendly, and
> that has had the effect of shielding consumers from some of the
> major payment shocks that are now really just coming about.*
> (emphasis added).
>
> *****
>
> And, in fact, what is happening o [sic] course, is rates are coming
> down, and that will, in fact, kind of ease pressure on the pick-a-pay
> product and reduce the amount of deferred interest that is
> accumulating where people opt to pay the minimum payment rate
> and probably make this (inaudible) what happens in the next
> couple years, *actually make the results better than what we show
> here.* (emphasis added).
>
> *****
>
> So, again, I hope this helps just put it into context *the deferred
> interest nature of this product really has not stressed the
> portfolio, nor has it put additional stress on the borrowers, and
> really hasn't at all been either a causal effect of borrowers going
> delinquent or adding really in any kind of significant way to any
> sort of severity.*

281.    Defendant Thompson's foregoing statements were materially false and

misleading.  First, the 7.5% rate cap Thompson referred to did not, and could not, "shield

consumers from some of the major payment shocks" caused by recasting – it could only delay

the inevitable.   Second, precisely because of this feature, Defendant Thompson knew or

recklessly disregarded that the results from the Pick-a-Pay portfolio were not likely to get

"better;" they were likely to get worse.  And finally, Defendant Thompson's statement that the

"deferred interest nature of [Pick-a-Pay]" did not stress the portfolio or borrowers was materially

95

false and misleading because deferred interest was precisely what was stressing portfolios and borrowers in nearly all Option ARM products, including Pick-a-Pay.

### W.    WACHOVIA'S 2007 FORM 10-K

282.    Defendants made materially false and misleading statements in Wachovia's 2007 Form 10-K. Defendants filed the 2007 10-K with the SEC on February 28, 2008.

283.    Discussing Wachovia's acquisition of Golden West, Defendant Thompson repeated his materially false and misleading assertions about the "quality" Golden West's business model and underwriting standards:

> With the benefit of hindsight, it is clear that the timing was poor for this expansion in the mortgage business.  Yet *we have reconfirmed our opinion of the quality of the Golden West franchise, its underwriting and service model, and the quality of its people.*

284.    Defendant Thompson's foregoing statement was materially false and misleading because Golden West's business model and underwriting standards were deficient for the reasons discussed above.

### X.    MARCH 12, 2008 CONFERENCE CALL

285.    Defendants made materially false and misleading statements during a March 12, 2008 conference call.

286.    Defendant Truslow made materially false and misleading statements during the March 12, 2008 call:

> Given the serious weakness in the housing markets, we are looking for the non-perform level to climb as we move through 2008, and that's in part driven by the sticky nature of these non-performing loans and we can talk about that if you'd like.  The Pick-a-Pay non-accrual loan levels are up, but comparing with some recently reported results by some other option ARM lenders in the industry, we believe our levels sit at relatively attractive levels or levels pretty significantly below what we have seen some others report.

*And I think that is probably due very heavily to the way the Pick-a-Pay product is designed and we are somewhat insulated from the recast pressure* that some other option ARM lenders are facing right now. . .

And we do get a lot of questions about the Pick-a-Pay product and its features and how the product works, and *it doesn't appear that the features themselves are creating any significant issue for us. . . .*

And when we stand back and look at the deferred interest component on non-performing loans, the deferred interest component on non-performs is only slightly higher than the portfolio overall. So, again *it doesn't appear that the deferred interest component is really a driver of loans defaulting. . . .*

*And again lot comes back to, I think, how our loans were originated versus some of the more problematic loans that others have been talking about.* I think on a relative basis, we feel very good about how that position is – that loan portfolio is positioned.

**Khori Gembermini of John Hancock:**

In terms of your Pick-a-Pay portfolio, reading some of your disclosures, I think you give some opinion of a current loan-to-value, but you don't divulge bands per se. I guess can you be more specific in terms of what you feel the current loan-to-value is based on your – however you do that and maybe a comment on how you do it would be great? And secondly, what percentage would be over 100% and in terms of that product, when do you start choking-off people?

**Don Truslow:**

*I believe the average loan-to-value on the Pick-a-Pay portfolio came back at about 72% or so, which was about pretty close to the original loan-to-value surprisingly.* What I will say is that on average we came in pretty close that the spread around the average is wider, so there is obviously more that is moved into the higher loan-to-values and then as our loans that have been and markets that have appreciated that haven't given back the appreciation or seasoned over time, there is more that is moved kind of the lower loan-to-value part of the spectrum.

But on the average it came back actually pretty close.

**Michael Mayo of Deutsche Bank:**

So, as of November, how much of Pick-a-Pay was loan-to-value of 90% or more?

Truslow:

*I don't think we've disclosed that number.*

287.    Defendant Truslow's foregoing statements were materially false and misleading because the Pick-a-Pay model was precisely what was "creating significant issues" for Wachovia.  Defendants repeated attempts to distinguish Pick-a-Pay from other Option ARMs were materially false and misleading as Pick-a-Pay suffered from the same deficiencies as other Option ARMs.  Defendant Truslow knew or recklessly disregarded that his foregoing statements were false and misleading as evidenced by the majority of Wachovia's loss reserves being set aside to cover losses from Pick-a-Pay loans.

**Y.    APRIL 14, 2008 FORM 8-K**

288.    Defendants also made materially false and misleading statements in the Form 8-K filed by Wachovia on April 14, 2008.  In its April 14, 2008 Form 8-K, Wachovia reported (i) total assets of approximately $784 billion (including a net loan balance of approximately $466 billion); (ii) total stockholders' equity of approximately $78 billion; and (iii) a net loss of $350 million for the first quarter of 2008.  However, each of these figures was materially inaccurate because the value of Wachovia's assets and shareholders' equity were materially overstated, and its net loss for the first quarter of 2008 was materially understated, as a result of (i) the severe impairments in Wachovia's residential mortgage portfolio, including its Pick-A-Pay portfolio; (ii) the impairments in Wachovia's portfolio of CDOs and RMBS; and (iii) the impairments to Wachovia's goodwill.

289.    In addition, the April 14, 2008 Form 8-K reported that Wachovia maintained a Tier 1 capital ratio of 7.5% as of March 31, 2008 – an increase over its Tier 1 ratio as of December 31, 2007, and substantially above the 6% ratio required to be "well capitalized." However, these representations were materially untrue and misleading because they failed to disclose that Wachovia's Tier 1 capital had been impaired and that, as a result, the Company's stated Tier I Capital had been substantially eroded.

290.    Furthermore, the April 14, 2008 Form 8-K contained numerous statements concerning Wachovia's "strong liquidity and capital position," which "provides ability to operate from a position of strength."   Wachovia also claimed that its "[p]roactive actions provide solid foundation in order to further strengthen the balance sheet and build capital to top tier levels."

291.    These statements concerning Wachovia's liquidity and capitalization were materially false and misleading, because Wachovia's balance sheet did not represent the Company's financial condition.   In reality, Wachovia's mortgage-related assets, including the Pick-a-Pay loan portfolio and CDOs, were substantially overvalued and had not been properly weighted to account for risk.   In addition, Wachovia failed to create adequate reserves to account for losses.   Thus, although its Tier 1 capital ratio of 7.5% signaled to investors that Wachovia could weather deteriorating market conditions, the truth was that

### Z.    APRIL 14, 2008 CONFERENCE CALL

292.    After filing the Form 8-K on the same day, Defendants finally admitted during an April 14, 2008 conference call that: (1) Wachovia incurred severe losses from Pick-a-Pay loans; (2) these losses were threatening the financial stability of Wachovia; and (3) Wachovia was making significant changes, including no longer originating Pick-a-Pay loans.

293.    The questions from conference call participants indicated a disconnect between what Defendants previously represented and their then-current disclosures.   For instance, a conference call participant, Jason Goldberg of Lehman Brothers, asked:

> *[Y]ou've been consistent in saying at least up until your 10-K in late February that you felt comfortable with your capital and dividend position.*   Obviously, something has changed dramatically.   Obviously, you went into February knowing the housing market was stressed.   Can you just kind of update us with your thoughts over the subsequent six weeks from the end of February?

294.    Similarly, Kevin Fitzsimmons of Sandler O'Neill asked:

> Could you give a little more detail on, you cited dramatic change in customer behavior or consumer behavior and that led to the decision to cut the dividend, increase capital.

295.    And Jonathan Adams of Oppenheimer Capital asked:

> *[I]t strikes me that there's nothing in the 90 days past due trends that would justify the kind of change that you have made in your outlook.*   You can pick a different – a number of different metrics, whether it's the dividend in suggesting that over a broad range of scenarios it wouldn't need to be cut, and then five or six weeks later coming to a different conclusion, or it's some other metrics as well.   *But it just strikes me as difficult to understand how management's view of the environment has changed so dramatically.*

296.    Defendants' responses were materially false and misleading because Defendants' responses indicated their "dramatic" change in outlook was due to a "new model" for projections, rather than information Defendants already knew, misrepresented, and failed to disclose:

**Defendant Thompson:**

Over the past year, we've witnessed a consistent pattern of deterioration in credit statistics in our mortgage portfolio in stressed areas of the country and particularly in California and Florida.…*The basis for our revised projections is a new model* which permits us to model home prices at the MSA level in conjunction with a behavioral model that captures changes n borrower's repayment behavior when their equity dissipates…

*****

**Defendant Wurtz:**

As Ken mentioned, *we've changed considerably the modeling of our Pick-a-Pay portfolio* with far greater emphasis on forecasted future changes in housing markets and customer behaviors, and particularly in the stressed markets …but the results of that is we expect further robust provisioning in both 2008 and 2009.

*****

**Defendant Truslow:**

Ken and Tom mentioned for the Pick-a-Pay and the portfolio, *we have implemented a new modeling tool which will help us better estimate the outlook for credit costs for this portfolio*, and we have chosen to use the OFHEO Index at the MSA level weighted for our loan balances in order to calibrate the correlations of what we were observing and borrower propensity to default to housing price declines.   And therefore using this as a backdrop for forecasting credit costs.…

[A]s housing prices decline and borrowers lose their equity in their homes relative to their first mortgage balances, we are seeing borrowers default at a faster rate than historical trends and other quality measures such as FICO would suggest… *[W]e believe that this new approach, this new model better captures these linkages and home price trends and this new analysis and what we've been experiencing in the housing market in the first quarter led us to build the allowance by about $1.1 billion for the Pick-a-Pay mortgage portfolio….* [W]e have used the models output to help dimension for investors credit costs we [are] currently estimating for the Pick-a-Pay loan through the end of 2009. We're currently expecting charge offs including first quarter results for all of 2008 at about 1.3 billion to 1.7 billion rising to somewhere in the 2.5 billion range in 2009. In terms of reserves, we expect to continue adding another $800 million to $1 billion in addition to the $1.1 billion that was added in the first quarter across 2008 and this is in anticipation of the estimated charge offs in 2009 so the reserve has a forward look to it. [A]s you can see, these actions substantially build the loan loss reserves for this product.

*****

297.    Defendants' foregoing statements were materially false and misleading when made because, as described herein, their disclosures were based on information Defendants knew, concealed, and misrepresented.

298.    During the April 14, 2008 conference call, Defendants admitted that their loans were not as highly collateralized as Defendants previously represented. Thus, Defendants previous representations about low initial LTV ratios and up-front equity requirements were obviously false. In fact, for the first time, Defendants disclosed that many borrowers had zero or near zero equity in their homes, and that because of this, many borrowers were simply abandoning their properties:

**Defendant Thompson:**

I would just say that what we are seeing is that *when equity in the home approaches zero, behavior changes.* And that's what the model tries to do is to then take that behavior along with house price depreciation and factor that into future losses. Don?

**Defendant Truslow:**

> Ken, that's exactly right. And Kevin, it's just this pattern almost that somewhere and I don't know where the tipping point is, but somewhere **when a borrower crosses the 100% loan to value, somewhat north of that. And they presumably run into some sort of cash flow bump, whether it's reduced income or normal things in life that have created past dues before. They're [sic] propensity to just default and stop paying their** mortgage **rises dramatically** and I mean really accelerates up. It's almost regardless of how they scored, say, in FICO or other kinds of character, credit characteristics …
>
> [T]hat behavior is going on. We're seeing in our portfolio the most significant declines and defaults activity in California, **and of course, it's the largest concentration for us in the Pick-a-Pay portfolio by far.**

299.    Betsy Graseck, an analyst with Morgan Stanley, questioned Defendant Truslow further regarding LTV ratios within the Pick-a-Pay portfolio:

> On page 21, **you've got the percentage of the Pick-a-Pay portfolio that [has] got an LTV above 100%, 14%. Is this the first time you're giving that data?**

300.    Defendant Truslow responded:

> **It is.** [W]e wanted to provide that just to, number one, that's the most stressed stratification in the portfolio. And also just exhibit that we recognize there's been severe deterioration in several of our markets where we have the Pick-a-Pay loans.

301.    Although Defendants' foregoing statements were partial corrective disclosures, Defendants made additional materially false and misleading statements.

302.    Specifically, Defendants falsely stated that: (1) LTV ratios had only risen slightly; (2) losses within the Pick-a-Pay portfolio would not exceed 7.5%; and (3) Wachovia had sufficient capital to fund a dividend payment representing approximately 60% of Wachovia's prior dividend.

303.   The false and misleading nature of Defendants' foregoing statements was not fully known until new Wachovia CEO Robert Steel admitted: (1) current LTV ratios were significantly higher than previously claimed; (2) losses from Pick-a-Pay would be almost twice as high as Defendants previously claimed; and (3) Wachovia could not fund its dividend as previously claimed.

### AA.   JULY 22, 2008 AND SEPTEMBER 9, 2008 CONFERENCE CALLS

304.   During a conference call on July 22, 2008, Defendant Steel admitted that Pick-a-Pay LTV ratios were significantly higher than previously claimed; that Pick-a-Pay losses would be significantly higher than previously claimed; and consequently, that Wachovia would have to eliminate its dividend.

305.   Although Steel's admissions constituted partial disclosures, Defendant Steel's statements were false and misleading when made because Defendants continued to understate LTV ratios and conceal the full extent of losses within the Pick-a-Pay portfolio.

306.   During a September 9, 2008 conference call, an analyst questioned Defendant Steel about his representations regarding Pick-a-Pay:

> I believe that the last time you offered projections with respect to the Pick-a-Pay portfolio, the bank was looking at about a 12% estimated cumulative loss rate. *When I apply the same estimated projections that come out of both Lehman and other firms fixed income research groups by vintage, I come up with a number much closer to something close to 20%.* [Y]ou've now been at the bank longer than the initial call, has your view on estimated cumm losses on a Pick-a-Pay changed? Or are you still looking at around 12% or perhaps something higher than that?

307.   CEO Steel and another unidentified Wachovia executive replied that the Company's figures were correct.   However, that representation was materially false and misleading, because within a few weeks, the full extent of Wachovia's fraud was revealed as

Wachovia was nearly forced into receivership by the FDIC and new and significantly higher projected losses within the Pick-a-Pay portfolio were announced.

## IX.   WACHOVIA'S AND THE INDIVIDUAL DEFENDANTS' SCIENTER

308.    The Individual Defendants, by virtue of their receipt of information reflecting the improper and fraudulent behavior described above and/or their failure to review information they had a duty to monitor, their actual issuance of and/or control over Wachovia's materially false and misleading statements, and their association with Wachovia, which made them privy to confidential proprietary information concerning Wachovia, were active, culpable, and primary participants in the fraudulent scheme and issuance of material misrepresentations alleged herein. The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the public.

309.    The Individual Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Wachovia's public statements would adversely affect the integrity of the market for Wachovia's common stock and would cause the price of Wachovia's common stock to be artificially inflated.  The Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

310.    The scienter of Wachovia and the Individual Defendants is supported by the following facts, which are described in detail herein.

### A.   DEFENDANTS KNEW AND/OR HAD ACCESS TO INFORMATION SUGGESTING THAT THEIR PUBLIC STATEMENTS WERE NOT ACCURATE

#### 1.   Defendants Knew That Wachovia Did Not Employ Strict Underwriting Standards In Its Origination Of Pick-a-Pay Loans

311.    From the moment the acquisition of Golden West was announced in May 2006, Defendants repeatedly emphasized that Pick-a-Pay loans were distinguishable from other

payment option ARMS because of the strict underwriting standards employed at the time of origination.

312.    Furthermore, the Individual Defendants made numerous public statements concerning Wachovia's underwriting standards.  Although these statements were designed to perpetuate the misleading impression that Wachovia continued to employ conservative underwriting practices, the Individual Defendants knew and/or had access to information indicating that Wachovia was originating Pick-a-Pay loans without verification of borrower income or requiring minimum credit scores.  The Individual Defendants also knew that Wachovia began to utilize outside appraisers.

313.    Because Wachovia's underwriting standards were an essential characteristic of the Pick-a-Pay loan program, and were therefore fundamental to Wachovia's overall financial condition, Wachovia's senior management, including the Individual Defendants, monitored and managed Wachovia's underwriting guidelines and operations.

### 2.    Defendants Knew That Employees Were Incentivized To Promote Pick-a-Pay Loans Without Regard To Risk Management Strategies

314.    Wachovia, at the direction of the Individual Defendants, established a system of financial rewards for originating higher risk loans, with corresponding negative consequences for those who did not follow the system.  Wachovia loan production personnel, including outside mortgage brokers, were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier Pick-a-Pay loans.  Commissions earned by Wachovia employees and brokers who sold Pick-a-Pay loans were substantially higher than those resulting from the sale of more traditional loan products.

315.    After the Golden West acquisition in 2006, Wachovia originated billions of dollars in new Pick-a-Pay loans.  Defendants received reports and/or had access to reports

detailing the Company's loan origination statistics, including information concerning compensation of loan personnel who sold Pick-a-Pay loans. As discussed, *supra* at Section XIII, Defendants also made numerous statements indicating that loan personnel were being specially trained to promote Pick-a-Pay loans and that the Pick-a-Pay product was being expanded throughout the organization.

**B.    SCIENTER CAN BE INFERRED FROM THE FACT THAT DEFENDANTS' MISSTATEMENTS CONCERNED MATTERS CENTRAL TO WACHOVIA'S CORE OPERATIONS**

316.    From the time that the Golden West acquisition was announced, Defendants made it clear in public statements that the goal was to grow Wachovia's business. The Pick-a-Pay loan figured prominently in that expansion plan. Indeed, the Pick-a-Pay loan portfolio was a $120 billion asset, which was central to Wachovia's financial performance and liquidity. Among other things, the value and stability of the Pick-a-Pay loan portfolio significantly impacted Wachovia's Tier 1 capital ratio, both in terms of Wachovia's loan loss reserves and retained earnings and in properly weighting Wachovia's assets for credit risk.

317.    Defendants knew and understood that the Pick-a-Pay loan portfolio was critical to Wachovia's business. From 2006 to 2008, Defendants made numerous public statements, as detailed herein, which were deliberately calculated to mislead investors about the level of risk contained in the Pick-a-Pay loan portfolio and Wachovia's ability to withstand losses in a declining real estate market. Similarly, Defendants continued to reassure investors that Wachovia maintained a Tier 1 capital ratio of 8% and that Wachovia was well capitalized.

318.    For example, Defendants repeatedly highlighted Wachovia's conservative underwriting standards, its use of inhouse appraisals, low loan-to-value ratios at origination and employee training as back-stop measures that mitigated risk and justified maintaining lower loan loss reserves. In actuality, numerous former employees, including Paul Bishop, Sharren

McGarry and Russell Kentell, have confirmed that a pervasive Company-wide culture existed that emphasized "quantity over quality" and rewarded employees for originating loans in derogation of underwriting standards. These sources have described how borrowers were steered into loans they did not understand and were encouraged to inflate their incomes because they could be approved quickly without verification.

319.   Moreover, when the pace of originations began to slow in 2007, Defendants ramped up efforts to sell more Pick-a-Pay loans by, among other things, deploying more employees to promote Pick-a-Pay loans, relying on third-party mortgage brokers to generate new loans without proper oversight and lowering required minimum monthly payments to only 1% of the loan balance to expand the pool of potential borrowers.

320.   In addition, Defendants began extending these risky loans to an increasingly broader class of less-creditworthy borrowers. While Defendants had represented on numerous occasions that Defendants " actively managed [Wachovia's] business to minimize our exposure to the subprime market," reports corroborated by numerous former employees confirm that they knew and/or recklessly disregarded the fact that Pick-a-Pay loans were being sold without requiring minimum credit scores or verifying income. In fact, in February 2007, Defendants claimed that "just over 0.5% of our consumer mortgage portfolio" consisted of loans to borrowers with credit scores below 620. However, a year later, in April 2008, Defendants disclosed that $51 billion in Pick-a-Pay loans (or approximately 62% of the total portfolio) had been made to subprime borrowers with credit scores below 660. Of that amount, nearly half, or roughly $25 billion, consisted of loans to borrowers with credit scores below 620. The magnitude of this discrepancy further substantiates Defendants' knowledge and intent to deceive investors.

321.   At the same time, Wachovia failed to properly account for accelerating negative amortization and rising delinquencies in the Pick-a-Pay loan portfolio, which, contrary to Defendants' assertions, were triggered by Wachovia's own practices, including the fact that Defendants had lowered required monthly minimum payments, and were not simply the result of being caught off-guard by unexpected economic conditions.

322.   Because the Pick-a-Pay loan portfolio lay at the core of Wachovia's business, knowledge of, *inter alia*, lax underwriting standards, perverse employee incentives, lack of oversight, increasing negative amortization and improper risk assessment and accounting methodologies in connection with Pick-a-Pay loans can be ascribed to Defendants.   Such knowledge, in conjunction with a pervasive Company-wide culture focused on growth at all costs, creates a strong inference of scienter.

### C.   WACHOVIA'S INABILITY TO SELL THE CDOs IT SECURITIZED CREATES AN INFERENCE OF SCIENTER

323.   Wachovia was a "vertically-integrated" mortgage originator and wholesaler with "burgeoning asset-backed and mortgage-backed securities businesses," which securitized $24.2 billion of commercial mortgages in 2007, accounting for 10.8% of the total securitizations in the U.S. that year.   In addition, Wachovia was a member of the consortium of bank that had developed the ABX Index to track the value of certain tranches of RMBS.   Wachovia also securitized billions of dollars of synthetic CDOs.

324.   In 2007, Wachovia was forced to retain over $4 billion in CDOs and other mortgage-backed securities that it had securitized but was unable to sell because of declining market values.   Given Wachovia's extensive knowledge and participation in the market, the failure to sell Wachovia's own securitizations was sufficient to provide Defendants with

knowledge that Wachovia's mortgage-related assets, including its largely-subprime Pick-a-Pay

loan portfolio, were materially overvalued and should have been written down.

**D.     HIGHLY UNUSUAL AND SUSPICIOUS INSIDER STOCK SALES BY THOMPSON AND OTHER INDIVIDUAL DEFENDANTS CREATE A STRONG INFERENCE OF SCIENTER**

325.    From 2006 through 2008, sales of Wachovia stock by Defendants Thompson,

Wurtz, and Truslow were highly unusual and suspicious as measured by (1) the amount and

percentage of shares sold, (2) a comparison with the Individual Defendants' own prior trading

history and that of other insiders, and (3) the timing of stock sales.  These sales therefore create a

strong inference of scienter.

326.    Based on publicly available trading data required to be reported to the SEC, as

compared with trading activity taking place prior to 2006, Individual Defendants' stock sales

from 2006 to 2008 were extremely large and highly unusual.

327.    From 2006 to 2008, the Individual Defendants owned and sold the following

Wachovia shares:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Thompson | 02/06/07 | 29,712 | $57.32 | 1,703,118.58 |
| Thompson | 3/30/2007 | 9,521 | $55.05 | 524,131.05 |
| Thompson | 4/18/2007 | 9,604 | $55.87 | 536,575.48 |
| Thompson | 4/19/2007 | 9,606 | $55.52 | 533,325.12 |
| Thompson | 4/20/2007 | 7,129 | $55.85 | 398,154.65 |
| Thompson | 2/20/2008 | 15,074 | $34.08 | 513,721.92 |
| Thompson | 3/31/2008 | 9,521 | $27.00 | 257,067.00 |
| Thompson | 4/18/2008 | 19,210 | $27.24 | 523,280.40 |
| Thompson | 4/22/2008 | 7,129 | $26.20 | 186,779.80 |
| **Total** |  | **116,506** |  | **5,176,154.00** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 10/23/06 | 23,358 | $55.95 | 1,306,880.10 |
| Wurtz | 12/16/06 | 6,368 | $57.04 | 363,230.72 |
| Wurtz | 2/5/2007 | 442 | $56.46 | 23,824.56 |
| Wurtz | 2/5/2007 | 1,984 | $56.50 | 112,090.84 |
| Wurtz | 2/5/2007 | 28,014 | $57.30 | 1,605,143.37 |
| Wurtz | 3/20/2007 | 1,684 | $55.05 | 92,704.20 |
| Wurtz | 4/18/2007 | 582 | $55.87 | 32,516,34 |
| Wurtz | 4/19/2007 | 431 | $55.52 | 23,929.12 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Wurtz | 4/20/2007 | 409 | $55.85 | 22,842.65 |
| Wurtz | 2/20/2008 | 2,133 | $34.08 | 72,692.64 |
| Wurtz | 3/31/2008 | 1,287 | $27.00 | 34.749.00 |
| Wurtz | 4/18/2008 | 775 | $27.24 | 21,111.00 |
| Wurtz | 4/22/2008 | 313 | $26.20 | 8,200.60 |
| **Total** | | **67,760** | | **3,719,915.14** |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Truslow | 10/18/2006 | 16,980 | $55.14 | 936,277.20 |
| Truslow | 3/20/2007 | 1,429 | $55.05 | 78,666.45 |
| Truslow | 4/18/2007 | 1,552 | $55.87 | 86,710.24 |
| Truslow | 4/18/2007 | 37,334 | $55.52 | 2,072,783.68 |
| Truslow | 4/18/2007 | 1,789 | $55.87 | 99,951.43 |
| Truslow | 4/19/2007 | 1,682 | $55.52 | 93,384.64 |
| Truslow | 4/20/2007 | 1,498 | $55.85 | 83,663.30 |
| Truslow | 2/20/2008 | 1,816 | $34.08 | 61,889.28 |
| Truslow | 3/31/2008 | 1,092 | $27.00 | 29,484.00 |
| Truslow | 4/18/2008 | 2,473 | $27.24 | 67,364.52 |
| Truslow | 4/22/2008 | 1,145 | $26.20 | 29,999.00 |
| **Total** | | **68,790** | | **3,640,173.74** |

328.    Defendant Thompson sold just over 61,000 shares of Wachovia common stock in the 16 months prior to May 2006, but sold over 116,500 shares in the 14 months between February 2007 and April 2008.

329.    Defendant Wurtz sold just 8,255 shares of common stock in the 16 months prior to May 2006, but sold over 67,700 shares in the 18 months between October 2006 and April 2008.

330.    Defendant Truslow sold just 25,730 shares of Wachovia common stock in the 16 months preceding May 2006, but sold almost 68,000 shares in the 18 months between October 2006 and April 2008.

### E.   GOVERNMENT INVESTIGATIONS CREATE A STRONG INFERENCE OF SCIENTER

#### 1.   The SEC's Investigation Into Defendant Steel

331.   The SEC is investigating whether Mr. Steel misled investors when he appeared on CNBC's "Mad Money" program on Monday, September 15, 2008.  Financial stocks plunged across the board that day as Lehman Brothers filed for bankruptcy protection and Bank of America Corp. announced a deal to buy Merrill Lynch & Co.  Host Jim Cramer asked Mr. Steel whether his goal was to sell the bank.  Defendant Steel responded that Wachovia had a "great future as an independent company."  He added, "[B]ut we're a public company.  So we're going to do what's right for shareholders, I can promise you that.  But we're also focused on the very exciting prospects when we get things right going forward."

332.   Defendant Steel made those statements, amazingly, right before Wachovia's shares fell off a cliff.  Defendant Steel apparently thought he could "spin" his way to survival by putting on a happy face despite knowing the materially adverse effect of the worsening financial condition on the Company.

333.   Steel spoke of Wachovia's efforts to raise money by cutting its dividend, cleaning up its balance sheet and reducing expenses.  That day, shares of Wachovia fell by about 25%.

334.   The next day, September 16, 2008, Wachovia's board met by telephone to discuss strategic options for the company, including raising money, selling core businesses and merging with another company, according to an SEC filing.

335.   On September 17, 2008, Mr. Steel called Morgan Stanley CEO John Mack to discuss a potential merger, according to people familiar with the matter.

336.   By the week of September 22 2008, under pressure from regulators and with customers starting to withdraw deposits, Steel was immersed in merger negotiations with Citigroup Inc. and Wells Fargo & Co. executives.

337.    After initially agreeing to sell its banking operations to Citigroup, Wachovia on October 3, 2008, agreed to sell the full company to Wells Fargo.  In the deal, valued at about $15.4 billion, Wachovia shareholders received Wells Fargo stock then valued at $7 for each Wachovia share they owned.  That was about 35% below Wachovia's $10.71 closing stock price on the day of Mr. Steel's CNBC interview.

### 2.    The SEC Launches an Investigation into Golden West's Lending Practices

338.    On November 19, 2008, federal prosecutors and the SEC announced that they were launching an investigation to determine whether Golden West had employed improper lending practices that mislead borrowers and investors.  Specifically, investigators stated that they were examining whether borrowers had been lured into mortgages that they could not afford, whether terms and conditions of loans had been adequately disclosed, and whether financial data had been falsified so that borrowers could qualify for larger, more expensive mortgages.

339.    On the day the investigation was announced, Wachovia's stock lost 13% of its remaining value.  The investigation remains ongoing.

### 3.    The SEC Recovers More Than $7 Billion From Defendant Wachovia Securities

340.    On February 5, 2009, the SEC announced a settlement with defendant Wachovia Securities in the amount of more than $7 billion to thousands of customers who invested in auction rate securities ("ARS").

341.    The SEC alleged Wachovia Securities violated Section 15(c) of the Securities Exchange Act by, *inter alia*, marketing ARS as highly liquid securities through mid-February 2008 even though Wachovia Securities employees knew or were reckless in not knowing that the risk of auction failures had materially increased.  Beginning in August 2007, monocline insurers

were experiencing credit problems as a result of the subprime crisis because they had insured mortgage-backed bonds.

**F.    WACHOVIA'S NUMEROUS AND EGREGIOUS VIOLATIONS OF GAAP AND SEC REGULATIONS IN ITS FINANCIAL REPORTING CREATE A STRONG INFERENCE OF SCIENTER**

342.   As explained, *infra* at Section X, Wachovia violated numerous provisions of GAAP, as well as SEC Regulations, in its financial reporting from May 2006 to October 2008. These violations include, but are not limited to: (i) failing to take adequate loan loss reserves; (ii) failing to write-down to fair value subprime-related assets in the Company's trading and loan portfolios in a timely manner; (iii) failing to adequately disclose risk; (iv) failing to properly consolidate certain off-balance sheet entities; and (v) failing to maintain proper internal accounting controls.

343.   As a result, Wachovia's financial statements failed to accurately portray the Company's financial position and results of operations. In fact, Wachovia's financial statements presented such a distorted picture of Wachovia's earnings and liquidity that each of its statements from May 2006 to October 2008 should have been restated as provided by GAAP and applicable SEC Regulations.

344.   As set forth, *infra* at Section X, the Individual Defendants certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements. However, the nature and extent of Wachovia's accounting violations, in conjunction with the Individual Defendants' own statements, suggest that as senior executives with oversight of the Company's financial reporting, the Individual Defendants knew that Wachovia was perpetrating a fraud by concealing mounting losses and hiding its actual holdings of subprime-related assets.

**G.   THE MAGNITUDE OF THE WRITE-DOWNS CREATES A STRONG INFERENCE OF SCIENTER**

345.   The extent to which Wachovia's assets ultimately were written down creates a strong inference that Defendants acted with scienter in concealing a massive financial fraud.

346.   In connection with its holdings of CDOs and mortgage-backed securities, Wachovia began to take writedowns in October 2007.  At that time, the Company reported a "market disruption loss" of $430 million from CDOs and other structured credit products. Incremental writedowns of Wachovia's CDO portfolio continued in the fourth quarter of 2007 and the first quarter of 2008, when Wachovia disclosed that additional writedowns of $1.048 billion and $1.4 billion, respectively, would be required.  By July 2008, Wachovia had written down the value of the $2.1 billion of retained CDOs by $1.69 billion, or 79.7%.  By the end of the third quarter of 2008, Wachovia recognized CDO-related losses totaling more than $2.2 billion.

347.   The writedowns associated with the Pick-a-Pay loan portfolio are of an even greater magnitude.  As late as September 2008, Defendant Steel continued to reassure investors that of the $500 billion in total loans outstanding, only $10 billion were likely impaired. However, by the end of September, in connection with its acquisition of Wachovia, Wells Fargo announced that it would take an immediate writedown of $24.3 billion on the value of the Pick-a-Pay portfolio – an amount that was almost three times as high as Wachovia's third quarter 2008 Pick-a-Pay loan loss reverse and $9 billion larger than Wachovia's entire third quarter 2008 allowance for loan losses.

348.   After closing the Wachovia acquisition, Wells Fargo recorded substantial additional writedowns.  Specifically, on January 28, 2009, Wells Fargo reported that it had identified an immediate "credit impaired loan balance" of almost $94 billion with respect to

Wachovia's residential and commercial real estate mortgages. Of that amount, approximately $59.8 billion related to pre-existing impairments in the Pick-a-Pay loan portfolio. Thus, roughly 50% of Wachovia's $120 billion Pick-a-Pay portfolio was credit impaired. Subsequently, in February 2009, Wells Fargo indicated in its 10-K that a large percentage of the Pick-a-Pay loans "have evidence of credit deterioration since origination."

349.    Finally, on October 22, 2008, Wachovia reported an astounding $23.9 billion loss, the largest quarterly loss by any bank in U.S. history. $12.9 billion of this amount was attributable to a substantial writedown in goodwill. As explained in detail, *infra* at Section X.C.2, the writedown wiped out nearly 50% of the goodwill Wachovia recognized in connection with the acquisition of Golden West in 2006.

350.    The scope and scale of all of these writedowns is mind-boggling, especially with respect to the Pick-a-Pay loan portfolio, which was a $120 billion asset with the power to take down the entire Company. Thus, the enormity of these writedowns creates a strong inference that Defendants knew or recklessly disregarded that truth about the level of risk embedded in Wachovia's Pick-a-Pay portfolio, the overvaluation of its assets, and its liquidity and capitalization.

## X.    WACHOVIA'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

### A.    OVERVIEW OF WACHOVIA'S GAAP AND SEC REGULATION VIOLATIONS

351.    As detailed herein, each of Wachovia's annual and interim financial reports issued from May 2006 through October 2008 violated numerous Generally Accepted Accounting Principles ("GAAP"), Generally Accepted Accounting Standards ("GAAS"), and SEC Regulations.    As a result of these violations of GAAP, GAAS and SEC Regulations, Defendants caused Wachovia to materially misstate its financial position and results of operations during the

relevant period. Wachovia's accounting violations were so numerous and egregious that Defendants should have caused Wachovia to issue re-statements of its publicly-filed financial statements from May 2006 through October 2008.

352. Defendants caused Wachovia to violate GAAP by: (1) failing to properly consider all relevant factors in developing and recording the allowance for loan losses on its Pick-a-Payment loan portfolio; (2) failing to write-down to fair value the Company's subprime related direct positions and auction rate securities in its financial statements; (3) failing to disclose the existence and risk exposure of its subprime related direct positions; (4) failing to properly consolidate certain off-balance sheet entities; and (5) failing to maintain proper internal accounting controls, which resulted in the material misstatements to the Company's financial statements.

353. Specifically, Wachovia's violations of GAAP include, *inter alia*, the following:

a. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions, (SFAC 1);

b. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources, (SFAC 1);

c. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general, (SFAC 1);

d. The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those

117

expectations are commonly based at least partly on evaluations of past enterprise performance, (SFAC 1);

e.  The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (SFAC 2);

f.  The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting, (SFAC 2);

g.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions, (SFAC 2);

h.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered, (SFAC 2);

i.  The principle that losses be accrued for when a loss contingency exists, (SFAS 5);

j.  The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred, (SFAS 5);

k.  The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports, (APB 28);

l.  The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial, (APB 28);

m.  The principle that management should provide commentary relating to the effects of significant events upon the interim financial results. (APB 28); and

n.  The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements, (APB 22).

## B.   APPLICABLE ACCOUNTING PRINCIPLES AND SEC REGULATIONS

354.   GAAP are generally accepted principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accounting practice at a particular time. GAAP is promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA. The highest level in the hierarchy includes Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), Financial Accounting Standards Board Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP") and SEC Staff Accounting Bulletins ("SAB"). GAAP provide other authoritative pronouncements, including, among others, Statements of Financial Accounting Concepts ("SFAC"), which are standards that form the conceptual framework for financial accounting and reporting.

355.   Management is responsible for preparing financial statements that conform to GAAP. As noted by AICPA auditing standards ("AU"), § 110.02:

> Financial statements are management's responsibility...
>
> [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

356.   Furthermore, as a publicly-traded company, Wachovia was required to maintain books and records in sufficient detail to reflect the transactions of the Company and therefore

119

prepare financial statements in accordance with GAAP.  Specifically, under the Exchange Act

public companies must: "

> a. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> b. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that; i. transactions are executed in accordance with management's general or specific authorization; ii. transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets....

*See* Section 13(b)(2)(A) and (B).

357.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. § 210.4-01(a)(1).

358.    Defendants also failed to comply with Item 303 of Regulation S-K, which requires, among other things, that the registrant provide information in the Management Discussion and Analysis (MD&A) section of the appropriate filings provide the reader with an understanding of what the financial statements show and do not show and highlight important trends and risks that have shaped the past or are reasonably likely to shape the future.  The MD&A rules require that the registrant provide information, where appropriate, not otherwise required under GAAP and/or which cannot be found in the financial statements.  Specifically, Item 303 requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

359.    Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."

The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."

360.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:  "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

361.    The SEC requires in every Form 10-Q filing in Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), that the issuer furnish information required by Item 303 of Regulation S-K.  The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future.  To further explain what must be included by Item 303 in MD&A, the SEC issued an interpretive release as follows:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

362.    The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

363.   SAB 101, Revenue Recognition in Financial Statements, also reiterates the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations.   This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."**  (emphasis added) (footnotes omitted).

364.   The Instructions to Paragraph 303(a) of Regulation S-K further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

365.   Item 303 also specifically addresses, inter alia, disclosures regarding off¬ balance-sheet arrangements (including guarantees and variable interests).  These rules require a registrant to disclose all material facts and circumstances that provide investors with a clear understanding of a registrant's off-balance-sheet arrangements and their material effects. Specifically, Item 303, ¶4(ii) states the following concerning MD&A:

> The disclosure shall include the items specified in paragraphs (a)(4)(i)(A), (B), (C) and (D) [below] of this Item to the extent necessary to an understanding of such arrangements and effect and shall also include such other information that the registrant believes is necessary for such an understanding.

A.     The nature and business purpose to the registrant of such off-balance sheet arrangements;

B.     The importance to the registrant of such off-balance-sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;

C.     The amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred by the registrant in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise; and*

D.     Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination, or material reduction in availability to the registrant, of its off-balance-sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances.

366.     Moreover, a recent Final Rule promulgated by the SEC entitled "Disclosure in Management's Discussion and Analysis about Off-balance-sheet Arrangements and Aggregate Contractual Obligations," amends Item 303 of Regulation S-K to clarify the MD&A disclosures required relating to off-balance-sheet arrangements. This amendment reaffirms the definition of "off-balance-sheet arrangements" in Item 303, ¶4(ii)(A)-(D) to include guarantees, such as the guarantee arrangements at issue here. Section III of the Final Rule prescribes the disclosure threshold for such off-balance sheet arrangements at subsection B as follows:

> The amendments require disclosure of off-balance-sheet arrangements that either have, or are reasonably likely to have, a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. That disclosure threshold is consistent with the existing disclosure threshold under which information that could have a material effect on financial condition [Item 303 of Regulation S-K], changes in financial condition or results of operations must be included in MD&A.

367.    The Final Rule goes on to state:

> If management concludes that the known trend, demand, commitment, event or uncertainty is not reasonably likely to occur, then no disclosure is required in MD&A. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources is not reasonably likely to occur.

368.    As a result of these violations of GAAP and SEC Regulations, the Defendants caused Wachovia to materially misstate its financial position and results of operations from May 2006 to October 2008. The Company's financial statements, and related Forms 10-K, for the years ended December 31, 2006 and December 31, 2007 and interim financial statements, and related Forms 10-Q, for the quarterly periods ended March 31, 2006; June 30, 2006; September 30, 2006; March 31, 2007; June 30, 2007; September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008 did not present fairly the Company's financial position and results of operations, and were not presented in conformity with GAAP and SEC rules, as applicable.

C.    **WACHOVIA'S SPECIFIC VIOLATIONS OF GAAP**

369.    Wachovia's financial statements during the period from June 2006 through September 2008 violated GAAP and SEC regulations, in that they failed to (i) disclose facts

necessary to present a fair and truthful representation of it's financial position and operating results, (ii) provide those disclosures that were required by GAAP, (iii) record adequate loan loss reserves, (iv) record investments at fair value, (v) record goodwill impairment, and (vi) consolidate controlled entities all of which were necessary for a financial understanding and evaluation of the Company.  Consequently, the overall impression that Wachovia was a going concern was not consistent with the business realities of a company on the brink of collapse.

### 1.    Mounting Loan Losses Went Unrecorded

370.    In connection with the acquisition of Golden West, Wachovia was saddled with $120 billion of subprime Pick-a-Pay mortgages.  Wachovia continued to expand and originate Pick-a-Pay mortgages, even as the real estate market by distributing throughout its franchise. Although Wachovia repeatedly touted the Pick-a-Payment product and its related underwriting as conservative, the mortgage terms combined with the location of the collateral made these loans no more resilient to the real estate crisis than other types of subprime mortgages.

371.    Wachovia was required under SFAS 114, *Accounting by Creditors for Impairment of a Loan*, to measure loan impairment for the Pick-a-Pay portfolio based on the present value of expected future cash flows or the fair value of the collateral.  A loan is impaired when it was probable that Wachovia would be unable to collect all amounts due according to the contractual terms of the loan agreement.

372.    Under SFAS 5, *Contingencies*, recording a loan loss allowance is required if it is probable that the loan has been impaired and that the amount of loss can be reasonably estimable.  Probable is defined in SFAS 5 as a future event that is likely to occur.

373.    In addition to accounting for loan losses in accordance with GAAP, Wachovia was also required under SAB 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, to implement a methodology for determining allowances for loan losses

in accordance with generally accepted accounting principles. SAB 102 focuses on the documentation to be prepared and maintained in support of the allowances for loan losses. The documentation should include a systematic methodology to be employed each period in determining the amount of loan losses to be reported and the rationale supporting each period's determination that the amounts reported were adequate.

374. Up until April 2008, Wachovia's loan loss allowance accounting and methodology violated GAAP and SEC standards with respect to recording the probable losses incurred as a result of the deterioration in its Pick-a-Pay mortgage portfolio. Not until the third quarter of 2008 did Wachovia finally admit the extent of losses in its Pick-a-Pay mortgage portfolio.

375. In April 2008, Wachovia implemented a loan loss allowance methodology that captured for the first time relevant indicators necessary to measure the likelihood of default by borrowers in its Pick-a-Payment subprime portfolio. These indicators were not new, but rather were gauges used by all lenders to determine the extent of probable loan losses. However, Wachovia chose to hide the fact that the Pick-a-Pay subprime portfolio was susceptible to non-payment as a result of these same indicators.

376. Had Wachovia complied with GAAP and SEC standards, they would have recorded loan loss reserves against the Pick-a-Pay mortgage portfolio in late 2006 and in early 2007 to coincide with the expected loss in value as a result of the sharp declines in residential real estate and the related effects on Wachovia's ability to collect and or salvage the value of the mortgage portfolio through foreclosures and subsequent sales of the underlying collateral.

377. An analysis of Wachovia's loan loss allowance, after consolidating the Golden West acquisition in the fourth quarter of 2006, shows that as a percentage of loans the amount

dropped by 23 bps and remained at that level until an up-tick in the first quarter of 2008, returning to its pre-acquisition levels. This 20% drop is betrayed by the rise in non-performing loans and Wachovia's loan loss allowance decreasing from four times the amount of non-performing loans prior to the Golden West acquisition to less than 80% of non-performing loans in the first quarter of 2008. Based on the trends in the housing and subprime markets Wachovia should have been increasing rather than decreasing its reserve for loan losses.

378.    The factors Wachovia cited in 2008 as reasons for dramatically increasing the provision for loan losses were known by Defendants in 2006 and 2007, and therefore, the loan losses recorded in 2008 should have been recorded during the period from the fourth quarter of 2006 through the second quarter of 2007 instead of during the first three quarters of 2008. The effects of correctly recording the loan loss allowance at the time Wachovia knew that the Pick-a-Pay subprime mortgage portfolio was suffering severe losses would have had a material effect on its earnings for those earlier periods. For instance, had Wachovia starting using a SEC-compliant loan loss methodology and calculated a loan loss allowance in accordance with GAAP in the fourth quarter of 2006, instead of belatedly in the first quarter of 2008, the fourth quarter 2006 reported income before income taxes of $3.3 billion would have been reduced by $1.1 billion or 33% and the income before income taxes for the entire year of 2006 would have been reduced by almost 10%. Likewise, Wachovia's reported income before income taxes of $3.5 billion in the first quarter of 2007 would have been nearly completed eliminated, the $2.2 billion income before income taxes in the second quarter of 2008 would have turned into a $1.2 billion loss and the income before income taxes for the entire year of 2007 would have been reduced by nearly 75%.

379.   It is not simply the benefit of hindsight that suggests Wachovia should have recorded significantly higher loss reserves on the Pick-a-Pay loans.  In fact, in the Form 10-K filed by Wells Fargo on February 27, 2009 – its first public filing following the completion of its acquisition of Wachovia – Wells Fargo stated *"The more significant fair value adjustments in our purchase accounting for the Wachovia acquisition were loans.  Certain of the loans acquired from Wachovia have evidence of credit deterioration since origination and it is probable that we will not collect all contractually required principal and interest payments."*   Wachovia concealed that these loans were bad from origination.  However, Wells Fargo caused Wachovia to reflect the true value of the Pick-a-Pay portfolio by taking a $2.9 billion write down the portfolio in the fourth quarter of 2008 and charging off another $24.3 billion (the "Wells Fargo Write Down").   The Wells Fargo Write Down is an objective indication of the Pick-a-Pay portfolio's fair value, as it follows an acquisition by a buyer, Wells Fargo, with no incentive to retain an over-valued asset on its books.  The Wells Fargo Write Down further substantiates that had Wachovia accounted for the Pick-a-Pay loan losses in accordance with GAAP, the carrying value of the portfolio would have been written down by even more substantial amounts than what Wachovia recorded in the first three quarters of 2008.

### 2.   Goodwill was Carried at Amounts Far in Excess of Realizable Value

380.   Throughout 2006, the ominous indicators of the residential real estate housing debacle were accumulating.  However, instead of performing rigorous due diligence to determine the fair value of Golden West, Wachovia irrationally concluded that it would pay a premium for Golden West's Pick-a-Pay portfolio of subprime option ARMs, underwritten using liberal criteria, and record $15 billion of goodwill.  The Pick-a-Pay subprime mortgage portfolio comprised 100% of Golden West's loans.  Therefore, as the value of the Pick-a-Pay portfolio declined, so did the $15 billion of recorded goodwill.

128

381.   In February 2008, Wachovia admitted that the Golden West acquisition was poorly timed, but still clung to the value of the franchise. Defendant Thompson's resignation in June 2008 was primarily the result of Wachovia's inability to effectively manage the Pick-a-Pay portfolio albatross inherited from Golden West. Then, in July 2008, Wachovia admitted that the Pick-Payment loss indicators previously disclosed were woefully deficient and that the losses would be three times more than what had been revealed.   As a result, Wachovia stopped originating Pick-a-Payment mortgages.   This series of events undermined any claim that Wachovia had not substantially overpaid to acquire Golden West.

382.   Under GAAP, specifically SFAS 142, *Goodwill and Other Intangible Assets*, impairment occurs when the carrying amount of goodwill exceeds its fair value. A two-step impairment test is used to identify potential goodwill impairment and the amount to be recognized. The first step in a goodwill impairment test compares the fair value of a reporting unit with its carrying amount.   The $15 billion of goodwill from the Golden West acquisition was recorded in Wachovia's General Bank Retail and Small Business reporting unit.   SFAS 142 stipulates that if the recorded amount of a reporting unit exceeds its fair value, then the second step of the goodwill impairment test is performed to measure the amount of impairment.   The second step compares the fair value of goodwill in the reporting unit with the carrying amount of that goodwill.   The fair value of goodwill is determined by allocating the fair value of a reporting unit to all of the assets and liabilities of that unit.   The fair value of a reporting unit is the amount at which the unit as a whole could be sold in a current transaction between willing parties. The excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the fair value of goodwill. If the carrying amount of reporting unit goodwill exceeds the fair value of that goodwill, an impairment loss is recognized.

383.   Had Wachovia recorded the loan losses related to the Pick-a-Payment subprime portfolio in accordance with GAAP then its calculation of the value of the General Bank reporting unit would have reflected these losses resulting in goodwill impairment write downs in periods much earlier than the third quarter of 2008.  Wachovia's fair value calculations were flawed because the calculations did not take into consideration the cumulative losses in the Pick-a-Payment subprime portfolio thereby materially overstating the fair value of the General Bank Reporting unit and the related goodwill.

384.   The mounting Pick-a-Payment losses were critical in the determining the fair value of the General Bank reporting unit.  By deferring the recognition of the Pick-a-Payment losses Wachovia was also able to defer the goodwill impairment charge.  If the Pick-a-Payment loan losses were recorded in accordance with GAAP, then the goodwill associated with the Golden West acquisition would have been written down during the same time period by similar amounts.

385.   Wachovia's third quarter 2008 goodwill write-down was $18.8 billion of which $12.3 billion related to the General Bank Retail and Small Business reporting unit which housed the Pick-a-Payment portfolio and the $14.9 billion of goodwill related to the Golden West acquisition.  The third quarter 2008 goodwill write-down was equal to 51% of the General Bank Retail and Small Business reporting unit's total goodwill.  Since Wachovia no longer separately maintained the goodwill associated with the Golden West acquisition, it follows that the 51% write down for the entire reporting unit can also be applied to the Pick-a-Payment / Golden West goodwill recorded at the time of the acquisition.  Therefore, of the $12.3 billion write down $7.6 billion related to Golden West.  Had Wachovia recorded the Pick-a-Payment losses timely, then such losses would have been included in the fair value calculations resulting in goodwill

130

impairment charges during the similar time from the fourth quarter of 2006 and the first two quarters of 2007.

386.    The effects of recording goodwill impairment charges at the time Wachovia knew that the Pick-a-Payment subprime mortgage portfolio was suffering severe losses would have had a material effect on its earnings for those earlier periods. For instance, had Wachovia calculated a goodwill impairment charge in accordance with GAAP in the fourth quarter of 2006 instead of belatedly in the third quarter of 2008, the fourth quarter 2006 reported income before income taxes of $3.3 billion would have been reduced by $1.1 billion or 33% and the income before taxes for the entire year of 2006 would have been reduced by 9%. Likewise, Wachovia's reported income before income taxes of $3.5 billion in the first quarter of 2007 would have all but been eliminated, the $2.2 billion income before income taxes in the second quarter of 2008 would have turned into a $1.2 billion loss and the income before income taxes for the entire year of 2007 would have been reduced by 75%.

### 3.    Wachovia Consistently Overstated the Value of Certain Investments

387.    Wachovia significantly overstated the fair value of its ABS CDO and other subprime related assets in its publicly filed financial statements between March 31, 2007 and June 30, 2008. The Company overvalued ABS CDO and other subprime related assets by failing to properly value these positions as of the current measurement date.

388.    Wachovia had traditionally been a major participant in structuring and underwriting fixed income investment products backed by pools of loans, such as commercial mortgage-backed securities (CMBS) and residential mortgage-backed securities (RMBS), as well as collateralized debt obligations (CDOs), which are typically backed by pools of bonds including CMBS and RMBS, loans and other assets. Prior to November 19, 2007, Wachovia never disclosed that it accumulated in excess of $7 billion in gross exposure in ABS CDO and

other subprime related assets primarily as the result of interests retained from mortgage-backed securitizations it had structured and were unable to completely sell.

389.    The majority of Wachovia's subprime positions were identified in public filings as "trading positions."[19] Pursuant to SFAS 115, *Accounting for Investments in Certain Debt and Equity Securities*, securities that are bought and held principally for the purpose of being sold in the near term are to be classified as "trading securities." This includes all mortgage-backed securities retained after the securitization of mortgage loans held for sale, regardless of whether the enterprise intended to sell those securities or hold them as long-term investments, (SFAS 134, *Accounting for Mortgage-Backed Securities Retained after the Securitization of Mortgage Loans Held for Sale by a Mortgage Banking Enterprise, an amendment of FASB Statement No. 65*). GAAP requires such trading securities to be carried at fair value in the statement of financial condition and all mark-to-market (unrealized) gains and losses on trading securities are recognized in the current period's income statement. Consequently, Wachovia was required to carry its subprime positions at "fair value" on its Statement of Financial Position.

390.    Prior to the issuance of SFAS 157, *Fair Value Measurements*, SFAS 107, *Disclosures about Fair Value of Financial Instruments*, provided procedures for estimating fair value. SFAS 157 did not significantly change the concept of fair value from SFAS 107, but simply established a GAAP framework for measuring it. SFAS 107 indicates quoted market prices are the best indication of fair value. In the absence of quoted market prices, companies are required to develop its best estimate using comparable values or pricing models, including using values based on similarly traded instruments or information obtained from pricing services.

---

[19] *See, e.g.*, Wachovia's consolidated financial statements, dated December 31, 2005, December 31, 2006 and December 31, 2007, Note 1, Summary of Significant Accounting Policies – Trading Account Assets and Liabilities.

391.    Wachovia ignored readily available market data in pricing its ABS CDO and other subprime related assets beginning in early 2007. The ABX and TABX indices were shared market standards of the value of representative subprime RMBS and Mezzanine CDO tranches. The ABX index was designed to track the value of subprime RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-). The TABX index consists of standardized tranches of the ABX Index, replicating the structure of a subprime-backed CDO.

392.    The ABX and TABX indices were objective, directly observable indicators of the value of these instruments, exactly the preferred valuation methods contemplated by both SFAS's 107 and 157. Wachovia was not only aware of these indices at all times, but in fact was one of the consortiums of 15 banks who originally developed them, made a market in them, and provided price quotations that served as their basis. In fact, Wachovia repeatedly disclosed the direct link the ABX indices had to the valuations of subprime RMBS and ABS CDOs. According to its initial reference to the ABX index in its Form 8-K filed on November 9, 2007:

> In October, rising defaults and delinquencies in subprime residential mortgages and rating agencies' downgrades of a large number of subprime residential mortgage-related securities led to unprecedented declines in the ABX subprime indices that contributed to a rapid decline in the valuations of subprime RMBS and ABS CDOs.

393.    It was commonly known in the industry that the standard in tracking and valuing CDO and RMBS transactions and values was the independent ABX indices. According to Citigroup Chairman CEO, Gary Crittendon[20], in an interview regarding the extent of subprime troubles and the decline in the AAA rated mortgage-backed debt, "the best way to kind of get an outside perspective on this is to look at the ABX Indices."

---

[20] CNNMoney.com article "Behind Wall Street's Subprime Fear Index", by Grace Wong, dated July 7, 2007.

133

394.   Despite Wachovia's knowledge that the ABX index was a direct market pricing source for its subprime RMBS and ABS CDOs, the Company failed to use the data to properly value them. Wachovia's first disclosed a write-down of the value of its subprime positions in its Form 8-K on October 19, 2007. At that time, Wachovia disclosed a total of $1.3 billion in "Market Disruption Related Loss" that included a $347 million loss directly related to subprime mortgage investments; the vast majority in AAA rated securities. These write-downs for the quarter-ended September 30, 2007 were the first recorded by Wachovia, yet during February and March 2007, the market consensus had already recognized that subprime losses were going to impair even the super senior tranches of ABS CDOs as evidenced by the ABX and TABX indices, which both suffered substantial declines by that time, with some BBB- ABX indexes having dropped to approximately 60% of par and TABX junior Mezzanine CDO tranches dropping to between 40-60% of par.

395.   Had Wachovia properly measured the value of its ABS CDO and other subprime related assets during the first three quarters of 2007, they would have significantly accelerated the mark-to-market write-downs recorded by the Company during the quarter-ended December 31, 2007, as evidenced below:

| ABS-CDO and other subprime related losses (in millions) | Q/E 3/31/07 | Q/E 6/30/07 | Q/E 9/30/07 | Q/E 12/31/07 | Q/E 1/31/08 | Q/E 3/31/08 |
|---|---|---|---|---|---|---|
| **Wachovia write-down** | $0 | $0 | $350 | $1,028 | $339 | $238 |
| **Losses based on ABX/TABX indices** | $198 | $210 | $574 | $549 | $469 | $219 |
| **Under (over)** | $198 | $210 | $224 | ($479) | $130 | ($19) |

134

| stated losses | | | | | | |
|---|---|---|---|---|---|---|
| Cumulative understated losses | $198 | $408 | $632 | $153 | $283 | $264 |

396.    Based on information available, as of September 30, 2007, Wachovia had failed to take losses during 2007 on its ABS CDO and other subprime-related assets by at least $632 million. By failing to properly value these positions using the market benchmark ABX and TABX indices, the Company overstated the value of these assets in its statement of financial position by this same amount.

397.    After failing to recognize any write-downs on its ABS CDO and other subprime-related assets in the quarters ended March 31, 2007 and June 30, 2007 and significantly under-recording losses in the quarter-ended September 30, 2007, the Company actually recorded write-downs in the fourth quarter ended December 31, 2007 that exceeded the decrease in the respective ABX and TABX indices during the 4th quarter.  It is apparent that Wachovia now recognized that the value of its subprime securities was not going to rebound, and Wachovia needed to get the recorded fair values in more in sync with the observable benchmark indices for its year end financial statements, as the valuations in these statements would be subject to a much higher level of scrutiny by its auditors than were the interim statements.

398.    Additionally, Wachovia overstated the value of its ABS CDO assets by failing to consider the counterparty credit risk associated with the significant amount of financial guarantee hedges it maintained on its super senior positions.

399.    Wachovia's accounting policies included in the 2007 Form 10-K stated that "The determination of fair value (of securities) includes various factors such as exchange or over-the-counter market price quotations; time value and volatility factors for options, warrants and