derivatives; observed prices for equivalent or synthetic instruments; and counterparty credit quality." Yet, Wachovia failed to make timely adjustment to the fair value of the financial guarantees on the ABS CDO super senior positions.

400.    On January 22, 2008, Wachovia first disclosed that it held $4.8 billion in super senior ABS CDO exposures, $4.2 billion of which were hedged under financial guarantee contracts, including $2.2 billion with monoline insurers, Ambac Financial and MBIA and another $1.1 billion with crumbling insurance giant AIG.

401.    In reality, Wachovia had every reason to record significant reserves against these monoline financial guarantees back in 2007. In the fall of 2007, high levels of delinquencies and defaults within residential mortgage loans prompted each of the rating agencies to review the capital adequacy of the financial guarantee industry. In the second half of 2007, Wachovia recorded losses of $330 million related to BluePoint Re Limited, its own consolidated subsidiary that operated as a financial guaranty re-insurer licensed in Bermuda even though it wasn't until February 1, 2008 that Moody's Investor Service announced that it had placed BluePoint Re on review for possible downgrade.

402.    Wachovia wrote-off substantially all of its investment in BluePoint Re, but failed to recognize the need for any reserves on its guarantees with other monolines, namely Ampac and MBIA, who Wachovia disclosed were hedging $2.2 billion of ABS CDO super senior positions. In late December 2007, following the rating agency reviews, Fitch placed Ambac Assurance on "rating watch negative" and stated that Ambac Assurance had a modeled $1 billion capital shortfall. On January 16, 2008, Moody's put Ambac Assurance's rating on review for possible downgrade. On January 18, 2008, S&P placed Ambac Assurance's financial strength rating on Credit Watch Negative. On January 18, 2008, Fitch downgraded Ambac Assurance's

insurance financial strength rating. Additionally, On February 25, 2008, S&P placed the long held ratings of MBIA on negative outlook as well.

403.    It was not until the filing of its Form 10-Q for Q1 2008 on May 11, 2008 that Wachovia disclosed that it recorded $166 million of reserves based on monoline exposure profiles and its assessment of the credit quality of each monoline. A similar disclosure in its Form 10-Q for Q2 2008 filed on August 11, 2008 revealed Wachovia recorded additional reserves of $245 million for monoline exposure. Plaintiffs are unable to determine whether further reserves were taken in the fourth quarter on 2008, either through earnings or as part of purchase accounting adjustments made by Wells Fargo. Yet, Wachovia, as a competitor to Ambac and MBIA through BluePoint Re, knew or should have known that the financial stability and ability to cover the guarantees on its ABS CDO super senior positions was seriously at risk prior to December 31, 2007. The reserves eventually recorded by Wachovia represented approximately 20% of the gross value of the ABS CDO super senior positions that only months before Wachovia had suggested were completely hedged by monolines.

404.    Wachovia's representations do not square with the monolines' own disclosures of their guarantees. Wachovia claims that it "transferred" $2.2 billion of super senior risks to the monolines and a further $2 billion to more creditworthy counterparties. But data released by the two largest monolines alone - Ambac and MBIA- indicates that Wachovia "transferred" in excess of $7 billion of super senior risks just to those two monolines, more than three times greater than Wachovia indicated. Should it be determined that the counterparties disclosure of the risk "in excess of $7 billion" is correct, Wachovia's 2007 loss reserves for monoline insurers should have been at least $1.4 billion.

405.    Wachovia's 2007 interim financial statements lacked the required GAAP disclosures regarding the Company's significant concentration in subprime-related securities. In fact, in the Company's Form 10-Q filed on July 30, 2007, the word "subprime" was used only 5 times within the entire filing, each of which simply referred to a Wachovia mortgage servicing company. No mention was made of Wachovia's exposure to subprime related assets that it retained and held on its balance sheet.

406.    Only a short time later, Wachovia issued a Form 8-K on October 19, 2007, disclosing for the first time $1.3 billion in "Market Disruption-Related Losses" for the quarter-ended September 30, 2007.  Still it was not until another Form 8-K filed on November 9, 2007 that Wachovia actually disclosed that it had remaining net exposure on ABS CDO-related positions of $3.84 billion and $2.73 billion, as of September 30, 2007 and October 31, 2007, respectively.

407.    Disclosure violations include:

- *Failure to Comply With Regulation S-X-* The SEC requires GAAP presentation in Regulation S-X, 17 C.F.R. §210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP, except quarterly statements are not required to have the same level of footnote disclosure. If the filings do not comply with GAAP, they are "presumed to be misleading and inaccurate," despite footnote or other disclosure.  See Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

- *Failure to Comply With Regulation S-K, Item 303-* Disclosure is mandatory where a known trend or uncertainty is reasonably likely to have a material effect on a company's financial condition or results of operations. Wachovia violated the MD&A requirements by materially omitting disclosure of the significant net exposure the Company had as a result of its subprime positions and its potential future losses associated with these positions.

- *SAB 101, Revenue Recognition in Financial Statements* - citing Financial Reporting Release No. 36 (promulgated by the SEC), explained that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective

analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

- *SOP No. 94-6, Disclosure of Certain Risks and Uncertainties* - requires disclosures to be made in financial statements any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on its future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity." SOP 94-6 requires, among other things, disclosure existing as of the date of those statements regarding: (a.) Nature of operations; (b.); Use of estimates in the preparation of financial statements (c.); Certain significant estimates; and (d.) Current vulnerability due to certain concentrations.

### 4.   Wachovia Misrepresented and Failed to Follow Its Disclosed Accounting Policies

408.   As stated in APB 22, *Disclosure of Accounting Policies*, the accounting policies adopted by a company can affect significantly the presentation of its financial position and results of operations. Accordingly, the usefulness of financial statements for purposes of making investment decisions depends considerably upon the investor's understanding of the accounting policies followed by the company.   In 2006 and 2007, Wachovia disclosed "Significant Accounting Policies" and "Critical Accounting Policies" in each of its filings on Form 10-K. However, a review of Wachovia's actual accounting reveals that Wachovia violated GAAP and SEC Regulations by failing to adhere to its own published accounting policies.   The following chart compares Wachovia's "Significant Accounting Policies," as disclosed by Wachovia, with Wachovia's actual accounting for certain transactions:

| Transaction | Disclosure | Actual Accounting |
|---|---|---|
| Loan losses | "The allowance for loan losses ... is maintained at levels that are adequate to absorb probable losses inherent in the loan portfolio." (*See* Wachovia's Consolidated Financial Statements, 2005-2007, Note 1, "Summary of Significant Accounting Policies – Allowance for Loan Losses and | Pick-a-Pay loans were materially overvalued for two years. |

| | Reserve for Unfunded Lending.") | |
|---|---|---|
| Loan loss methodology | "Wachovia uses a variety of modeling and estimation tools for measuring credit risk that are used in developing an appropriate allowance for loan losses … The allowance for loan losses consists of formula-based components for both the commercial and consumer portfolios, each of which includes an adjustment for historical loss variability …" (*Id.*) | A GAAP and SEC-compliant loan loss methodology was not employed until the first quarter of 2008. Even then, Wachovia failed to fully implement the loan loss methodology to accurately reflect the risk of loss inherent in its loan portfolio. |
| Consumer loans | Consumer loans delinquent by greater than 180 days are charged off. (*Id.* at "Summary of Significant Accounting Policies – Loans.") | Pick-a-Payment loans were not charged off until the underlying collateral was sold resulting in a $63 million catch-up charge in the fourth quarter of 2007 |
| Investment valuation | "Trading account assets and liabilities are recorded … at fair value with realized and unrealized gains and losses recorded in trading account profits in the results of operations." (*Id.* at "Summary of Significant Accounting Policies – Trading Account Assets and Liabilities.") | Losses on ABS CDO and other subprime-related positions understated throughout 2007 as Wachovia failed to properly value its positions at the measurement date. |
| Investment valuation | "The fair value of securities is based on quoted market prices, or if quoted market prices are not available, then the fair value is estimated using quoted market prices for similar securities, pricing models or discounted cash flow analyses using observable market data where available." (*Id.* at "Summary of Significant Accounting Policies – Securities and Trading Activities.") | In valuing its ABS CDO and other subprime related positions, Wachovia failed to use observable benchmark pricing data in the form of the ABX and TABX indices. |
| Counterparty risk | "The determination of fair value of investments includes an assessment of certain factors, including counterparty credit quality." (*Id.*) | The hedge portion of the undisclosed CDO positions was placed with non-creditworthy monoline financial guarantors. Such credit risk concentrations should have been disclosed in accordance with GAAP, specifically the provisions of |

|  |  | SFAS 107, *Disclosures About Fair Value of Financial Instruments* |
|---|---|---|
| Consolidation | Wachovia consolidates variable interest entities in which Wachovia is deemed to be the "primary beneficiary." (*Id.* at "Summary of Significant Accounting Policies – Consolidation.") | Entities in which Wachovia was the primary beneficiary were not consolidated in accordance with GAAP, specifically the provisions of FIN 46(R) *Consolidation of Variable Interest Entities* |
| Goodwill | "Goodwill assets are subject to impairment testing on an annual basis, or more often if events or circumstances indicate there may be impairment." (*Id.* at "Summary of Significant Accounting Policies – Goodwill and Other Intangible Assets.") | Goodwill associated with the Golden West acquisition was not written down even though the Pick-a-Payment portfolio on which the $15 billion of goodwill was based deteriorated rapidly in 2006 and 2007. |
| Underwriting fees | "Revenue is recognized when the transaction is complete." (*Id.* at "Summary of Significant Accounting Policies – Revenue Recognition.") | Wachovia was unable to sell 77% of CDOs underwritten in 2006 and 2007. The positions that Wachovia did not sell were never disclosed. The revenue recorded was not earned, therefore under GAAP should not have been recorded. |

5.   **Wachovia   Failed   To   Consolidate   Certain   Off-Balance   Sheet Arrangements**

409.   Wachovia was a major participant in structuring and underwriting fixed income investment products backed by pools of loans, such as commercial mortgage-backed securities (CMBS) and residential mortgage-backed securities (RMBS), as well as collateralized debt obligations (CDOs), which are typically backed by pools of bonds including CMBS and RMBS, loans and other assets.[21]   As such, Wachovia regularly used certain off-balance sheet arrangements known as variable interest entities ("VIEs") to transform mortgage loans into securities.

---

[21] *See, supra*, Section VI.D.

410.    FIN 46(R), *Consolidation of Variable Interest Entities*, provides that the assets, liabilities and results of activities of VIEs should be consolidated in the financial statements of their "primary beneficiaries." For purposes of FIN 46(R), the determination of whether an enterprise is the primary beneficiary, and thereby required to consolidate the VIE in its financial statements, should be performed when the enterprise initially becomes involved with the VIE and subsequently upon certain "reconsideration events." (*See* FIN 46(R), ¶15).

411.    As early as December 31, 2006, Wachovia had significant variable interests in unconsolidated VIEs where it was the primary beneficiary. Wachovia should have consolidated the activities of each of these VIEs resulting in the inclusion of a significant amount of assets and liabilities in Wachovia's consolidated balance sheets, potentially causing default on certain loan covenants or negatively affecting already troubled capital ratios.

412.    Specifically, Wachovia violated GAAP by failing to consolidate certain Evergreen money market funds and certain structured lending vehicles in which Wachovia was the primary beneficiary.

413.    With respect to the Evergreen Money Market Funds, Wachovia purchased $1.1 billion of asset-backed commercial paper from the Evergreen money market funds in the third quarter of 2007 and again in the third quarter of 2008. These asset purchases in Evergreen money market funds ultimately resulted in significant valuation losses to Wachovia. The Company recorded losses of $40 million and $17 million as of September 30, 2007 and December 31, 2007, respectively, and an additional $761 million in the first nine months of 2008, including $432 million of losses on a Lehman Brothers bond that Wachovia purchased as of September 30, 2008 from the funds.

414.    As to the structured lending vehicles, Wachovia disclosed in its Form 10-Q, filed on November 9, 2007 that:

> On September 30, 2007, as a result of the disruption in the capital markets, the Company consolidated a structured lending vehicle we administered, adding $4.9 billion of assets to our consolidated balance sheet. The structured lending vehicle was considered a VIE. The Company consolidated the structured lending vehicle because our expectation of the variability associated with our variable interests changed, primarily due to a decline in the fair value of the entity's assets.

415.    Consistent with the Company's failure to properly value its ABS CDO and other subprime related positions held on its consolidated balance sheet beginning in the first quarter of 2007, the assets within this structured lending vehicle would have been similarly overstated at the earlier periods. As a result, the FIN46(R) tests to determine the primary beneficiary would have required consolidation beginning in with the quarter-ended March 31, 2007.

416.    Moreover, Wachovia failed to properly disclose the implicit and explicit liquidity guarantees it had provided to certain VIEs. The risks posed by Wachovia's VIEs were not disclosed to investors in violation of GAAP and SEC regulations.

### 6.    Wachovia's Financial Statements Should Have Been Restated

417.    As a result of Wachovia's multiple, intentional and reckless GAAP violations in 2006 and 2007, Wachovia's annual audited financial statements and quarterly financial statements were materially misstated.  SFAS 154, *Accounting Changes and Error Corrections* and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, provide that material financial statement errors, which are defined as mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared, that are discovered subsequent to the issuance of the financial statements should be

143

reported as prior period adjustments by restating the prior period financial statements. In addition to restating the financial statements the entity is required to disclose (i) the description and nature of the error; and (ii) the effect of the correction on each financial statement line item and per share amounts. A major feature of a correction of an error is that the financial statements of the affected prior period, when originally issued, should have reflected the adjustment.

418.     In applying SFAS 154 and SAB 108, financial statements are only to be restated for error corrections that are considered material. Materiality is defined in SFAC 2, *Qualitative Characteristics of Accounting Information*, as the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

419.     The corrections that were required to bring Wachovia's financial statements in line with reality from May 2006 to October 2008 were material. Wachovia misused facts that existed at the time the 2006 and 2007 financial statements were prepared in connection with the accounting for loan losses, investment valuations and goodwill impairment. Wachovia understated Pick-a-Pay loan losses by $7.8 billion; overvalued CDOs by $600 million; failed to record $411 million for counterparty risk; overvalued ARS by $1 billion; and overvalued goodwill by $7.6 billion. Had Wachovia complied with GAAP and recorded these amounts when the losses occurred rather than deferring these amounts to subsequent periods, its earnings in the annual and quarterly financial statements would have been drastically reduced, as depicted in the following chart:

| Period | Reported Income (Loss) before income taxes | Restatement adjustments | Restated Income (Loss) before income taxes | Reported Income (Loss) before income taxes was |
|---|---|---|---|---|

| | | | | overstated by |
|---|---|---|---|---|
| Q4 06 – 10-Q | $3,295 | ($2,100) | $1,195 | 176% |
| FY 06 – 10-K | $11,470 | ($2,100) | $9,370 | 22% |
| Q1 07– 10-Q | $3,300 | ($6,598) | ($3,298) | NM |
| Q2 07– 10-Q | $3,481 | ($7,011) | ($3,530) | NM |
| Q3 07– 10-Q | $2,226 | ($723) | $1,503 | 48% |
| Q4 07– 10-Q | $(234) | ($429) | ($663) | NM |
| FY 07– 10-K | $8,773 | ($14,761) | ($5,998) | NM |

420.    In addition to these restatement adjustments, further downward adjustments to reported earnings would have been required in connection with the consolidation of the VIEs and unearned CDO underwriting fees and securitization gains. However, further discovery is required to quantify the adjustments to earnings attributable to these factors.

421.    Finally, Wachovia operated with capital barely above the 'well capitalized' requirement. Thus, had Wachovia complied with GAAP and properly accounted for Pick-a-Pay loan losses, declining values on its CDO positions, losses related to counterparty risk on its hedged, but undisclosed, CDO positions, and valuation losses related to ARSs, not only would it have been necessary to restate earnings, but Wachovia's capital base would have been depleted in 2007.

422.    Therefore, Wachovia's 2006 and 2007 financial statements, containing numerous violations of GAAP, presented a distorted picture of Wachovia's true financial condition. In actuality, Wachovia was grossly undercapitalized. By the end of 2007, Wachovia's financial statements should no longer have assumed that Wachovia would remain a going concern.

### 7.    Overstated Underwriting Revenue on CDO Securitizations

423.    Throughout 2006 and 2007, Wachovia underwrote more than $10 billion of CDOs. Unbeknownst to investors, Wachovia did not sell 77% of these CDOs, but instead retained $7.8 billion, of which $5.7 billion was purportedly hedged with creditworthy counterparties. In addition to the massive investment valuation losses that Wachovia concealed as a result of holding, but not disclosing, its $7.8 billion CDO position, Wachovia was compelled to cover up losses by recording commensurate underwriting fees it had not earned. This practice violated GAAP.

424.    Wachovia recognized a total of $1.5 billion and $1.3 billion in advisory, underwriting and other investment banking fees in 2007 and 2006, respectively. A portion of the underwriting fees in 2007 and 2006 related to CDO securitizations.

425.    According to Wachovia's financial statements, its accounting policy related to underwriting fees provided that revenue was recognized when the transaction was complete. Based on this accounting policy, underwriting fees related to CDO securitizations should not have been recognized, because Wachovia's retention of most of the securitization meant that the purported "underwriting" was incomplete and had only served to saddle Wachovia with huge CDO positions.

426.    SFACs set forth the primary guidelines of how to account for transactions, including the recognition and measurement of transactions in financial statements. SFAC 2, *Qualitative Characteristics of Accounting Information*, SFAC 5, *Recognition and Measurement in Financial Statements of Business Enterprises* and SFAC 6, *Elements of Financial Statements*, outline the fundamental principles that are to be used to prepare financial statements in accordance with GAAP.

146

427.   With respect to recording revenue, these three SFACs state that amounts recorded in financial statements and described as revenue must be reliable, meaning that revenue amounts, the description as revenue, and what the description and amounts purport to represent all correspond.  Further, the amounts recorded and described as revenue must be relevant, *i.e.*, the amounts recorded and described as revenue are useful in making financial decisions and are realizable, meaning that the resources the revenue represents are available to be used by the company to generate future economic benefit.

428.   Under GAAP,  the revenue recognized by Wachovia in connection with CDO securitizations should not have been recorded as revenue since neither the resources of the Company increased nor was the revenue described without bias.   The characterization of amounts recorded in connection with securitizations as revenue violated GAAP for the following specific reasons:

- Had Wachovia disclosed the CDO positions it retained, investors would have realized that Wachovia had recast what were portrayed as underwriting transactions to overvalued investments, resulting in an actual overall decrease in resources;

- The amounts described as underwriting fees did not accurately reflect the risk to investors of Wachovia's inability to underwrite CDO securitizations; and

- By recording underwriting fees on CDO securitizations it couldn't sell, investors were unable to make relevant decisions about Wachovia's financial position and operating results.

429.   Had Wachovia complied with GAAP, they would not have recorded the amounts as revenue until they had completed the transaction by selling the securities to third parties. Wachovia knew that once investors became aware of its inability to sell CDOs, it would have had to record significant investment losses on its CDO positions.  By recording the amounts as revenue, investors were lead to believe that the amounts were realized by Wachovia, that its

operating results relating to CDO underwriting were significant, that its assets would be realized at the full amounts as recorded in the balance sheet and that its future prospects were promising. Nothing could have been further from the truth.

### 8.    Wachovia Manipulates ARS Auctions to Hide Losses

430.    Auction Rate Securities ("ARS") are municipal bonds, corporate bonds, and/or preferred stocks often with maturity periods of thirty years, with interest rates and dividend yields that are reset and determined regularly through auctions, typically every 7, 28, or 35 days.

431.    Reportedly, the ARS market was built on assurances from companies like Wachovia that ARS were investments that were near cash equivalents because investors could liquidate their positions on a regular basis.    As such, ARS provided a means for investors to obtain a slightly better rate of interest by buying high yielding ARS rather than investing in money-market funds, with the same convenience of being able to liquidate funds as needed.

432.    Because of the investors' expectations of liquidity in their ARS holdings, unbeknownst to the investing public, Wachovia routinely prevented auctions from failing in 2007 by buying ARS from sellers when there weren't enough buyers.

433.    2007 was not the first time Wachovia and A.G. Edwards were involved with unsavory ARS auction practices.    In 2006, Wachovia and A.G. Edwards each paid a $125,000 penalty to the SEC to settle charges that each had manipulated ARS auctions in 2003 and 2004. In connection with the settlement, Wachovia was required to implement procedures to prevent and detect violations in the auction rate securities areas.    Obviously, Wachovia ignored the requirements of the SEC order and continued to manipulate ARS auctions, initially to add liquidity expected by customers, and later, to hide valuation losses and the related negative effects on operating results.

434.    Beginning in 2007, as the subprime market was unraveling, the demand for ARS began to dwindle.  This was caused in part by the lack of confidence in the soundness of the ARS being sold, as the bond insurers which insured these municipal securities were facing the threat of downgrades themselves, and a general lack of liquidity in the marketplace.

435.    Also, in March 2007, Wachovia was aware that the FASB had decided that the notion of cash equivalents should not be retained in financial statement presentation which had a spill-over effect on the ARS market.  As a result, the elimination of cash equivalents would force organizations to move cash out of certain financial instruments permanently or to liquidate their cash equivalents position on a quarterly basis.  Wachovia knew the ramifications of the FASB decision meant that assets currently classified as cash equivalents would be reclassified the same way as other short-term investments.  Corporations would respond by moving out of ARS to maintain their balance sheet cash positions.  As corporate demand diminished, Wachovia would be left holding more ARS.

436.    Wachovia was also aware of industry concerns with ARS practices.  In April 2007, the Securities Industry and Financial Markets Association issued ARS guidance called the Best Practices for Broker-Dealer of Auction Rate Securities.  The best practices included, among others: education of issuers and investors as to the material features of ARS, inform issuers and investors that Wachovia can place a bid for its own account to avoid having a failed auction; disclose to issuers and investors that it routinely places bids in auctions with the knowledge of other orders; and disclose the current auction procedures to inform investors of the salient features of the program.

437.    Again, similar to the requirements of the SEC order, Wachovia disregarded industry ARS recommendations in order to keep investors and issuers in the dark about the

149

conflicts it had in the ARS process so it could manipulate ARS auctions to initially add liquidity expected by customers, and later, to hide valuation losses and the related negative effects on operating results.

438.    Facing mounting failed auctions, Wachovia was creating a façade of a liquid ARS market by buying up excess ARS without disclosing that they themselves were a significant source of demand for these securities. While maintaining assurances of liquidity to the investors in these auctions until the end, in February 2008, the ARS market crashed when Wachovia and other market participants, which had previously been buyers of ARS, began selling them, leaving a dearth of willing buyers in the market.

439.    An investigation launched by the SEC into Wachovia's conduct with respect to ARS markets, reveals that by the fall of 2007, Wachovia was well aware of the failing ARS markets but nevertheless continued to advise its clients that these markets were liquid.

440.    In addition to misleading its own customers, Wachovia was misleading investors as well.  Despite the accumulation of illiquid ARS during 2007 and the spring of 2008, Wachovia first disclosed any exposure with respect to ARS in its June 30, 2008 Form 10-Q and recorded a $500 million charge for expenses and valuation losses related to its role in manipulating the ARS market.

441.    Even though this was the first disclosure concerning Wachovia's exposure to ARS risk, this disclosure was hardly truthful as Wachovia had been propping up ARS auctions during 2007.  Furthermore, the disclosure that the first auction failed in February 2008 was materially false and misleading, because Wachovia failed to disclose that earlier auctions would have failed had it not manipulated the results, and that this recent failure was directly due to its

inability to no longer manipulate the auctions and not through independent market forces impacting ARS.

442.    Wachovia recorded a further $497 million charge in its September 30, 2008 Form 10-Q for expenses and valuation losses related to its role in manipulating the ARS market.

443.    Shortly after the crash of the ARS market, the SEC commenced an investigation into Wachovia's conduct.    Wachovia quickly reached a settlement with the SEC.    Under the settlement, announced on August 15, 2008, Wachovia agreed to the following:

- Purchase at par ARS held by all individuals, charities and religious organizations, as well as ARS held by small and medium-sized businesses with account values and household values of $10 million or less, that were purchased at Wachovia on or before Feb. 13, 2008.  These purchases will commence no later than November 10, 2008, and conclude no later than Nov. 28, 2008, for clients who accept this offer;

- Purchase at par ARS held by all other clients that were purchased at Wachovia on or before Feb. 13, 2008.  These purchases will commence no later than June 10, 2009, for clients who accept this offer and conclude no later than June 30, 2009;

- Reimburse investors who can reasonably be identified and who would have been covered by the offer but who sold their ARS below par, between Feb. 13, 2008, and the date of entry of the settlement, for the difference between par and the price at which the investor sold the ARS. The reimbursement will be made by Nov. 28, 2008.

- Offer loans to affected clients in need of liquidity until the ARS repurchases occur;

- Refund refinancing fees to municipal ARS issuers who issued ARS in the initial primary market between Aug. 1, 2007, and Feb. 13, 2008, and refinanced those securities after Feb. 13, 2008; and

- Pay a fine of $50 million to the state regulatory agencies.

444.    The repurchase of ARS under the agreement was estimated at $8.5 billion with an estimated $3.9 billion remaining on Wachovia's balance sheet at June 30, 2009.

151

445. Wells Fargo, in its December 31, 2008 financial statements, disclosed that as a result of the settlement it purchased $3.7 billion of ARS which was held in its balance sheet. In the fourth quarter of 2008 Wells Fargo recorded an additional $93 million of losses for anticipated future losses on ARS yet to be purchased under the settlement. Wells Fargo went on to say that if it purchases all remaining ARS subject to the settlement then the estimated maximum exposure to loss is $620 million.

446. In total, as a result of Wachovia manipulating the ARS market, it recorded over $1 billion of losses through December 31, 2008, will eventually purchase more than $8 billion of ARS and may record an additional $620 million of losses.

447. Under GAAP, Wachovia was required to write down the value of the illiquid ARS held in its balance sheet to fair value when it was apparent that these assets were overvalued and illiquid. The impaired value of ARS was implicitly acknowledged when Wachovia began manipulating ARS auctions in 2007.

448. SFAS 115, *Accounting for Investments in Certain Debt and Equity Securities*, requires that securities which are purchased and held with the intention of being sold in the near term are to be classified as "trading securities." GAAP requires companies to record trading securities in its balance sheet at fair value, and further requires that all mark-to-market (unrealized) gains and losses on trading securities be recognized in the current period's income statement.

449. As set forth above, however, significant ARS liquidity concerns existed during 2007, when Wachovia first began manipulating auctions. Under GAAP, once the market for such assets became illiquid and Wachovia began manipulating auctions, the Company was required to mark down the value of these assets to reflect their fair value. Nevertheless, in

violation of GAAP, Wachovia failed to write down the value of its ARS electing instead to carry these assets in its balance sheet at artificially inflated amounts.

450. In addition, Wachovia failed to make adequate disclosures of the risks posed by its ARS portfolio in violation of SEC regulations. Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

451. Despite the SEC requirement that Wachovia discuss significant aspects of the Company's operating results and financial condition, the Company failed to disclose its overvalued ARS portfolio. Additionally, though it had a duty to describe unusual and/or significant transactions "that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue," the Company failed to inform investors that during 2007, it was manipulating the liquidity of ARS auctions.

452. An integral part of manipulating ARS auctions was the selling of ARS to customers at prices Wachovia knew were inflated. As a result Wachovia was contingently liable for potential claims made by customers who got stuck paying above market prices for their ARS. Therefore, under GAAP, specifically SFAS 5, *Contingent Liabilities*, a company is required to record contingent liabilities when the occurrence of a possible claim is probable and can be reasonably estimated. At the time Wachovia bilked customers; Wachovia was required to

153

record a liability in compliance with GAAP for the amount they overcharged customers. An estimate of the amount Wachovia overcharged customers should have been recorded by Wachovia during 2007 when they began to manipulate ARS auctions.

453.    Furthermore, Wachovia was recording revenue in connection with manipulated ARS auctions which they hadn't earned. Under GAAP, specifically, SFAC 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, revenues are not recognized until earned. SFAC 5 goes on to say that a company's revenues are considered to have been earned when the company has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Under GAAP, an amount described as revenue in financial statements is meant to convey that a transaction has occurred; a service has been provided that a customer needed and was willing to pay for; and a reciprocal exchange of value has taken place, i.e. a company has given up something of value and in return has received something of value. In connection with ARS, Wachovia recorded fees for underwriting ARS and recorded commissions for selling ARS while delivering a service purported to be an auction but was nothing more than a scam. Wachovia was not providing any valuable underwriting services to the ARS issuer or any valuable investment services to customers. In other words, issuers and customers were exchanging valuable consideration for worthless services. It is clear that Wachovia's clients and customers paid for services that they did not receive; Wachovia did not perform the service that their clients and customers thought they were doing and therefore Wachovia did not give up anything of value; and that Wachovia's clients and customers paid money, i.e. gave up something of value to Wachovia, but did not receive anything of value in return. As a result of the ruse Wachovia was recording revenue in connection with ARS auctions that they hadn't earned in violation of GAAP.

454.   The proof that Wachovia had not earned revenue related to ARS auctions is contained in the settlement.  Not only did Wachovia have to repay customers for the amounts they were overcharged by Wachovia but the issuers were repaid all the refinancing fees they had paid to Wachovia.

455.   The reason Wachovia gave for the write-offs related to ARS was as a result of failed ARS auctions driven by the deterioration in the credit markets.  However, the record is clear, ARS auctions would have first failed in 2007 had the auctions not been revived by Wachovia's manipulation.  Therefore, given the reason for the write-off disclosed by Wachovia, the write-offs should have been recorded by Wachovia not in the second and third quarters of 2008 but rather in 2007 at the time of the first instance of a failed ARS auction.  Had Wachovia complied with GAAP and appropriately recorded the ARS write-offs in the third and fourth quarters of 2007, instead of the second and third quarters of 2008, the 2007 third quarter pre-tax earnings of $2.2 billion would have been materially reduced by $500 million or 29%, the 2007 fourth quarter pre-tax loss of $234 million would have tripled to a pre-tax loss of $731 million and for the 2007 fiscal year pre-tax earnings of $8.8 billion would have been materially reduced by nearly $1 billion or 11%.  Earnings would have been reduced even further had Wachovia not recorded the unearned ARS underwriting fees and commissions and on the other hand recorded a contingent liability associated with defrauding their customers by overcharging for ARS.

### 9.   Wachovia Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting

456.   Deficient internal controls over financial reporting allowed Wachovia to issue financial statements that were not in accordance with GAAP. The SEC defines "disclosure controls and procedures" as:

...controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms...

(SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02).

457.    Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB ) Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements,* ("AS 2"), as follows, in relevant part:

A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and;

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Note: This definition is the same one used by the SEC in its rules requiring management to report on internal control over financial reporting, except the word "registrant has been changed to "company to conform to the wording in this standard.

*See* Securities Exchange Act Rules 13a-15 (f) and 15d-15(f).2/) (AS 2 ¶7).

458.    Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer ) is required to include in its annual report a report of management on the company' s internal control over financial reporting ... The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company' s internal control over financial reporting is effective ... (AS 2 ¶2).

459.    From May 2006 to October 2008, the Company misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. During this period, Wachovia failed to maintain effective internal controls and procedures over financial reporting, despite contrary certifications signed by Defendants Thompson and Wurtz in both the 2006 and 2007 Form10-K.

460.    The Company's disclosure controls and procedures, and internal control over financial reporting were ineffective throughout the relevant period. Wachovia materially misstated the valuation of its exposure to subprime-related positions, and lacked full disclosure of the holdings as well. As a result of the Company's failure to maintain effective disclosure controls and procedures and internal control over financial reporting, it was not only able to delay recognizing material losses on its subprime-related positions, but was also able to avoid even disclosing that the Company had such a significant subprime exposure, in violation of

157

GAAP. The Company's true financial condition and results of operations were only further masked with false reassurances that the Company had an effective risk management process and adequate disclosures.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

461.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concern Wachovia's financial statements and historical and/or current conditions affecting the Company.   Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.   To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

462.   Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Wachovia who knew that the statement was materially false and misleading when made.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

463.   At all relevant times, the market for Wachovia securities was an efficient market for, *inter alia*, the following reasons:

      a.   Wachovia's common stock met the requirements for and was listed on the New York Stock Exchange;

b.  Wachovia's trading volume was substantial, trading at an average of 19.6 million shares per day from May 2006 through September 2008;

c.  As a regulated issuer, Wachovia filed periodic public reports with the SEC and NYSE;

d.  Wachovia regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

e.  The market reacted swiftly to public information disseminated regarding Wachovia; and

f.  Wachovia was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

464.    As a result of the foregoing, the market for Wachovia securities promptly digested current information regarding Wachovia from all publicly available sources and reflected such information in Wachovia's securities prices at all relevant times.  Under these circumstances, Plaintiffs, as a purchaser of Wachovia securities, suffered injury through their purchase or acquisition of Wachovia's securities at artificially inflated prices and a presumption of reliance applies.

465.    In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Wachovia's business, financial results and business prospects.

## XIII.  LOSS CAUSATION

466.    Plaintiffs were damaged as a result of the Defendants' fraudulent conduct as set forth herein. From May 2006 to October 2008, Defendants engaged in a scheme to deceive the market by issuing a series of misrepresentations (and omitting material facts) relating to, *inter*

*alia*, (i) the credit quality of Wachovia's Pick-a-Pay loan portfolio; (ii) the extent to which Wachovia was protected from losses as a result of the Pick-a-Pay product features and Wachovia's purportedly conservative underwriting standards; (iii) the amount and value of Wachovia's subprime-related holdings in its trading portfolios; and (iv) the extent to which Wachovia was exposed to a substantial degree of risk in connection with the downturn in the real estate and capital markets.

467.   As a result of the Defendants' scheme, misrepresentations, and omissions of material facts, the price of Wachovia's stock was artificially inflated from May 2006 until October 2008.

468.   In reliance on Defendants' materially false and misleading statements and/or omissions, Plaintiffs purchased Wachovia stock at artificially inflated prices.   But for the Defendants' misrepresentations, omissions and fraudulent acts, Plaintiffs would not have purchased Wachovia stock, nor would they have purchased it at the artificially inflated prices at which it traded prior to October 2008.   As the Defendants' material misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on July 20, 2007, Wachovia stock steadily declined, culminated in a drop of over 80% on September 29, 2008, when Wachovia's precarious financial position was fully exposed and the artificial inflation caused by Defendants' conduct was removed from Wachovia's price.

469.   The declines in Wachovia's stock price between July 20, 2007 and September 29, 2008, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting the Defendants' fraudulent misrepresentations and omissions (and/or the materialization of risks concealed by Defendants).

470.   Plaintiffs suffered economic losses as the price of Wachovia's stock fell in response to the issuance of partial corrective disclosures and/or the materialization or risks concealed by the Defendants, as summarized herein.

471.   On July 20, 2007, Wachovia released its second quarter 2007 results, which included a dramatic increase in loan loss reserves. Defendant Thompson conceded that Wachovia was "going through a little pain" as a result of the acquisition of Golden West. While the July 20, 2007 earnings release continued to conceal the full extent of risk contained in Wachovia's Pick-a-Pay loan portfolio, the release partially corrected the Defendants' misrepresentations concerning the timing of the Golden West acquisition and the "pristine credit quality" of the inherited Golden West subprime loan portfolio.

472.   As the market absorbed the information in the July 20, 2007 earnings release, Wachovia's stock price fell 3.16%, from $51.61 on July 19, 2007 to close at $49.98 on July 20, 2007. This decline exceeded the drop in the S&P 500 Index, which fell by 1.22%, on the same trading day.

473.   October 19, 2007, Wachovia announced its third quarter results, which included $1.3 billion in write downs on certain subprime CDOs and increases in loan loss reserves. The October 19, 2007 earnings release was corrective in that: (i) it disclosed for the first time that Wachovia was holding subprime-related securities in its trading portfolio; (ii) it attempted to bring Wachovia's valuations of its Pick-a-Pay loan portfolio and its subprime-related assets in line with reality; and (iii) it acknowledged that Pick-a-Pay loans were not as insulated from changing market conditions as Defendants previously represented. However, Defendants knew but did not disclose at that time that Wachovia's holdings of subprime CDOs were actually much greater and continued to be overvalued based on then-current market indices. Likewise,

Defendants knew that Wachovia's Pick-a-Pay loan portfolio was still overvalued. Following the October 19, 2007 disclosure, Wachovia's stock price fell from $48.14 to $46.40, a decline of 3.61%, representing a loss of $3.3 billion in market capitalization. This decline exceeded the decline in the S&P Index, which dropped by 2.56% on the same day.

474.    On December 10, 2007, Merrill Lynch downgraded Wachovia's stock on the belief that Wachovia's net credit losses would rise "significantly" in 2008 because of rapidly deteriorating non-conforming mortgage exposure in California. This continued to correct Defendants' previous misstatements that the Pick-a-Pay loan portfolio was low risk and protected from losses due to its unique product features and conservative underwriting at origination. Based on this news, and on the announcement on December 12, 2008 that Wachovia would increase its loan loss reserves, Wachovia's stock price fell over the next two days from $44.46 on December 10, 2007 to $40.53 on December 12, 2007, a decline of 8.84%, or $7.5 billion in market capitalization. In the same period, the S&P Index declined 1.92%.

475.    On February 4, 2008, Merrill Lynch demoted Wachovia to a "sell" rating due to the weakening California housing market. As the market absorbed this information, Wachovia's stock price declined by 8.33%, from $38.76 to close at $35.53 on February 4, 2008. This decline exceeded the decline in the S&P Index, which fell 1.05% on the same day.

476.    On February 28, 2008, Wachovia announced that it had increased its loan loss reserves, primarily due to increasing defaults in its Pick-a-Pay loan portfolio. Defendant Thompson admitted in the annual report that "[w]ith the benefit of hindsight, it is clear that the timing was poor for this expansion into the mortgage business." The February 28, 2008 announcement was partially corrective in that it continued to expose the fact that Pick-a-Pay loans were not really different from other payment option ARMs and were at risk to incur the

162

same degree of losses as market conditions deteriorated. Nevertheless, Defendants reassured investors that conservative underwriting standards and Pick-a-Pay's product features would save the day, and that Wachovia "will be ready for a market with far fewer irrational participants."

477.   Over the course of the next two days, Wachovia's stock dropped from $34.10 to $30.62, a decline of 10.21% or $6.9 billion in market capitalization. The S&P Index declined by 3.6% during the same period.

478.   On March 12, 2008, Defendant Truslow announced that the housing market "appears to be getting worse." Wachovia's stock dropped from $29.78 to $27.24 over a two-day period, a decline of 8.53% or $5 billion in market capitalization.

479.   On April 14, 2008, Wachovia shocked analysts and investors when it announced a series of actions "to further enhance its capital base and operational flexibility." First, Wachovia planned to sell $7 billion worth of stock in a dilutive stock offering at 14% less than its closing price in the prior week in order to raise capital. Second, Wachovia lowered the quarterly common stock dividend, which Wachovia stated would "preserve $2 billion of capital annually." This corrected Defendants' misstatements just weeks earlier, which reassured investors that Wachovia was adequately capitalized.

480.   In addition, Wachovia corrected several misstatements and omissions concerning expectations for Pick-a-Pay loans. First, credit loss reserves were increased by $2.8 billion increase, which included a build of $1.1 billion specifically for Pick-a-Pay loans. Second, Wachovia revealed serious credit deterioration in the Pick-a-Pay portfolio, as LTV ratios for 14% of the $120 billion in Pick-a-Pay loans exceeded 100%, late payments had doubled to 3.1% and an increasing number of borrowers were electing to make only minimum payments. Third, Wachovia reported that lending standards would be tightened. Finally, Wachovia disclosed that

it would update its credit reserve modeling to take into account deteriorating market conditions, and specifically, the impact of rising LTV ratios and negative amortization on borrower behavior.

481.   Analysts pressed Defendants to identify the reasons for the sudden change in outlook from just a few months earlier:

> [Y]ou've been consistent in saying at least up until your 10K in late February that you felt comfortable with your capital and dividend position.   Obviously, something has changed dramatically.   Obviously, you went into February knowing the housing market was stressed.  Can you just kind of update us with your thoughts over the subsequent six weeks from the end of February?

482.   Defendants attempted to blame deteriorating market conditions, but as another analyst pointed out, "[T]here's nothing in the 90 day past due trends that would justify the kind of change that you have made in your outlook . . . [I]t just strikes me as difficult to understand how management's view of the environment has changed so dramatically." In other words, no external market condition was responsible.   Instead, Defendants knew that the Pick-a-Pay portfolio was a ticking time bomb, but they had hidden that insidious truth from investors by hailing Pick-a-Pay as a superior payment option ARM and obfuscating statistics that would have revealed to investors the actual levels of risk.

483.   As a result of Wachovia's issuance of these corrective disclosures, its share price fell 8.13% from $27.81 to $25.55 on abnormally high volume, a decline of $4.5 billion in market capitalization.  From April 14, 2008 to April 16, 2008, Wachovia's stock price declined another .54%.  In the same period, the S&P Index increased 2.73%.

484.   On June 2, 2008, Wachovia announced that its board of directors forced Thompson to retire from the company.  Defendant Thompson's ouster was largely attributed to the now-apparent failure of the Golden West acquisition.  Wachovia's stock dropped from

$23.40 on June 2 to $21.92 on June 3, 2008, a decline of 6.342% or $3.0 billion in market capitalization.

485.   On June 4, 2008, BUSINESS WEEK published an article describing Wachovia's questionable and previously undisclosed business practices following the Golden West acquisition:

> In most mergers, it's the acquirers that exert their will.  But right after Wachovia bought Golden West, executives from the S&L took control of all mortgage lending.  And according to former brokers, they began pushing Wachovia's sales force to steer applicants into its signature "Pick-a-Payment" loans. ...
>
> Former brokers say they were given sales targets for the Pick-a-Payment loans and were told to downplay the fact that making the minimum payment would cause the loan balance to rise – a phenomenon known as "negative amortization."  In one trading video reviewed by BUSINESS WEEK, brokers were instructed to avoid terms like "negative amortization" in favor of euphemisms like "deferred interest."  (Wachovia has said it does not set sales quotas by mortgage type.) ...
>
> Analysts note that Golden West focused too much on appraisals and too little on verifying the income and assets of applicants. ...[22]

486.   In response to this disclosure, which continued to correct investors' belief that Wachovia had employed strict underwriting standards and risk management strategies in its origination of Pick-a-Pay mortgages, Wachovia's share price fell another 1.55% on June 4, 2008 to close at $21.58.  Thus, in three days of trading, from June 2 to June 4, 2008, as the market absorbed information concerning Thompson's forced retirement and Wachovia's lending practices, Wachovia's stock price declined a total of 9.55%.  The S&P Index declined by 1.66% during the same period.

487.   On June 30, 2008, Wachovia announced that Pick-a-Pay mortgages would no longer include a payment option that allowed borrowers to pay less each month than the amount

---

[22] See Foust, *supra* at fn. 8.

of accrued interest.  In addition, pre-payment penalties on Pick-a-Pay mortgages were suspended in an effort to reduce defaults by allowing borrowers to re-finance loans they could not afford. The June 30, 2008 announcement was partially corrective, because it continued to dispel the Defendants' misrepresentations concerning the strength of Wachovia's underwriting practices and the damaging effects of negative amortization.   In fact, analysts considered the announcement "an admission that a lot of borrowers were put into loans they either didn't understand or couldn't afford."[23]   On the day of the announcement, Wachovia's stock price declined 4.25%, from $16.22 to close at $15.53.  The S&P Index climbed .13% on the same day.

488.    On July 9, 2008, Wachovia forewarned the market that it expected $2.6 to $2.8 billion in losses for the second quarter of 2008, largely as the result of additional provisions in its loan loss reserves due to the recently-defunct Pick-a-Pay product.  Defendants also reported that Wachovia would take a long overdue write down on impaired goodwill, conclusively acknowledging that the Golden West franchise had been substantially overvalued.  On July 10, 2008, during an investor conference call, Lanty Smith admitted that, "[t]here has been a complete recognition at the board level that Golden West was a mistake and that we have to deal with the consequences of it."   As a result of these disclosures on July 9 and 10, 2008, Wachovia's stock declined by 8.04% and 8.12%, respectively, from $15.54 at the close of trading on July 8, 2008, to $13.13 at the close of trading on July 10, 2008.  In the same period, the S&P Index declined by 1.58%.

489.    Then, on July 11, 2008, Wachovia fell the most it fell in 20 years after an analyst from Fox-Pitt Kelton lowered his rating on the stock stating that Wachovia may raise up to $7 billion and cut its dividend.  On July 15, 2008, well-known financial analyst Meredith Whitney

---

[23] *See* Dean Foust, "Pick-a-Pay Goes Away…," BUSINESS WEEK, June 30, 2008, available at: http://www.businessweek.com/the_thread/hotproperty/archives/2008/06/pick_a_pay.html.

of Oppenheimer & Co. reduced her rating on Wachovia to "underperform" from "perform" stating that the earnings outlook for Wachovia had "dramatically diminished" and bank stocks would keep falling until asset prices "get real." Whitney stated that prospects for shareholders of Wachovia were "bleak" and that mortgage assets were still priced too high on U.S. banks' balance sheets. From July 10, 2008 to July 15, 2008, Wachovia's stock price dropped over 30% wiping out approximately $8.75 billion in market capitalization.

490.    On September 29, 2008, the true value of Wachovia, which Defendants had concealed in each of its prior disclosures, was finally revealed, when it was announced that Citigroup, Inc. agreed to acquire Wachovia's banking operations for $2.1 billion in stock and the assumption of $53 billion in Wachovia debt.    The deal was negotiated as federal banking regulators threatened to place Wachovia into receivership. The proposed Citigroup acquisition valued Wachovia's banking operations at merely $1 per share. This low valuation was due to Wachovia's failure to properly value its subprime-related assets, particularly its $120 billion Pick-a-Pay loan portfolio, which was projected to incur substantial losses as the truth concerning rising LTV ratios and borrower defaults came to light.

491.    Following the announcement of the proposed Citigroup acquisition, Wachovia's stock lost nearly all of its remaining value, plummeting from $10 per share to close at an all-time low of $1.84 per share on September 29, 2008. This represented a decline of over 80%, which was nearly ten times greater than the decline in the S&P Index, which fell by 8.79%, on the same day.

## COUNTS

### COUNT I
#### For Violation Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder For Issuing Materially False And Misleading Statements

492.   Plaintiffs repeats and reallege each and every allegation contained above as if fully set forth herein.

493.   From May 2006 through September 2008, the Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Wachovia's securities; and (c) caused Plaintiffs to purchase or otherwise acquire Wachovia securities at artificially inflated prices.

494.   Each of the Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by the Rule 10b-5(b) Defendants not misleading, and/or substantially participated in the creation of the alleged misrepresentation, which operated as a fraud and deceit upon Plaintiffs, in an effort to maintain the artificially inflated price of Wachovia's securities.   The Defendants' false and misleading statements (and omissions of material facts) are set forth in Section VIII, *supra.*

495.   As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

496.   The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth

herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

497.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew or with extreme recklessness disregarded that the statements set forth in Section VIII, *supra*, were materially false and misleading for the reasons set forth herein.

498.    The Defendants carried out a deliberate scheme to misrepresent the value of Wachovia's assets, the risks the Company's investors were being exposed to, the effectiveness of Wachovia's controls and Wachovia's compliance with applicable laws.

499.    In addition to having actual knowledge, and/or with extreme reckless disregard for the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive to engage in the fraudulent scheme set forth herein.

500.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wachovia's securities was artificially inflated throughout the relevant time period.  Unaware that the market price of Wachovia's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which Wachovia's securities traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the Defendants but not disclosed in their public statements, Plaintiffs purchased or acquired Wachovia's securities at artificially inflated prices. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases

and sales of Wachovia securities from May 2006 through September 2008, when the inflation in the price of Wachovia's securities was gradually corrected as the truth regarding Defendants' conduct was revealed.

501.   By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with their transactions in Wachovia's securities during the relevant time period.

**COUNT II**
**For Violation Of Section 20(a) Of The Exchange Act**
**(Against The Individual Defendants)**

502.   Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Individual Defendants.

503.   Wachovia is primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

504.   The Individual Defendants acted as controlling persons of Wachovia within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reason of their positions as officers and/or directors of Wachovia, their ability to approve the issuance of statements, their ownership of Wachovia's securities and/or by contract. As such, the Individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. The Individual Defendants were provided with or had unrestricted access to copies of the Company's reports, press releases, public filings and other statements alleged by to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same. The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles and conference calls. The Individual Defendants controlled Wachovia and each of its employees.

505.    By virtue of their positions as controlling persons of Wachovia, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling primary a violator of the federal securities laws.  The facts set forth herein establish that the Individual Defendants culpably participated in the fraudulent activities detailed herein.

506.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's securities from May 2006 through September 2008.

### COUNT III
### Common Law Fraud For Inducing Plaintiffs
### To Purchase Wachovia Stock

507.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

508.    This cause of action is asserted by Plaintiffs against the Defendants, based on common law principles of fraud and conspiracy.

509.    As alleged herein, each of the Defendants made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding Wachovia's financial condition.

171

510.   In addition, the Defendants each conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding Wachovia's financial condition, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

511.   The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

512.   The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

513.   The aforesaid conduct by Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

514.   Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to purchase Wachovia's common stock.

515.   At the time Wachovia's common stock was purchased by Plaintiffs, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

516.   As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their purchases of Wachovia's common stock.

517.   Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, until late 2008.

## COUNT IV
### Common Law Fraud For Inducing Plaintiffs
### To Hold Their Wachovia Stock

518.   Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

172

519.   This cause of action is asserted by Plaintiffs against the Wachovia Defendants, based on common law principles of fraud and conspiracy.

520.   As alleged herein, each of the Defendants made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding Wachovia's financial condition.

521.   In addition, the Defendants each conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding Wachovia's financial condition, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

522.   The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

523.   The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

524.   The aforesaid conduct by Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

525.   Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to hold (and refrain from selling) Wachovia's common stock.

526.   Specifically, with respect to deciding whether to hold (and refrain from selling) Wachovia's common stock, Plaintiffs and/or their agents continued to rely on Defendants' statements regarding Wachovia's financial condition.   Defendants knew or had reasonable ground to believe that these and other statements were false and such statements lacked any reasonable basis.   Had Plaintiffs known the truth about Wachovia's financial condition, which

was materially worse, Plaintiffs would have immediately sold all of their shares of Wachovia's common stock. Defendants fraudulently concealed Wachovia's financial condition from Plaintiffs and did not reveal the full extent of such liability until late 2008.

527.    At the time Wachovia's common stock was held by Plaintiffs, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

528.    As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

529.    Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, until late 2008.

## COUNT V
### Negligent Misrepresentation For Inducing Plaintiffs To Purchase Wachovia Stock

530.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all Defendants.

531.    This cause of action is asserted by Plaintiffs against the Defendants based on common law principles of negligent misrepresentation.

532.    The Defendants made the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

533.    The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

534.    Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Wachovia.  Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Defendants' statements disseminated to Plaintiffs and their agents.

535.    As a result of Plaintiffs' position as stockholders of the corporation, the Defendants had a special relationship with Plaintiffs so as to constitute "privity" or "near-privity."

536.    Plaintiffs and/or their agents justifiably relied to its detriment upon the integrity of Wachovia's statements in purchasing Wachovia common stock.

537.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the financial condition of Wachovia from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by the Defendants' overstatements and misstatements of the financial condition of Wachovia, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

538.    The Plaintiffs, as Wachovia investors, were entitled to rely and justified in relying on the representations made by the Defendants, set forth above, regarding the financial condition of Wachovia.   Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to purchase Wachovia's common stock.  Plaintiffs had no actual knowledge of the false and misleading nature of the Defendants' statements when purchasing Wachovia's stock.

539.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their purchases of Wachovia's common stock.

540.    In ignorance of the fact that market prices of Wachovia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, and/or in the absence of knowledge of material adverse information that was known to the Defendants, Plaintiffs purchased Wachovia's common stock and were damaged when the price of that stock declined.

## COUNT VI
### Negligent Misrepresentation
### For Inducing Plaintiffs To Hold Wachovia Stock

541.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this  Complaint as if fully set forth herein.

542.    This cause of action is asserted by Plaintiffs against the Wachovia Defendants, based on common law principles of negligent misrepresentation.

543.    The Defendants made the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

544.     The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

545.     Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Wachovia. Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Wachovia's statements disseminated to Plaintiffs and/or their agents.

546.     As a result of Plaintiffs' position as stockholders of the corporation, the Wachovia Defendants had a special relationship with Plaintiffs so as to constitute "privity" or "near-privity."

547.     Plaintiffs and/or their agents justifiably relied to their detriment upon the integrity of Wachovia's statements when deciding to hold (and refrain from selling) Wachovia's common stock. Had Plaintiffs and/or their agents been aware of the true facts, they would not have retained Wachovia's stock.

548.     Specifically, with respect to deciding whether to hold (and refrain from selling) Wachovia's common stock, Plaintiffs continued to rely on Defendants' statements regarding the financial condition of Wachovia. Defendants knew, or had reasonable ground to believe, that these and other statements were false and that such statements lacked any reasonable basis. Had Plaintiffs known that the financial condition of Wachovia was so materially worse, Plaintiffs would have immediately sold all of their shares of Wachovia's common stock. Defendants fraudulently concealed the true nature of the financial condition of Wachovia from Plaintiffs and

did not reveal the full extent of Wachovia's capital and liquidity problems until September 29, 2008.

549.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Wachovia's operating condition and future business prospects from the investing public and supporting the artificially inflated price of the Company's securities. As demonstrated by the Defendants' overstatements and misstatements concerning Wachovia's lending practices, its exposure to subprime markets, its adherence to its accounting policies, and its valuation of its assets, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

550.    The Plaintiffs, as Wachovia shareholders, were entitled to rely and justified in relying on the representations made by the Defendants, set forth above, regarding the financial condition of Wachovia.    Plaintiffs and/or their agents reasonably relied on Defendants' representations when deciding to hold (and refrain from selling) Wachovia's common stock. Plaintiffs had no actual knowledge of the false and misleading nature of the Defendants' statements when deciding to hold and then continuing to hold Wachovia's stock.

551.    As a direct and proximate result of the dissemination of the materially false and misleading information and the failures to disclose material facts, as set forth above, the market

price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

552.    In ignorance of the fact that market prices of Wachovia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, and/or in the absence of knowledge of material adverse information that was known to the Defendants, Plaintiffs held Wachovia's common stock and were damaged when the price of that stock declined.

**COUNT VII**
**Civil Conspiracy**

553.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

554.    This cause of action is asserted by Plaintiffs against the Defendants based on common law principles of civil conspiracy.

555.    The Defendants acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, by making the materially false and misleading statements, set forth above, regarding, *inter alia*, the financial condition of Wachovia.

556.    In making their false and misleading statements concerning, *inter alia*, the financial condition of Wachovia, the Defendants agreed to take actions that inflicted a wrong against or injury upon Plaintiffs.

557.    The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the financial condition of Wachovia were materially false and misleading.

558.    Defendants breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material

179

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Wachovia's statements disseminated to Plaintiffs and/or their agents.

559.     Specifically, with respect to deciding whether to purchase and hold (and refrain from selling) Wachovia's common stock, Plaintiffs continued to rely on Defendants' statements regarding the financial condition of Wachovia.  Defendants knew, or had reasonable ground to believe, that these and other statements were false and that such statements lacked any reasonable basis.  Had Plaintiffs known that the financial condition of Wachovia was so materially worse, Plaintiffs would never have purchased such shares and/or would have immediately sold all of their shares of Wachovia's common stock.  Defendants' agreed to fraudulently conceal the true nature and extent of the financial condition of Wachovia from Plaintiffs and did not reveal the full financial condition of Wachovia until late 2008.

560.     As a direct and proximate result of the Wachovia Defendants' agreement to disseminate materially false and misleading information and the failures to disclose material facts, as set forth above, the market price of Wachovia's common stock was artificially inflated, and Plaintiffs suffered damages in connection with their decisions to refrain from selling Wachovia's common stock.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiffs and for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

C.    Awarding Plaintiffs such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.


Dated: New York, New York
       May 28, 2010

                                        **GRANT & EISENHOFER P.A.**


                              By:    _Geoffrey Jarvis_
                                     JAY W. EISENHOFER
                                     GEOFFREY C. JARVIS
                                     JAMES R. BANKO
                                     MICHELE S. CARINO
                                     485 Lexington Avenue, 29th Floor
                                     New York, NY 10017
                                     Telephone:  (646) 722-8500
                                     Facsimile:  (646) 722-8501

                                     *Attorneys for Plaintiffs*
                                     *Deka Investment GmbH, Deka*
                                     *International S.A. Luxemburg, Deka*
                                     *Fundmaster Investmentgesellschaft mbH,*
                                     *International Fund Management S.A.*
                                     *Luxemburg, Metzler Investment GmbH,*
                                     *Forsta AP-Fonden and Stichting*
                                     *Pensioenfonds ABP*


*Of Counsel:*

ALEXANDER REUS
DIAZ REUS LLP
Bank of America Tower
100 S.E. Second Street, Suite 2600
Miami, Florida 33131
Telephone:  (305) 375-9220
Facsimile:  (305) 375-8050


181

## CERTIFICATE OF SERVICE

I, Geoffrey C. Jarvis, certify that on this 28th day of May, 2010, I caused the

foregoing **First Amended Consolidated Complaint for Violations of The Federal**

**Securities Laws** to be served on the parties below via hand-delivery:

Douglas H. Flaum, Esq.
Israel David, Esq.
John W. Brewer, Esq.
Eric A. Hirsch, Esq.
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY  10004


Ira M. Press, Esq.
Roger W. Kirby, Esq.
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY  10022


William C. Fredericks, Esq.
Kurt Hunciker, Esq.
John Rizio-Hamilton, Esq.
Jeroen van Kwawegen, Esq.
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1285 Avenue of the Americas, 38th Floor
New York, New York 10019


Geoffrey C. Jarvis